GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
RYAN A. BAGGS – State Bar No. 301240
rbaggs@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone:   (949) 720-4100
Facsimile:    (949) 720-4111

[Proposed] General Insolvency Counsel for
Vitality Health Plan of California, Inc.,
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>VITALITY HEALTH PLAN OF CALIFORNIA, INC., a California corporation<br><br>        Debtor and<br>        Debtor-in-Possession | Case No. 2:20-bk-21041-WB<br><br>Chapter 11 Proceeding<br><br>**DECLARATION OF BRIAN BARRY IN SUPPORT OF THE FOLLOWING MOTIONS:**<br><br>**1.  PAYROLL**<br>**2.  CASH MANAGEMENT**<br>**3.  BAR DATE**<br>**4.  LIMIT NOTICE**<br><br>Date:      [To Be Set]<br>Time:     [To Be Set]<br>Place:     [To Be Set] |

I, Brian Barry, hereby declare as follows:

1. I am the Chief Financial Officer and President of Vitality Health Plan of California, Inc., a California corporation, the debtor and debtor in possession (the "Debtor"). As Chief Financial Officer and President, I have been responsible for overseeing the day-to-day financial operations and financial performance of the Debtor. Accordingly, I have personal knowledge of the facts stated herein, and if called upon to testify to such facts I could and would testify competently thereto.

2. The Debtor owns and manages a full-service private Medicare Advantage HMO plan for the benefit of thousands of its Medicare-eligible members. The Debtor employs approximately 33 employees and contractors in its Cerritos headquarters located at 18000 Studebaker Rd., Suite 960, Cerritos, CA 90703.

3. The Debtor currently services Medicare-eligible members primarily in Santa Clara County and San Joaquin County, California, but is in the process of expanding to Southern California.

4. The Debtor enrolls Medicare-eligible members in its HMO plan, which provides its members with access to prescription medications, medical care and more. The Debtor contracts with physicians, hospitals, and other medical providers to provide medical care to the Debtor's members. The Center for Medicare and Medicaid Services ("CMS"), on behalf of the Federal Government, and the State of California, each pay the Debtor a monthly fee (commonly known as capitation payments) to cover the medical services contracted and paid for by the Debtor. In other words, the Debtor generates its revenues from the government, not from its members. The amount of revenues paid (i.e., capitation payments) is determined each month by Medicare based on the number of members in the Debtor's plan and the health risk of its members, which is projected from medical diagnoses of patients. The Debtor then uses the funds received to pay its expenses, including the medical and pharmacy providers who provided medical treatment to the Debtor's members. For the year ended 2019 and ten months ended 2020, the Debtor generated revenues of $87,652,544 and $90,295,547 million, respectively, during which time it sustained losses of $20,573,198 and $2,417,816, respectively.

5.     The Debtor's goal since its inception in 2016 was to enroll and provide a Medicare Advantage health plan to Medicare-eligible members in its local area (Los Angeles), which is a very profitable market.  However, there are significant barriers to entry into the HMO industry, in general (e.g., significant capital required for front loaded fixed administrative fees, broker acquisitions costs, and other start-up costs, obtaining licenses, and securing relationships and contracts with medical providers), which are even more exacerbated in the Los Angeles County area.  Accordingly, the Debtor decided to first pursue a smaller and easier to penetrate market in Northern California as soon as it obtained its required licenses to operate its plan.  This strategy allowed the Debtor to secure relationships with medical providers and gain traction in the industry.  The Debtor was wildly successful in the enrollment of new members in Northern California.  In fact, in its first year of operation, the Debtor enrolled approximately 9,900 new members in Santa Clara and San Joaquin County, which is the largest enrollment for a Medicare Advantage health plan start-up in the last 30 years.

6.     Unfortunately, however, the market in these two counties were not profitable, in large part, due to what appears to be CMS's underfunding of capitation payments to the Debtor based on a high proportion of health diagnoses in these two counties that were never documented nor submitted to CMS.  CMS pays HMO plans based on their members health risk scores.  The healthier the members, the smaller the payments to the health plan.  Prior to enrolling members, the Debtor expected that a large portion of its members would schedule annual wellness visits with their physicians, which the Debtor had arranged at no cost for its members.  As it turned out, physicians in the Northern California area are not incentivized by their medical groups to encourage patients to visit the office to obtain their annual exams, and as a result, a large portion of the Debtor's plan members did not take advantage of this free annual wellness visit.  It is believed that many health diagnoses that could have been diagnosed, such as depression, peripheral artery disease, Nash liver disease, and much more, went unreported to the government.  Consequently, the Debtor's plan members appeared to have lower-than-average health risk scores, thereby resulting in less revenues realized by the Debtor.  In fact, the Debtor generated only 70% of the Medicare benchmark. Unfortunately, the members incurred medical expenses in excess of

the capitation payment received by the Debtor, for which the Debtor was responsible. As a result, the Debtor sustained significant losses.

7. In an effort to reduce its losses and effectuate its strategy to infiltrate the market in Los Angeles (where physicians are incentivized by their medical groups to encourage patients to obtain annual exams, resulting in higher capitation payment ratios), the Debtor has been purposely reducing the number of members in its plan in Northern California, while gearing up to aggressively pursue membership in the Los Angeles area. Unfortunately, as a matter of law, an HMO must operate in its current region for two years (or, in the case of the Debtor, until January 2021) before it is eligible to expand into other markets. Fortunately, the Debtor is only one month away before it may expand into the Los Angeles and other markets. Moreover, the Debtor has already procured a willing investor to provide significant and the necessary funding to enable the Debtor to transition to a profitable market and pave the way to profitability.

8. Based on the historical losses and the resulting cash flow deficit, however, the Debtor has not been able to pay many of its medical providers and its pharmacy vendor. This has created two potentially fatal consequences: (i) the Debtor's failure to pay its medical providers subjects the Debtor to the risk of potential termination of contracts with critical medical providers; and (ii) the Debtor's arguable insolvency subjects the Debtor to losing its state licenses to operate. In order to stay any termination of a contract and to ensure that its members have access to medical care, while enabling the Debtor to restructure its debt and obtain additional funding so as to avoid any argument over insolvency, on December 18, 2020, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. I believe the Debtor's filing will save employee jobs, preserve the Debtor's going concern, maximize value for creditors, and enable the Debtor's members to obtain ongoing medical care.

**Payroll**

9. The Debtors seek court authority to pay its pre-petition wage related obligations and honor its employee related pre-petition benefits.

10. The Debtor seeks Court authority to pay its pre-petition wage related obligations and honor its employee related pre-petition benefits. These obligations include prepetition

payroll, wages, salaries, federal, state and local payroll taxes, deductions and withholdings, payroll deductions relating to various benefits, reimbursement of business expenses; and miscellaneous other claims asserted by current employees (including, without limitation, worker's compensation, medical, dental, life insurance, and disability insurance) (collectively, the "Prepetition Compensation"). These benefits include vacation pay, sick leave, holiday pay, jury duty pay, and other paid leave ("Benefits").

11. In order to preserve and maintain its ongoing business operations, and thus provide its Medicare-eligible members with the ability to continue to obtain medical care, the Debtor must retain the support of its employees. To retain this support, the Debtor must timely pay all prepetition payroll and wage related obligations owed.

12. The next employee payroll is due and payable on December 24, 2020, for employee services rendered for the pay period December 6, 2020, through December 19, 2020, and thus represents pre-petition claims for the amounts accrued prior to the December 18, 2020, petition date. Additionally, in order to timely make payments to the Debtor's employees, the Debtor must release funds to its payroll servicer, Employers Resource, on Wednesday, December 23, 2020. The payroll for the employees is paid on a bi-weekly basis every other Friday. Attached to this declaration as **Exhibit 1** is a list of the Debtor's employees and the monthly payroll amount for each.

13. I believe that employees will leave if they are not paid, which will cause immediate and irreparable damage to the Debtor's business and a public crisis for the health plan members. In contrast, if the Debtor can promptly obtain the relief sought herein, its business value will be preserved for the benefit of all creditors, as well as its Medicare members.

### Cash Management

14. The Debtor seeks authorization to retain its pre-petition bank account ending in xx-6223 held at Chase Bank (the "Revenue Account), for the purposes of receiving cash and check deposits from the government and sweeping such deposits into debtor in possession bank accounts to be opened in the accordance with the requirements set forth by the Office of the United States

Trustee.  The Debtor further seeks authorization to transfer, on a routine basis, all deposits of cash, check and wire transfers made to the Debtor's Revenue Account.

15.    The Debtor's entire revenue source and ability to pay its medical providers and other expenses, which are necessary to sustain its operations and provide its members with the ability to continue to obtain medical care, is based on its monthly receipt of revenues from the Federal government to pay these expenses.  100% of these revenues are deposited into the Revenue Account.  I believe that if the Debtor is required to close the Revenue Account, the Debtor's ability to collect cash and pay critical expenses and sustain its operations could be severely disrupted and impaired.  In order to ensure that the Debtor is able to timely receive its revenues to pay its medical providers and other operating expenses and ensure that its members are provided the medical treatment needed, it is imperative that this motion be heard on an emergency basis.

16.    Without Court authorization to maintain the Revenue Account, the Debtor will be required to try to change the government's depositing protocol.  I am concerned that such a change, particularly during the holidays and the pandemic, will severely delay the receipt of funds, and could severely and negatively affect the Debtor's receipt of funds necessary to sustain its operations and ensure availability of ongoing medical care to its members.

17.    I believe good cause exists to authorize the Debtor's continued use of its Revenue Account.

### Bar Date

18.    In order for the Debtor to develop a plan of reorganization to successfully emerge from bankruptcy, the Debtor must quantify the total amount of claims pending against the estate. Accordingly, to ensure finality regarding the amount of claims asserted against the estate and to adequately determine the total amount of claims against the estate, the Debtor seeks an order requiring certain creditors to file claims against the estate by a certain date.

19.    The Debtor must assess the extent of claims, particularly Section 503(b)(9) administrative claims against it and its estate from the outset of this bankruptcy proceeding to

finalize and implement the Plan efficiently and effectively. I believe delay in the finality of claims against the Debtor and its estate is likely to cause unnecessary uncertainty to the Debtor and impede or postpone the Debtor's evaluation and thus consummation of its reorganization efforts and the payment to the Debtor's creditors. Accordingly, I believe emergency relief is both necessary and appropriate.

20. I believe that, under these circumstances, giving sixty (60) days' notice of the Bar Date is reasonable and will provide time sufficient for the Debtor's creditors, including Section 503(b)(9) administrative expense claimants, to file proofs of claim.

**Limit Notice**

21. The Debtor has approximately 1800 creditors. I believe requiring the Debtor to serve all of the creditors with notice of all proceedings in this case and to respond to the related inquiries arising therefrom would be administratively burdensome and unduly expensive. The sooner that notice requirements are lessened, the faster the estate can reduce expenses. I believe granting the relief requested in the limit notice motion will substantially reduce the Debtor's postage and reproduction costs, as well as attorney's fees, from the outset of these bankruptcy proceedings, thereby facilitating significantly the economical and efficient administration of the Debtor's case.

22. I believe that limiting notice to the U.S. Trustee, the secured and twenty largest unsecured creditors, and to all parties who request special notice in the Debtor's Chapter 11 case, would provide adequate and proper notice to affected creditors and to other interested parties. Additionally, the Debtor will provide notice to any party whose interest is impacted directly by a particular action or proceeding filed by the Debtor.

23. Notwithstanding the Debtor's proposed procedures for limiting notice in the Debtor's case, the Debtor will provide to all creditors notice of the following matters:

  a. The time fixed for filing objections to, and the hearing to consider approval of, a disclosure statement;
  b. The time fixed for filing objections to, and the hearing to consider confirmation of, a plan;

    c. Any time fixed for filing objections to, and any hearing to consider, a proposed sale of all or substantially all assets of the estate;

    d. Notices with respect to claims bar dates; and

    e. Any time fixed for filing objections to, and any hearing on, a dismissal or conversion of the case.

24. I believe that adoption of this proposed notice procedure, after notice and the opportunity for a hearing, is necessary and appropriate. Such notice procedure will relieve the Debtor of the significant administrative burdens that would be associated with periodic "mass mailings," and would reduce substantially the Debtor's postage and reproduction costs, as well as the time spent by attorneys and/or paralegals, thereby facilitating significantly the economical and efficient administration of the Debtor's case. Any entity whose interest is directly affected by any action or proceeding filed by the Debtor will receive proper notice thereof. Moreover, any entity that is sufficiently interested in the proceedings in the Debtor's case may, by written request for special notice, receive all notices of such proceedings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of December 2020, at Cerritos, California.

    Brian Barry

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DECLARATION OF BRIAN BARRY IN SUPPORT OF THE FOLLOWING MOTIONS: 1. PAYROLL 2. CASH MANAGEMENT 3. BAR DATE 4. LIMIT NOTICE** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 21, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Garrick A Hollander**   ghollander@wghlawyers.com, jmartinez@wghlawyers.com; Meir@virtualparalegalservices.com

- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On**, 2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3. SERVED BY FEDERAL EXPRESS** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 21, 2020**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 21, 2020 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

# FEDERAL EXPRESS LIST

| | | |
|---|---|---|
| Vitality Health Plan of California, Inc.<br>18000 Studebaker Road, Suite 960<br>Cerritos, CA 90703 | United States Trustee (LA)<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, CA 90017-3560 | **Vitality – Debtor – 20 Lgst – UST**<br>**Doc No. 248815** |
| Christopher Do, M.D.<br>a Professional Corporation<br>Sole Proprietor<br>1569 Lexann Ave.<br>San Jose, CA 95121 | Convey Health Solutions<br>T. Fairbanks, CFO<br>100 SE 3rd Avenue, 26th Floor<br>Fort Lauderdale    FL 33394 | Doctors Hospital of Manteca<br>1205 E. North Street<br>Manteca, CA 95336-4932 |
| El Camino Hospital<br>Joan Kezic, VP<br>2500 Grant Rd.<br>Mountain View, CA 94040 | Good Samaritan Hospital<br>James Johnston<br>2425 Samaritan Dr.<br>San Jose, CA 95124-3908 | Heritage Oaks Hospital<br>4250 Auburn Blvd<br>Sacramento, CA 95841 |
| Kaiser Foundation Hospital<br>700 Lawrence Expy<br>Santa Clara, CA 95051-5173 | Kindred at Home<br>Attn: Regional Director<br>4030 Moorpark Ave., Suite 251<br>San Jose, CA 95117 | Medcore HP<br>Maria Martinez, COO<br>2609 E. Hammer Lane<br>Stockton, CA 95210 |
| MedImpact Healthcare Systems<br>James Gollaher, CFO<br>10181 Scripps Gateway Court<br>San Diego, CA 92131 | O'Connor Hospital<br>George Hurrell<br>2105 Forest Ave<br>San Jose, CA 95128 | Physician Partners IPA<br>Attn: Ann Nguyen<br>14221 Euclid Ave. Suite G<br>Garden Grove, CA 92843 |
| Regional Medical Center of San Jose<br>James Johnston<br>225 North Jackson Ave.<br>San Jose, CA 95116-1603 | Santa Clara County IPA<br>Janet Pulliam<br>1051 E Hillsdale Blvd, Suite 750<br>Pasadena, CA 91101 | Santa Clara Valley Medical<br>George Hurrell<br>751 S. Bascom Ave.<br>San Jose, CA 95128-2604 |
| Satellite Healthcare Silver Creek<br>1620 East Capitol Expressway<br>San Jose, CA 95121 | St. Louise Regional Hospital<br>George Hurrell<br>9400 No Name Uno<br>Gilroy, CA 95020 | Stanford Medical Center<br>Attn: President<br>300 Pasteur Dr, MC 5500<br>Stanford, CA 94305-2200 |
| UCSF Medical Center<br>505 Paranusus Ave.<br>San Francisco, CA 94143-0810 | Washington Hospital<br>2000 Mowry Ave.<br>Fremont    CA 94538-1716 | |

248813