GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone:   (949) 720-4100
Facsimile:   (949) 720-4111

[Proposed] General Insolvency Counsel for
Vitality Health Plan of California, Inc.,
Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>VITALITY HEALTH PLAN OF CALIFORNIA, INC., a California corporation<br><br>       Debtor and<br>       Debtor-in-Possession | Case No. 2:20-bk-21041-WB<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO AMENDMENT TO MEDICAL SERVICES AGREEMENT FOR MEDICARE SERVICES BETWEEN DEBTOR AND ALLCARE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF BRIAN BARRY IN SUPPORT THEREOF** |

**TO THE HONORABLE JULIA W. BRAND, UNITED STATES BANKRUPTCY JUDGE, AND TO CREDITORS:**

Vitality Health Plan of California, Inc., a California corporation and the debtor and debtor-in-possession in the above-captioned Chapter 11 proceeding (the "Debtor"), hereby submits this *Motion for Order Authorizing Debtor to Enter into Amendment to Medical Services Agreement for Medicare Services between Debtor and AllCare* ("Motion").  By this Motion, the Debtor seeks an order authorizing the Debtor to extend the term of the Medical Services Agreement for Medicare Services between Vitality Health Plan of California and Independent Physician Associates Medical Group Incorporated d/b/a AllCare (the "Agreement"), which expires on January 15, 2021.

1  The Motion is made on the basis of the Declaration of Brian Barry ("Barry Declaration")

2  appended hereto, all pleadings, papers and records on file with the Court, and such other evidence, oral

3  or documentary, as may be presented to the Court prior to or at the time of any hearing on the Motion,

4  should a hearing be required.

5      WHEREFORE, the Debtor respectfully requests that the Court enter an order:

6  1. Authorizing the Debtor to enter into amendment extending the term of the Agreement

7      through March 31, 2021 pursuant to an order in substantially the same form as attached

8      hereto as **Exhibit 1**; and

9  2. Granting such further relief as the Court deems appropriate.

10  DATED:  January 15, 2020    **WINTHROP GOLUBOW HOLLANDER, LLP**

12  By:*/s/ Garrick A. Hollander*
    Garrick A. Hollander, Esq.

13  [Proposed] General Insolvency Counsel for Vitality
Health Plan of California, Inc., Debtor and Debtor-in-Possession

-2-

248947

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Independent Physician Associates Medical Group Incorporated d/b/a AllCare ("AllCare") provides critical medical care to substantially all of the Debtor's plan members.  In order to ensure ongoing medical care to its members, and thus preserve the Debtor's business, the Debtor needs to enter into an amendment to the Agreement extending the term of the Agreement through March 31, 2021.  While the Debtor believes that entering into this transaction is within the ordinary course of business, and thus not necessary for Court approval, given the importance of this agreement, coupled with the fact that AllCare has required that the Debtor obtain Court approval, the Debtor seeks Court authority to enter into the amendment to the Agreement (the "Amendment").  The Debtor believes that approval of the foregoing is in the best interests of the estate.

**II.**

**BACKGROUND**

A.    **The Debtor's Business**

The Debtor owns and manages a full-service private Medicare Advantage HMO plan for the benefit of thousands of its Medicare-eligible members.  The Debtor employs approximately 33 employees and contractors in its Cerritos headquarters located in Cerritos, California.   The Debtor currently services Medicare-eligible members primarily in Santa Clara County and San Joaquin County, California.

The Debtor enrolls Medicare-eligible members in its HMO plan, which provides its members with access to prescription medications, medical care and more.  The Debtor contracts with physicians, hospitals, and other medical providers to provide medical care to the Debtor's members. The Center for Medicare and Medicaid Services ("CMS"), on behalf of the Federal Government, and the State of California, each pay the Debtor a monthly fee (commonly known as capitation payments) to cover the medical services contracted and paid for by the Debtor.

B.    **The Agreement with AllCare and Need to Amend the Term Thereof**

On October 1, 2020, the Debtor and AllCare entered into the Agreement, which enables the Debtor to provide its members access to medical care.  A copy of the Agreement is attached to the

248947

Barry Declaration as **Exhibit 2**.  Pursuant to the Agreement, AllCare controls exclusively the downstream contracts with many network medical care providers in the San Joaquin county, which represents the majority of the Debtor's plan membership.

The Agreement was going to expire on December 31, 2020.  Based on the good relationship between AllCare and the Debtor, Allcare has agreed to extend the term of the Agreement to March 31, 2021, but has requested that the Debtor obtain formal Court approval to enter into the Amendment memorializing such extension.  A copy of the Amendment is attached as **Exhibit 3**.  In the meantime, as a courtesy to the Debtor and its plan members, AllCare has extended the term through January 15, 2021 to allow the parties time to negotiate and finalize the Amendment and obtain Court approval of same, and has agreed to continue to honor and comply with the terms of the Agreement pending Court approval, so long as it is obtained on shortened time.

In addition to extending the term of the Agreement through March 31, 2020, the following is a summary of the other material terms of the Amendment:

- <u>Rights and Remedies</u>.  Allcare may enforce any of its rights and remedies under the Agreement without the need to obtain relief from the automatic stay.

- <u>Assumption and Assignment</u>.  Neither the Agreement nor the Amendment may be assumed and assigned, unless other consented to by Allcare.

- <u>Replenishment of Deposit</u>.  The Debtor must replenish the Advance in the amount of $69,407, which is already required under the Agreement and for which the Debtor gets credit on its payments owing to AllCare.

The Agreement and Amendment with AllCare are absolutely critical to the Debtor's ability to perform under its obligations to CMS and its members.  Without the enforceability of this Agreement, the Debtor will not be able to continue its business operations.  Moreover, the terms of the Agreement and Amendment conform to the requirements of CMS and are standard for the industry, and thus are fair and reasonable.  In order to continue the Debtor's business and continue to enable medical providers to provide seamless ongoing medical care to the Debtor's plan members, it is necessary to obtain authority to enter into the Amendment to extend the term of the Agreement.  Accordingly, the Debtor believes that obtaining Court approval to enter into the Amendment is in the best interests of the estate.

248947

1

## III

## THE COURT SHOULD AUTHORIZE THE DEBTOR TO ENTER INTO THE AMENDMENT

### A.    Section 363(c)(1) Authorizes the Debtor to Enter into Transactions in the Ordinary Course of Business

Section 363(c)(1) of the Bankruptcy Code provides that a debtor, without notice or court approval, may enter into transactions within the "ordinary course" of the debtor's business. Consequently, operations in the ordinary course of a debtor's business do not require bankruptcy court approval.

Although the Bankruptcy Code does not define the term "ordinary course of business," the Ninth Circuit Court of Appeals has determined that a transaction that meets both a "horizontal dimension" test and a "vertical dimension" test of "ordinariness" is a transaction within a debtor's "ordinary course of business."  In re Dant & Russell, 853 F.2d 700, 703-06 (9th Cir. 1988).

### 1.    The "Horizontal Dimension" Test

The "horizontal dimension" test applies an industry-wide perspective to a transaction and involves a comparison of the debtor's business to other like businesses, and a determination of whether the transaction is of a type that other similar businesses would engage in as "ordinary business."  Dant & Russell, 853 F.2d at 704.  As Collier on Bankruptcy explains:

> **[t]he horizontal dimension test looks to similarly situated businesses and determines whether the transaction at issue is one that would normally be entered into by similar businesses.  In effect, this test is aimed at determining whether the transaction is abnormal or unusual, in which case it is probably not in the ordinary course of business, or whether it is a reasonably common type of transaction.  Significantly, a transaction may be considered reasonably common even if it does not occur frequently, provided that it is an ordinary type of transaction within the business and the industry.[1]**

Under the "horizontal dimension" test, therefore, a transaction is in the "ordinary course" of a debtor's business if it is a reasonably common type of transaction within the debtor's business and the debtor's industry.

/ / /

---

[1] Collier on Bankruptcy, ¶ 363.03[1][a] (15th ed. rev. 2001).

248947

### 2.    The "Vertical Dimension" Test

The "vertical dimension" test examines a transaction from the viewpoint of a hypothetical creditor, focusing on the creditor's "reasonable expectations" of the type of transactions that the debtor is likely to enter into in the "ordinary course" of its business.  Dant & Russell, 853 F.2d at 705. In utilizing the vertical dimension test, a bankruptcy court must look to the nature of the debtor's pre-petition business as compared to its post-petition business.  Id.  Collier further explains:

> [t]he vertical dimension test reviews the transaction from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor or trustee to enter into.  This test measures the types of risks that creditors impliedly agreed to when they extended credit to the debtor, and determines whether the transaction at issue is within the range of risks reasonably expected by creditors. … [T]ransactions of a type that the debtor commonly engaged in, or which the debtor might have reasonably been expected to engage in [pre-petition], are likely to be within the ordinary course of business after the commencement of a case.[2]

Therefore, under the "vertical dimension" test, a transaction is in the ordinary course of a debtor's business if the transaction is one into which creditors reasonably would expect the debtor to enter.

### B.    Entering into the Amendment Satisfies Both the "Horizontal" and "Vertical" Dimension Tests and Should, Therefore, Be Deemed to Be "Ordinary Course" Transactions and Thus Not Require Court Approval

In this case, the evidence supports the conclusion that the Debtor's entry into the Amendment meets both the "horizontal" and "vertical" dimension tests articulated by the Ninth Circuit, and, accordingly, that such transaction should be considered to be in the "ordinary course" of the Debtor's business.

1.    _Horizontal Dimension Test_.  The Debtor seeks to enter into the Amendment, which is necessary for the Debtor to provide the core service to its business - to continue provide its members with access to critical medical care.  Entering into the Amendment will thus enable the Debtor to

---

[2] <u>Collier on Bankruptcy</u>, ¶ 363.03[1][b] (15th ed. rev. 2001).

248947

generate revenue and continue its operations.  Thus, amending the terms of the Agreement is not only representing a typical transaction for a business like the Debtor's, but also makes economic sense, as the Agreement provides the Debtor with the only means by which to meet the needs of its members, and thus satisfy the requirements of CMS, the Debtor's source of revenue, and continue its operations.  Based on the foregoing, the Debtor believes that entering into the Amendment satisfies the "horizontal dimension" test articulated by the Ninth Circuit.

   2. <u>Vertical Dimension Test</u>.  It is core and thus common to the practice for HMOs to contract with medical providers.  Therefore, it is reasonable for creditors to expect that entities such as the Debtor would enter into contracts like the Agreement, particularly where the Debtor was already in contract with AllCare.  Based upon the foregoing, the Debtor respectfully submits that this Court should authorize the Debtor to enter into the Amendment to extend the term of the Agreement as a transaction in the ordinary course of the Debtor's business, pursuant to the provisions of Section 363(c)(1) of the Bankruptcy Code.

  **C.**  **<u>Alternatively, the Debtor Has Provided Hereby Notice to Creditors of the Debtor's Intention to Enter into the Amendment, Which Notice Is Sufficient to Satisfy the Requirements of Section 363(b).</u>**

   To the extent that entry into the Amendment is characterized as outside the "ordinary course" of the Debtor's operations, the Debtor recognizes that such a transaction would require the approval of this Court.  See 11 U.S.C. § 363(b) (requiring "notice and a hearing" prior to the "use, sale or lease" of property of the estate outside the ordinary course of business).  <u>See</u> <u>also</u> <u>In re Crystal Apparel, Inc</u>., 220 B.R. 816, 829 (Bankr. S.D.N.Y. 1998) (noting that "[a] Chapter 11 debtor in possession's transactions other than those in the ordinary course of business must be authorized by the court after notice and a hearing").

   The purpose of imposing on a debtor the requirement to obtain court approval for a transaction outside the ordinary course of the debtor's business is simply to provide to creditors, who have an interest in maximizing realization from assets of the estate, an opportunity to review the terms of the transaction and to object thereto if they deem the transaction not to be in their best interest.  <u>In re Crystal Apparel</u>, 220 B.R. at 830 (citing <u>In re Caldor</u>, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996)).  Thus, the standard for approval of a transaction not in the ordinary course of business is whether

248947

creditors have had an opportunity to review the proposed transaction, and to afford those creditors an opportunity to be heard in the event that those creditors believe that the transaction is not in their best interests.  In re James A. Phillips, Inc., 29 B.R. 391, 394 (S.D.N.Y. 1983) ("[T]he apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor-in-possession is allowed to continue normal business operations...").

In this case, as discussed above, the Debtor believes that entry into the Amendment constitutes business conducted in the "ordinary course" of its operations.   Moreover, the Debtor is only seeking an order allowing the Debtor to extend for three months a contract that has been in existence in order to preserve the Debtor's ability to continue providing ongoing medical care to its members and sustain its operations.  Creditors will receive notice of the hearing on the Motion.  Therefore, the Debtor submits that such notice is sufficient to meet the requirements of Section 363(b) in the event that this Court should determine that such a transaction is not within the ordinary course of the Debtor's business operations.

The Debtor's entry into the Amendment, which will enable the Debtor to continue to provide its members with access to medical care, and generate revenue for the benefit of the estate and its creditors, and continue to service profitably its plan members, is an exercise of the Debtor's sound business judgment.  See, e.g., In re Copy Crafters Quickprinting, Inc., 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988); In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (in the commonly considered context of the sale of business assets under section 363(b), noting that a "sound business judgment" must justify the transaction).  See also In re Levinson Steel Co., 117 B.R. 194, 196 (W.D. Pa. 1990) (approving severance pay plan as "necessary incentive for continued employment" by certain of the debtor's employees).  Accordingly, with the notice given to creditors set forth above, this Court should authorize the Debtor to enter into the Amendment.

248947

1

## IV.

2

## <u>CONCLUSION</u>

3       For the foregoing reasons, the Debtor respectfully requests that the Court grant the relief

4   prayed for herein.

5   DATED:  January 19, 2020              **WINTHROP GOLUBOW HOLLANDER, LLP**

6

7                                        By:  _/s/ Garrick A. Hollander_

8                                             Garrick A. Hollander, Esq.
                                             General Insolvency Counsel for Debtor and
9                                             Debtor-in-Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

248947

## DECLARATION OF BRIAN BARRY

I, Brian Barry, hereby declare as follows:

1.      I am the President and Chief Executive Officer of Vitality Health Plan of California, Inc., a California corporation, the debtor and debtor in possession (the "Debtor").  As such, I have been responsible for overseeing the day-to-day operations of the Debtor.  Accordingly, I have personal knowledge of the facts stated herein, and if called upon to testify to such facts I could and would testify competently thereto.

2.      The Debtor owns and manages a full-service private Medicare Advantage HMO plan for the benefit of thousands of its Medicare-eligible members.  The Debtor employs approximately 33 employees and contractors in its Cerritos headquarters located at 18000 Studebaker Rd., Suite 960, Cerritos, CA 90703.   The Debtor currently services Medicare-eligible members primarily in Santa Clara County and San Joaquin County, California, but is in the process of expanding to Southern California.

3.      The Debtor enrolls Medicare-eligible members in its HMO plan, which provides its members with access to prescription medications, medical care and more.  The Debtor contracts with physicians, hospitals, and other medical providers to provide medical care to the Debtor's members. The Center for Medicare and Medicaid Services ("CMS"), on behalf of the Federal Government, and the State of California, each pay the Debtor a monthly fee (commonly known as capitation payments) to cover the medical services contracted and paid for by the Debtor.

4.      On October 1, 2020, the Debtor and Independent Physician Associates Medical Group Incorporated d/b/a AllCare ("AllCare") entered into the Medical Services Agreement for Medicare Services between Vitality Health Plan of California and Independent Physician Associates Medical Group Incorporated d/b/a AllCare (the "Agreement"), which enables the Debtor to provide its members access to medical care.  A true and correct copy of the Agreement is attached hereto as **Exhibit 2** and incorporated herein by this reference.  Pursuant to the Agreement, AllCare controls exclusively the downstream contracts with many network medical care providers in the San Joaquin county, which represents the majority of the Debtor's plan membership.

5.      The Agreement was going to expire on December 31, 2020.  Based on the good relationship between AllCare and the Debtor, Allcare has agreed to extend the term of the Agreement

-10-

248947

1  to March 31, 2021, but has requested that the Debtor obtain formal Court approval to enter into the
2  Amendment memorializing such extension. A copy of the Amendment is attached as **Exhibit 3**. In
3  the meantime, as a courtesy to the Debtor and its plan members, AllCare has extended the term
4  through January 15, 2021 to allow the parties time to negotiate and finalize the Amendment and
5  obtain Court approval of same, and has agreed to continue to honor and comply with the terms of the
6  Agreement pending Court approval, so long as it is obtained on shortened time.

7       6.    In addition to extending the term of the Agreement through March 31, 2020, the
8  following is a summary of the other material terms of the Amendment:

9       • <u>Rights and Remedies</u>. Allcare may enforce any of its rights and remedies under the
10         Agreement without the need to obtain relief from the automatic stay.

11      • <u>Assumption and Assignment</u>. Neither the Agreement nor the Amendment may be
12         assumed and assigned, unless otherwise consented to by Allcare.

13      • <u>Replenishment of Deposit</u>. The Debtor must replenish the Advance in the amount of
14         $69,407, which is already required under the Agreement and for which the Debtor gets
15         credit on its payments owing to AllCare.

16      7.    The Agreement and Amendment with AllCare are absolutely critical to the Debtor's
17  ability to perform under its obligations to CMS and its members. Without the enforceability of this
18  Agreement, the Debtor will not be able to continue its business operations. Moreover, the terms of
19  the Agreement and Amendment conform to the requirements of CMS and are standard for the
20  industry, and thus are fair and reasonable. In order to continue the Debtor's business and continue to
21  enable medical providers to provide seamless ongoing medical care to the Debtor's plan members, it
22  is necessary to obtain authority to enter into the Amendment to extend the term of the Agreement.
23  Accordingly, I believe that obtaining Court approval for the Debtor to enter into the Amendment is in
24  the best interests of the estate.

25      I declare under penalty of perjury that the foregoing is true and correct.
26      Executed this _19_ day of January 2021, at Cerritos, California.

27

28      _____
        Brian Barry

29

-11-

248947

EXHIBIT 1

1

2   GARRICK A. HOLLANDER – State Bar No. 166316
    ghollander@wghlawyers.com
3   **WINTHROP GOLUBOW HOLLANDER, LLP**
    1301 Dove Street, Suite 500
4   Newport Beach, CA 92660
    Telephone:   (949) 720-4100
5   Facsimile:    (949) 720-4111

6   [Proposed] General Insolvency Counsel for
    Vitality Health Plan of California, Inc.,
7   Debtor and Debtor-in-Possession

8

9                  **UNITED STATES BANKRUPTCY COURT**

10                 **CENTRAL DISTRICT OF CALIFORNIA**

11                    **LOS ANGELES DIVISION**

12

13  In re:                                Case No. 2:20-bk-21041-WB

14  VITALITY HEALTH PLAN OF               Chapter 11 Proceeding
    CALIFORNIA, INC., a California
15  corporation                          **ORDER AUTHORIZING DEBTOR TO
                                          ENTER INTO AMENDMENT TO
16          Debtor and                    MEDICAL SERVICES AGREEMENT FOR
            Debtor-in-Possession          MEDICARE SERVICES BETWEEN
17                                        DEBTOR AND ALLCARE**

18

19

20

21

22

23

24

25

26

27

28

On _____, 2021, at ___, a hearing was held on the *Motion for Order Authorizing Debtor to Enter into Amendment to Medical Services Agreement for Medicare Services between Debtor and AllCare* ("Motion") filed by Vitality Health Plan of California, Inc., debtor and debtor-in-possession in the above-entitled Chapter 11 proceedings (the "Debtor").  Garrick A. Hollander, Esq. of Winthrop Golubow Hollander, LLP appeared on behalf of the Debtor.  Other appearances were as reflected on the record.

The Court having reviewed the Motion, the Declaration of Brian Barry in support thereof (the "Barry Declaration"), and other pleadings and documents on file in this Chapter 11 case, and having heard the arguments and representations made by counsel, finding that the notice of the hearing on the Motion was sufficient, and good and adequate cause exists,

**IT IS HEREBY ORDERED** that:

1.    The Motion is granted;

2.    The Debtor is authorized to enter into the Amendment to Medical Services Agreement for Medicare Services (the "Amendment") between the Debtor and Independent Physician Associates Medical Group Incorporated d/b/a AllCare ("AllCare"), which amends that certain Medical Services Agreement for Medicare Services (as amended, the "Agreement");

3.    All amounts paid to and/or received by AllCare pursuant to the Agreement are not subject to any right of offset, clawback, recoupment, reconciliation, or retroactive adjustment;

4.    As more specifically set forth in the Amendment, AllCare may enforce any of its rights and remedies to which it may be entitled under the terms of the Amendment and the Agreement (including without limitation its rights under Article 6 thereof) without the need for any further relief from or order of the Court;

5.    AllCare's rights and remedies under or in connection with the Agreement, including without limitation, its rights to receive payments and advances under the Agreement, shall be free and clear of all liens and encumbrances and to the extent not otherwise

EXHIBIT 1 - PAGE 2

249097

1    paid shall constitute administrative expense claims (and are hereby granted priority in

2    accordance therewith);

3        6.    AllCare and the Agreement shall not be subject to any substantial contribution claim

4    pursuant to Bankruptcy Code Section 506 or otherwise;

5        7.    The Agreement and Amendment may not be assumed and assigned pursuant to

6    Bankruptcy Code Section 365 or otherwise.

7        8.    No further hearing is necessary to effectuate the foregoing.

8                                                ###

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

EXHIBIT 1 - PAGE 3

249097

EXHIBIT 2

# MEDICAL SERVICES AGREEMENT
# FOR MEDICARE SERVICES
*between*


# Vitality Health Plan of California

## *and*


# Independent Physician Associates Medical Group Incorporated d/b/a ("AllCare")

# Vitality Health Plan of California
# Medical Services Agreement for Medicare Services

### TABLE OF CONTENTS

RECITALS.................................................................................................................1
ARTICLE 1 DEFINITIONS.....................................................................................1
ARTICLE 2 MEDICAL GROUP OBLIGATIONS .................................................4
ARTICLE 3 MEDICAL GROUP OBLIGATIONS ...............................................16
ARTICLE 4 ADDITIONAL PLAN AND MEDICAL GROUP OBLIGATIONS .........17
ARTICLE 5 COMPENSATION ............................................................................20
ARTICLE 6 TERM AND TERMINATION ..........................................................23
ARTICLE 7 DISPUTE RESOLUTION .................................................................26
ARTICLE 8 INSURANCE AND INDEMNIFICATION .......................................26
ARTICLE 9 GENERAL PROVISIONS..................................................................27
ATTACHMENT "A" DIVISION OF FINANCIAL RESPONSIBILITY FOR PLAN MEDICARE
MEMBERS .............................................................................................................31
ATTACHMENT "B" MEDICAL GROUP COMPENSATION AND HOSPITAL FULL RISK PROGRAM
FOR COVERED MEDICAL SERVICES FOR MEDICARE MEMEBRS........................35
ATTACHMENT "B-1" RISK POOL PROVISIONS...............................................36
ATTACHMENT "C" CO-PAYMENTS AND DEDUCTIBLES ............................39
ATTACHMENT "D" MEDICAL GROUP DELEGATED ACTIVITIES ............40
ATTACHMENT "D-1" CREDENTIALS DELEGATION AGREEMENT .............42
ATTACHMENT "D-2" CREDENTIALS DELEGATION AGREEMENT INITIAL/RE-CREDENTIALING
VERIFICATIONS ..................................................................................................45
ATTACHMENT "D-3" DELEGATION OF UTILIZATION MANAGEMENT RESPONSIBILITIES
CITIZENS CHOICE PARTICIPATING INDEPENDENT PHYSICIAN ASSOCIATION / MEDICAL
GROUP...................................................................................................................49
ATTACHMENT "D-4" CLAIMS DELEGATION AGREEMENT.........................56
ATTACHMENT "E" HIPAA BUSINESS ASSOCIATE AGREEMENT ...............58

# MEDICAL SERVICES AGREEMENT

# FOR MEDICARE SERVICES

This Medical Services Agreement for Medicare Services ("Agreement") is made and entered into by and between Vitality Health Plan of California, a California corporation ("Plan"), and Independent Physician Associates Medical Group Incorporated, d/b/a AllCare ("Medical Group"), a California professional medical corporation ("Medical Group"), to be effective from October 1, 2020 ("Effective Date").

## RECITALS

A.  **WHEREAS,** Plan is a health care service plan licensed under the Knox-Keene Health Care Service Plan Act of 1975, as amended (the "Knox Keene Act"). Plan operates a Medicare Advantage ("MA") Plan and a Medicare Advantage Prescription Drug ("MA-PD") Plan pursuant to its contract with the Centers for Medicare and Medicaid Services ("CMS").

B.  **WHEREAS,** Medical Group is a medical group or independent physician association ("IPA") formed under California law that contracts with health plans to provide or arrange for the provision of health care services to health plan enrollees; and

C.  **WHEREAS,** Plan desires to engage Medical Group to provide or arrange for the provision of certain health care and related services to Plan's Medicare enrollees ("Plan Medicare Members" or "Plan Members"), and Medical Group desires to provide or arrange such services, on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants herein stated, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1  "**Affiliated Hospital**" shall mean the Plan Hospital to which Members are admitted by Group Physicians, as applicable.

1.2  "**Benefit Agreements**" shall mean the written agreements entered into between Plan and employer or other groups, individuals or governmental agencies or other payors under which Plan provides or administers health benefits to persons enrolled in Plan. For the purposes of this Agreement it means the contract/s between Plan and CMS.

1.3  "**Capitation**" shall mean a monthly per Plan Member per month fee paid to Medical Group by Plan as specified in Attachment B - Medical Group Compensation, in exchange for the provision of Physician Services and related administrative services that are the responsibility of Medical Group as set forth in this Agreement.

1.4  "**CMS**" shall mean the Centers for Medicare and Medicaid Services, which is the agency of the federal government responsible for administration of the Medicare program including Plan's Medicare Advantage Plan or its successor.

1.5  "**Coordination of Benefits**" or "**COB**" shall mean the determination of order of financial responsibility that applies when two or more entities provide coverage of services for an individual.

1.6 **"Copayments"** shall mean those charges, including deductibles, for Covered Services that are to be paid directly to Medical Group or a Group Provider by a Plan Member in accordance with the applicable Benefit Agreement.

1.7 **"Covered Services"** shall mean those Medically Necessary health care services and supplies that are benefits to which a Plan Member assigned to Medical Group is entitled under the applicable Benefit Agreement and state and federal laws and regulations. Covered Services includes Covered Medical Services.

1.8 **"Covered Medical Services"** shall mean those Covered Services, set forth in Attachment A, the division of responsibility between Plan and Medical Group, for the provision of Covered Services to Plan Medicare Members assigned to Medical Group, which has been agreed upon by Plan and Medical Group. Covered Medical Services include Physicians Services defined below.

1.9 **"Division of Financial Responsibility"** or **"DOFR"** is the document that assigns financial responsibility for Covered Services among Plan and the Medical Group.

1.10 **"DMHC"** shall mean the California Department of Managed Health Care, which is the agency responsible for licensing and regulating health plans under the Knox-Keene Act.

1.11 **"Downstream Entity"** shall mean all Group Providers or other entities contracted or subcontracted with Medical Group to provide or arrange for Physician Services to Members, including but not limited to individual Physicians, ancillary providers, subcontracted administrative services vendors, third party administrators and management companies.

1.12 **"Emergency Medical Condition"** shall mean (a) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances and/or symptoms of substance abuse) such that a prudent layperson would reasonably have cause to believe constitutes a condition whereby the absence of immediate attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or the unborn child) in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part; or (b) with respect to a pregnant woman who is having contractions, (i) a situation in which there is inadequate time to effect a safe transfer to a hospital or another health care facility before delivery; or (ii) a situation in which transfer may pose a threat to the health or safety of the woman or the unborn child.

1.13 **"Emergency Services"** shall mean those Medically Necessary medical and hospital services that are (i) furnished by a provider qualified to furnish Emergency Services; and (ii) needed to evaluate or stabilize an Emergency Medical Condition. Emergency Services shall include psychiatric screenings, examinations and evaluations by a physician or other licensed professional (if permitted by applicable law) to determine if a psychiatric Emergency Medical Condition exists, and necessary care and treatment to relieve or eliminate the psychiatric Emergency Medical Condition.

1.14 **"Evidence of Coverage"** shall mean the document issued to a Plan Member that describes the benefits to which the Plan Member is entitled under the applicable Benefit Agreement.

1.15 **"Group Physician"** shall mean a Physician who is a Group Provider. Group Physician shall also mean a Physician or other health professional that acts on behalf of, at the request of, or under the supervision of, a Group Physician.

1.16 **"Group Provider"** shall mean a Physician or other health professional who is under contract with Medical Group, or an organization that contracts with Medical Group, to provide Physician Services to Members.

EXHIBIT 2 - PAGE 4

1.17     **"Hospital Services"** shall mean acute and sub acute inpatient care and hospital outpatient services and supplies that are both (a) covered by a Benefit Agreement, and (b) ordered or authorized by Plan or Medical Group, if delegated. Hospital Services do not include long-term non-acute care.

1.18     **"Medical Group"** shall mean Independent Physician Associates Medical Group Incorporated, d/b/a AllCare and is a party to this Agreement

1.19     **"Medical Group Practice Area"** shall mean the geographic area in which Medical Group shall provide Physician Services to Plan Members. Medical Group Practice Area is defined as San Joaquin County, but may be expanded pursuant to Section 3.6 or by mutual agreement of the parties.

1.20     **"Medically Necessary"** shall mean medical or surgical treatment Plan determines (i) is not experimental, (ii) is required and appropriate in accordance with acceptable standards of medical practice, (iii) has been established as safe and effective, and (iv) is furnished in accordance with generally accepted professional standards to treat an illness, injury, or medical condition. These services must be consistent with Plan medical policy, be consistent with the symptoms or diagnosis, be furnished at the most appropriate level and not be furnished primarily for the convenience of the Plan Member, the attending physician or any other provider.

1.21     **"Medicare Advantage Plan"** shall mean the Medicare managed care benefit plan that Plan offers to Medicare beneficiaries pursuant to Plan's contract with CMS.

1.22     **"Non-Covered Services"** shall mean those services that are not benefits under the applicable Benefit Agreement.

1.23     **"Non-Participating Provider"** shall mean an institutional, professional or other provider of health care services who has not entered into an agreement with Plan, Medical Group or another organization to provide Covered Services to Members.

1.24     **"Out of Area"** shall mean geographic areas not within Medical Group Practice Area.

1.25     **"Outpatient Hospital Services"** shall mean services provided in a Plan Hospital to a Plan Member who has not been admitted for an overnight stay. Outpatient ("OP") Hospital Services includes, but is not limited to, the facility component of outpatient surgery, pre-admission testing, and laboratory and radiology services.

1.26     **"Participating Provider"** shall mean an institutional, professional or other provider of health care services who has entered into an agreement with Plan, Medical Group or another entity to provide Covered Services to Members.

1.27     **"Pharmacy Services"** shall mean outpatient pharmacy services that are Covered Services under the applicable Benefit Agreement.

1.28     **"Physician"** shall mean an individual who holds an unrestricted license to practice medicine or osteopathy issued by the State of California.

1.29     **"Physician Contracting Group"** shall mean a physician group, including Medical Group that has entered into an agreement with Plan to provide or arrange for Covered Services to Members, subject to section 3.5 of this Agreement.

1.30     **"Physician Services"** shall mean those Covered Services that are the financial responsibility of Medical Group as set forth in the Division of Financial Responsibility, which is attached hereto as Attachment A and incorporated herein by this reference.

EXHIBIT 2 - PAGE 5

1.31  **"Plan Hospital"** shall mean a licensed acute care hospital that has entered into a contract with Plan to provide Covered Services to Members.

1.32  **"Plan Medicare Member"** shall mean an individual eligible to receive Medicare benefits who has elected or has been assigned to Plan to receive applicable Medically Necessary Covered Services.

1.33  **"Plan Member"** shall mean an individual who is entitled to receive Covered Services pursuant to the applicable Benefit Agreement and for whom the proper prepayment fees have been paid. In this Agreement Plan Member means only Plan Medicare Members.

1.34  **"Primary Care Physician" or "PCP"** shall mean a general or family practitioner or internist who is chosen by or for a Plan Member and is responsible for coordinating and controlling the delivery of Covered Services to Members.

1.35  **"Provider Manual"** shall mean the document, incorporated herein by this reference, that is created by Plan to inform Medical Group of Plan's administrative policies, procedures and guidelines applicable to Medical Group's performance under this Agreement and to ensure Medical Group compliance with the requirements and operational standards imposed by applicable laws and regulations and Plan contractual obligations, however nothing stated in the Provider Manual shall be construed to be a material term or a terminable offence unless so stated in this Agreement.

1.36  **"Self-Referred Urgently Needed Services"** shall mean those Urgently Needed Services obtained by a Plan Member who accesses such services on his/her own volition absent any form of prior authorization or referral by Plan or any Participating Provider.

1.37  **"Urgent" or "Urgently Needed Services"** shall mean those Covered Services (other than Emergency Services) that are Medically Necessary to prevent serious deterioration of a Plan Member's health, alleviate severe pain, or treat an illness or injury with respect to which treatment can not reasonably be delayed.

1.38  **"Utilization Management Program"** shall mean the programs and process standards to authorize and monitor the utilization of Covered Services provided to Members.

## ARTICLE 2
## MEDICAL GROUP OBLIGATIONS

2.1  **Compliance.** Medical Group agrees to comply with Plan policies and procedures and all applicable Federal, State and local laws, rules and regulations and CMS instructions, now or hereafter in effect, including but not limited to 42 CFR § 422 regarding the performance of Medical Group's obligations hereunder, including without limitation, laws or regulations governing the record timeliness, adequacy and accuracy, Plan Medicare Member privacy and confidentiality along with the appeal and dispute resolution procedures related to Covered Service provided to a Plan Medicare Member, to the extent that they directly or indirectly affect Medical Group, Medical Group's facilities or Plan and bear upon the subject matter of this Agreement.

2.2  **Arranging Covered Medical Services.**

    i.    Medical Group shall provide or arrange for the provision of those Covered Medical Services listed in Attachment A in a manner consistent with the applicable Benefit Agreement, the Provider Manual, the Utilization Management Program, and any other Plan policies and procedures and quality management standards. Plan shall arrange and pay for telephone and face-to-face interpreter

services to Plan Medicare Members who have limited English proficiency (LEP). Medical Group shall ensure that Medical Group's Participating Physicians and other providers identify interpretation needs of Plan Medicare Members who have LEP, schedule such interpreter services, and participate and comply with the performance standards, policies, and procedures and programs established from time to time by CMS and Plan with respect to providing services to Plan Medicare Members in a culturally and linguistically appropriate manner

ii.    Medical Group expressly agrees that it shall accept the delegated responsibility from Plan to provide utilization management services that arise in the course of providing or arranging for the provision of Covered Medical Services specified in Attachment A  However, Plan shall retain responsibility to provide utilization management services for Covered Medical Services for which Plan has financial responsibility, as specified in Attachment A.  Medical Group shall comply with the standards and procedures governing utilization management as defined in the delegated utilization management standards set forth in Plan's Utilization Management Program and in the Provider Manual.  Plan shall monitor Medical Group's compliance with Plan's utilization management standards and procedures on an ongoing basis. In the event Medical Group is found to be in non-compliance with Plan standards, which shall be consistent with NCQA, Plan will inform Medical Group of the deficiencies and will require compliance within a time frame established by Plan in the form of a corrective action plan as described in the Provider Manual. In the event Medical Group fails to comply in correcting the deficiencies, Plan may only rescind delegation of credentialing only.

2.3.    **Provider Network Maintenance**.

i.    Medical Group agrees to select, enter into, and maintain contracts with Group Providers in sufficient numbers, specialties and geographic distribution to assure, reasonable and timely Plan Member access to the full range of Physician Services, in accordance with CMS rules and regulations or DMHC as applicable.

ii.    Medical Group will maintain accurate records regarding Group Providers. Medical Group will make best efforts, in accordance with Plan's policies and procedures set forth in the Provider Manual, to notify Plan at least seventy-five (75) days in advance of the addition of a Group Provider.  Medical Group will make best efforts to assist Plan to comply with the requirements of DMHC (if and when applicable) and CMS by notifying Plan seventy-five (75) days in advance of the termination of a Group Provider.

2.4    **Physicians**. Medical Group shall ensure that each Plan Member has a PCP who is responsible for coordinating the provision of Covered Services to said Plan Member.  Medical Group will be responsible for assuring that its PCPs are trained and have experience in dealing with the medical problems frequently encountered in the populations served by Plan, which populations include, but are not limited to, elderly individuals.  Medical Group and its PCPs shall be responsible for the provision, coordination, referral, and authorization of Covered Services in accordance with the Utilization Management Plan and prevailing standards of medical practice.

2.5    **Non-Discrimination**.  Medical Group agrees:  (i) not to differentiate or discriminate in the provision of Covered Medical Services to Members because of race, color, national origin, ancestry, religion, gender, health status, marital status, sexual orientation or age; and (ii) to render Covered Medical Services to Members in the same manner, in accordance with the same standards, and within the same time availability as offered to non-Plan patients. Medical Group

also agrees to include the requirements of this section in its contracts with Group Providers or to otherwise make such requirements binding upon them.

2.6    **Use of Names and Trademarks; Identification of Medical Group and Physicians**.

    i.    Plan and Medical Group each reserve the right to control the use of its name, symbols, trademarks or other marks currently existing or later established. However, either party may use the other party's name, symbols, trademarks or other marks with the prior written approval of the other party. Plan shall be allowed to use the name of Medical Group in its promotional activities and marketing campaign and shall give Medical Group reasonable prior notice of its intent to use Medical Group's name. Any dispute over Plan's intended use of Medical Group's name shall be resolved through the dispute resolution processes specified in Section 7.1 ("Dispute Resolution") and Section 7.2 ("Arbitration"). This section shall not preclude Medical Group or their providers from listing the Plan as a contracted health plan in routine listings of contracted plans.

    ii.    The parties understand that each of them conducts marketing activities in order to enroll potential patients in Plan where allowed by law. It is expressly understood and agreed that, during the course of such marketing activities, the parties may inform potential Members and others that the parties have a contractual agreement under which Members may be eligible to receive Covered Services from Plan. Medical Group agrees that Plan may list the name, address, telephone number and hours of operation of Medical Group, and specialty, board status and curriculum vitae information on Group Physicians in Plan publications furnished to current or potential Participating Providers or Members. Plan shall also have the right to use such information in advertising and marketing materials.

    iii.    Any marketing material created by Medical Group to be directed at Plan Medicare Members must be submitted to Plan, prior to sending out to Plan Medicare Members, for review and submission to CMS for approval.

2.7    **Availability**.

    i.    Medical Group shall ensure that Physician Services that are not Emergency Services are available to Members during normal physician business hours (generally, Monday through Friday, 9:00 a.m. to 5:00 p.m.) and that Emergency Services and telephone advice and referral shall be available, as Medically Necessary, twenty-four (24) hours per day, seven (7) days per week, fifty-two (52) weeks per year. Appointment scheduling and office waiting times shall be within the applicable guidelines set forth in the Provider Manual.. Physician Services shall at all times during the term of this Agreement be made readily available through PCP facilities located in the Medical Group Practice Area.

    ii.    In providing and arranging for Physician Services for Members assigned to Medical Group, Medical Group shall comply with and require Group Providers to comply with all state and federal laws and regulations relating to continuity of care and continued access to terminated providers.

    i.    Medical Group shall at all times ensure that an adequate number of its PCPs' practices are open to Members assigned to Medical Group, to meet all access standards required by applicable laws and regulations. Medical Group shall ensure that each PCP, whether or not his/her practice is closed to new patients, shall accept each Plan Member assigned to Medical Group who is a patient of the

PCP at that time through another plan or coverage option. Without limiting the foregoing, Medical Group shall ensure that whenever a PCP is accepting new patients of other health care service plans, such PCP also accepts Plan Members assigned to Medical Group. In the event a PCP, during the term of this Agreement, elects to close his/her practice to new Members assigned to Medical Group, or ceases to be a Group Provider, Medical Group shall make best efforts to give Plan at least seventy-five (75) days prior written notice of such closure or termination.

2.8   **Standards For Provision of Care**.

i.   Medical Group and Group Providers shall maintain facilities and equipment that meet all applicable legal requirements, including accessibility requirements, and which otherwise comply with the provider credentialing requirements developed by Plan for such providers, as more fully described in the Provider Manual. Accessibility shall include compliance with the requirements of the Americans with Disabilities Act.

ii.   To assure the optimal coordination of the parties' respective administrative efforts, in compliance with applicable laws and regulations and the objectives of the parties under this Agreement, Medical Group shall, through one or more designated representatives, attend in-person or telephonically those provider education/orientation sessions conducted by Plan.

iii.   In providing or arranging for the provision of Physician Services hereunder, Medical Group shall utilize only Group Providers who are credentialed and re-credentialed in accordance with Plan's standards as set forth in the Provider Manual which shall be consistent with NCQA standards, unless a Medically Necessary service is not available from a Group Provider. Medical Group shall promptly advise Plan of such circumstances so that an appropriate referral can be made. Medical Group and/or each Group Provider shall provide to Plan, on request, credentialing information, in a format specified by Plan.

iv.   Medical Group represents and warrants that, during the term of this Agreement, each Physician who is a Group Provider shall: (i) maintain a current, unrestricted license to practice medicine in California; (ii) maintain such staff privileges with one or more hospitals contracted with Plan and meeting CMS (and if applicable DMHC) member access standards or use the services of a hospitalist physician or formally arrange with a physician to attend to hospitalized Plan Medicare Members, and (iii) meet Plan's credentialing standards which shall be consistent with NCQA standards. Medical Group further represents and warrants that: (i) each non-Physician Group Provider shall maintain a current and unrestricted license to practice his/her profession in California, as applicable; and (ii) use of any physician extender shall be in strict compliance with the rules of the California Medical Board.

v.   Medical Group shall promptly notify Plan as of the date Medical Group knows that a Group Provider no longer meets any of Plan's credentialing criteria, including the provisions of this Section 2.7 and those set forth in the Provider Manual.

2.9  **Downstream Agreements**.

   i.   Medical Group agrees that each Downstream Entity shall be required to execute a written contract with Medical Group that will require the Downstream Entity to comply with those aspects of this Agreement relating to activities of Downstream Entities and shall be in compliance with CMS regulations and instructions, other applicable state and federal laws and regulations, and with the standards of accrediting agencies governing Plan's activities. The Medical Group agreements with Downstream Entities shall be made available to Plan for inspection upon request. Medical Group's contracts with Downstream Entities shall include, either expressly or by general inclusion, provisions to ensure that the Downstream Entities will, if applicable:

      a)  except for applicable Copayments, seek payment for Covered Services only from Medical Group and under no circumstances seek payment for such services from a Plan Member assigned to Medical Group, from Plan, or CMS.

      b)  under no circumstances balance bill or surcharge Plan Members assigned to Medical Group for Covered Services (including in the event of Medical Group and/or Plan insolvency);

      c)  maintain and disclose such records to, and permit inspection of its offices, records and facilities by Plan and governmental officials pursuant to Section 4.3 upon reasonable advance written notice unless otherwise required by law;

      d)  cooperate with and participate in Plan's and Medical Group's Utilization Management Program, quality management and improvement programs and Plan Member grievance and appeal procedures, for Members assigned to Medical Group, as described in Section 4.1 below;

      e)  continue to provide Physician Services to all Plan Members assigned to Medical Group following notice of termination of the Group Provider's contract with Medical Group, including any Plan Members who select Medical group and who become eligible during the notice period and up to date of termination between Downstream Entity and Medical Group in accordance with Sections 6.8 and 6.9 hereof and as otherwise required by state or federal law;

      f)  maintain professional and general business liability insurance as set forth in Article 8 hereof, and

      g)  collect and retain the Plan Member's applicable Copayment for Covered Services provided.

   ii.   Upon Plan's request, Medical Group's form of provider contract(s) a/k/a boilerplate agreement, along with the executed signature pages to such contracts, shall be provided to Plan. Upon Plan's request, such contracts shall be promptly amended to contain or reference by general inclusion, any provisions required to be in provider contracts by CMS, accreditation agencies and if applicable DMHC or any other governmental entity with jurisdiction over Plan.

    iii.    Medical Group shall promptly pay valid claims of downstream entities which are the financial responsibility of the Medical Group under the Agreement.

2.10    **Group Provider Termination**.

    i.    In the event a Group Provider is suspended or terminated by Medical Group for cause, Medical Group shall promptly notify Plan in writing and shall take all necessary actions as required by law or CMS instructions.

    ii.    Medical Group warrants that a Group Physician may be excluded by Plan from providing services to Plan Members assigned to Medical Group under this Agreement if Group Physician: (1) jeopardizes the health, safety or welfare of Plan Members assigned to Medical Group by continuing to provide services to such Plan Members; or (2) furnishes false, incomplete, or inaccurate information to Plan in the application to participate; or (3) at any time during the term of this Agreement, suffers revocation, termination or suspension of his/her medical license or medical staff privileges; or (4) is convicted of Medicare or Medi-Cal fraud, or any other crime involving the delivery of health care. In such case, Medical Group and/or Group Physician may present to Plan for further consideration any additional information or explanation regarding Group Physician's compliance with the requirements set forth herein. During the term of this Agreement, the number of Group Physicians so excluded shall not exceed five percent (5%) of the average number of Group Physicians. Any further exclusion beyond such 5% will require Medical Group's approval with the exception of instances identified in items 1 through 4 above.

2.11    **Continuation of Coverage with a Provider Terminated by Medical Group**.

    i.    Medical Group agrees to cooperate with Plan to arrange for the continuation of Physician Services rendered by a terminated provider to a Plan Member who is assigned to Medical Group, and who is undergoing a course of treatment from a terminated provider or for the smooth transfer of care to another provider contracted with Medical Group, as required by law or CMS instructions.

    ii.    Upon termination of the Agreement or the termination of the contract between Medical Group and a specialist provider, Medical Group agrees to immediately notify Plan of Plan Members assigned to Medical Group who are receiving treatment by, or under treatment and care of, the Medical Group or the participating specialist provider. Plan shall be responsible for the notification of the termination to affected Plan Members prior to the effective date of termination.

2.12    **Quality Improvement and Quality Management Programs**. Plan retains responsibility for quality improvement. Plan's quality improvement program has been developed to ensure that practice guidelines consistent with CMS (and if and when applicable DMHC) regulations and instructions are followed. Medical Group shall ensure that Medical Group and its Downstream Entities fully cooperate with and participate in Plan's Quality Improvement Program and procedures as described in the Provider Manual. Medical Group and its Downstream Entities shall fully cooperate with Plan with regard to the Health Employer Data Information Sets (HEDIS) measurements and HEDIS audits, guideline development, preventive services utilization, disease/risk management, clinical service monitoring and quality improvement studies and initiatives.

2.13    **Plan Liaison**.  Medical Group shall designate an individual who will assume the day to day responsibilities with regard to Medical Group's obligations hereunder and to serve as liaison with Plan.  Medical Group will also designate an individual to be responsible for answering Plan Member inquiries who are assigned to Medical Group, and responding promptly to a grievance by following Plan's grievance procedures.

2.14    **Medical Group Medical Director**.  Medical Group agrees to designate a Group Physician as Medical Director for purposes of this Agreement.  The Medical Group Medical Director will be a member of Medical Group's quality management and utilization management committee(s) and will be the individual with whom Plan communicates regarding provision of professional medical care and regarding quality and/or appropriate utilization of medical services.  Medical Group shall ensure that medical decisions rendered by its Medical Director will not be hindered by fiscal or administrative concerns.  The Medical Director will be the individual responsible for representing Medical Group in the resolution of any grievances related to the provision of medical care to Plan Members assigned to Medical Group by Group Providers.

2.15    **Plan Member Medical Record**.  Medical Group agrees to ensure that a medical record will be established and maintained for each Plan Member assigned to Medical Group as set forth in Section 4.3.  The record shall include, at a minimum, all information about the Plan Member as dictated by generally accepted medical practice standards.

2.16    **Prescriptions**.  In accordance with applicable regulations and the Provider Manual, Medical Group and Group Providers shall use best efforts to comply with the outpatient drug formulary, drug prior authorization requirements and pharmacy benefit design (including maximum supplies, use of generics, and mail order for maintenance drugs).

2.17    **Use of Group Providers and Non-Participating Providers.**  Medical Group agrees to use best efforts to ensure that Covered Services are provided only by Group Providers.  In the case of Emergency Services, or if no such provider is available to perform the appropriate services, Medical Group shall promptly arrange for such services or consult with Plan to arrange for such services from non-Group Providers.  It will be Medical Group's responsibility to ensure that such provider: (i) looks solely to the financially responsible party for compensation for Covered Services; (ii) except for applicable Copayments will not bill Plan Members assigned to Medical Group for Covered Services under any circumstances; and (iii) comply with all other applicable requirements hereunder.

2.18    **Right to Re-Assign Plan Members**.  Plan reserves the right to re-assign individual Plan Members assigned to Medical Group, from one Group Physician to another Group Physician, or to limit or deny the assignment of new Plan Members to a Group Physician, to honor a Plan Medicare Member's choice, or to ensure the continuation of quality care to a Plan Medicare Member.. A Plan Medicare Member may be removed from Medical Group if required by applicable laws, regulations and CMS instructions.

2.19    **Plan Member Grievances**.  Plan retains responsibility for grievance resolution for Plan Members.  Medical Group agrees to cooperate with Plan in resolving Plan Member grievances related to Medical Group.  Plan will bring to Medical Group's attention all Plan Member complaints involving Medical Group or a Group Provider, and Plan will, in accordance with its regular procedure, investigate such complaints and use its best efforts to resolve them in a fair and equitable manner.  Plan agrees to notify Medical Group promptly of any action taken or proposed with respect to the resolution of such complaints and Medical Group will provide Plan an action plan so that similar complaints in the future may be avoided.  Medical Group agrees to adhere to all state and federal regulations regarding Plan Member grievances.

2.20    **Site Visits**. Medical Group agrees to permit state and federal regulators having jurisdiction over Plan's activities, including CMS, if applicable DMHC or another unit of the U.S. Department of Health and Human Services or a successor organization, and accrediting agencies, to conduct a site evaluation of Medical Group and of Group Providers' facilities in accordance with the current applicable state and federal laws and regulations and to comply with the recommendations, if any, of such entities.

2.21    **Credentialing Program**.

    i.    Medical Group agrees to comply with Plan's policies and procedures in regard to credentialing standards as outlined in the Provider Manual which shall be consistent with NCQA guidelines. In order to ascertain Medical Group's continuous compliance with Plan standards, Plan retains the right to oversee Medical Group's credentialing processes. At least annually, upon Plan's request, Medical Group shall provide Plan with a written credentialing program for Plan's review and approval. Medical Group shall also allow Plan to conduct an on-site audit and review a sample of Group Provider credentialing files to determine that delegation of the credentialing process is appropriate. Plan shall provide Medical Group with reasonable notice prior to requesting an on-site audit. If Medical Group is in compliance with Plan's standards, specifically, the applicable NCQA standards and state and federal regulations, Plan shall continue to delegate credentialing to Medical Group. Medical Group's credentialing program shall include: procedures used for credentialing and re-credentialing Group Providers according to applicable NCQA standards, in addition to procedures used for reducing, suspending or terminating a Group Provider's participation for reasons relating to quality of care, competence, professional conduct or service-related issues; procedures for reporting to appropriate authorities serious quality deficiencies which could result in suspension or termination of a Group Provider's participation; and procedures for provider appeal, as required by law or CMS instructions.

    ii.    In the event Medical Group is found to be in non-compliance with Plan standards, which shall be consistent with NCQA, Plan will inform Medical Group of the deficiencies and will require compliance within a time frame established by Plan in the form of a corrective action plan as described in the Provider Manual. In the event Medical Group fails to comply in correcting the deficiencies, Plan may rescind delegation of credentialing,

    iii.    Credentialing Responsibilities delegated by Plan to Medical Group are set forth in Attachments D 1 and D2.

2.22    **Direct Referrals**.

    i.    Medical Group agrees that a female Plan Member assigned to Medical Group may, without obtaining the prior authorization of her PCP, have the right to access OB/GYN services from a Group Physician who is an obstetrician/gynecologist or family practitioner. Medical Group shall have procedures and policies to ensure that Plan Members assigned to Medical Group are not required to obtain authorization prior to obtaining such services.

    ii.    Medical Group will allow Plan Medicare Members to directly access screening mammography and influenza and pneumococcal vaccines. Medical Group agrees to establish policies and procedures to ensure that Plan Medicare Members

assigned to Medical Group are not required to obtain authorization prior to obtaining such services.

2.23   **Reciprocity**.  Medical Group shall make best efforts to require its Group Providers to agree that if Emergency Services or Self-Referred Urgently Needed Services are provided to a Plan Member who is not assigned to Medical Group, Group Providers shall accept compensation from Plan or the financially responsible Participating Provider at the rates reflected in Section 2 of Attachment B, which is attached hereto and incorporated herein by this reference.

2.24   **Termination of Physician/Patient Relationship**.

    i.    Medical Group or a Group Physician may terminate the professional relationship with a Plan Member only with Plan's consent, or as allowed by law, and in accordance with the procedures set forth in the Provider Manual.  In the event a Group Physician terminates his/her relationship with a Plan Member assigned to Medical Group, Medical Group shall assist the Plan Member in selecting another Group Physician for the provision of Physician Services.

    ii.    In no event shall either Medical Group or a Group Physician terminate the professional relationship with a Plan Member assigned to Medical Group because of such Plan Member's medical condition, or the amount, variety, or cost of Covered Services that are required by the Plan Member.

    iii.    Medical Group acknowledges that a Plan Member may request transfer between Group Physicians or removal from Medical Group in accordance with the Plan Member's applicable Evidence of Coverage.  However, written advance approval is required from Medical Group before the transfer of a Plan Member from another Participating Provider to a Group Provider who is not accepting new Medicare members. Such approval shall not be unreasonably withheld.

    iv.    Notwithstanding the foregoing, when the consent of CMS, if applicable DMHC or any other governmental agency to the termination of a physician-patient relationship is required pursuant to the rules and regulations governing Plan's activities or any other governmental program, neither Medical Group nor a Group Physician may terminate the physician-patient relationship without first obtaining the consent of Plan, CMS, or as applicable, the other governmental agency.

2.25   **Disclosures.**  In addition to giving Plan notice of certain events as set forth in Sections 2.8 (vi), 2.9 and 2.10 above, Medical Group shall notify Plan immediately in writing when Medical Group becomes aware of the occurrence of any of the following events: (i) Medical Group's or a Group Provider's liability insurance is canceled, terminated, not renewed, or materially modified; (ii) an act of nature which prevents Medical Group's ability to perform its obligations hereunder; (iii) a petition is filed to declare Medical Group bankrupt or for reorganization under the bankruptcy laws of the United States or a receiver is appointed over all or any portion of Medical Group's assets; or (iv) any other situation arises which could reasonably be expected to prevent Medical Group's ability to carry out its obligations under this Agreement.  Medical Group shall also provide Plan with at least thirty (30) days' advance notice of any proposed material change in the ownership of Medical Group, a change in its management services organization (if any), or the sale of all or substantially all of the assets of the Medical Group.

2.26    **Acceptance of Plan Members.**

i.    Plan Members assigned to Medical Group and residing within the Medical Group Practice Area are eligible to receive Covered Medical Services from Medical Group. Plan Members not residing within the Medical Group Practice Area may be assigned to Medical Group by Plan following written approval by Medical Group. A Plan Member's assignment to Medical Group shall be evidenced by the inclusion of a designated number and/or the name of the Medical Group on the identification card issued to Plan Members by Plan and in the form of eligibility lists or capitation reports denoting such.

ii.    In no event will Plan or Medical Group permit a Plan Member to be assigned to a Group Physician if, in the reasonable professional judgment of the Group Physician, accepting additional patients would endanger patients' access to, or continuity of, care.

2.27    **Physician/Patient Communication.** Medical Group understands that Medical Group's Group Providers may freely communicate with Plan Members assigned to Medical Group and who are their patients about their treatment, regardless of benefit coverage and limitations. Plan affirms that its utilization management decision making is based only on appropriateness of care and service and existence of coverage; that it does not specifically reward health care providers or plan staff for issuing denials of coverage or service care; and while it has risk/cost savings sharing arrangements with certain health care provider groups, these incentives are to encourage appropriate utilization and discourage underutilization but not to encourage barriers to care and service or underutilization. Moreover, Plan will not penalize or sanction Medical Group or a Group Provider and Medical Group shall not penalize nor sanction any Group Provider in any way for engaging in such free, open and unrestricted communication with a Plan Member or for advocating for a particular service on a Plan Member's behalf.

2.28    **Notice of Termination to Affected Plan Members.** Upon termination of this Agreement or the termination of the contract between Medical Group and any of its participating providers, Medical Group agrees to immediately notify Plan of Plan Members assigned to Medical Group who are receiving treatment by, or under treatment and care of, the Medical Group or Group Providers. Plan shall be responsible for the notification of the termination to affected Plan Members prior to the effective date of termination.

2.29    **Compliance with Legal, Accreditation and Regulatory Requirements.**

i.    Medical Group represents and warrants that it does, and agrees that it will during the term of this Agreement, comply with all federal, state, and local laws, CMS instructions, and NCQA standards, and shall require any Downstream Entity to comply with the same. Medical Group shall include in its contracts with any Downstream Entity all provisions required by state and federal laws and regulations, CMS instructions and NCQA standards as described in this Agreement and as outlined in the Provider Manual, either explicitly or by general inclusion.

ii.    Medical Group understands that payments made by Plan are, in whole or in part, derived from federal funds and, therefore, Medical Group and any Downstream Entity are subject to certain laws that are applicable to individuals and entities receiving federal funds. Medical Group agrees to comply with all applicable federal laws, CMS regulations and instructions, including Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, the Americans with Disabilities Act, and to require any Downstream Entity to comply accordingly. Medical Group agrees to include

the requirements of this section in its contracts with any Downstream Entity, either by direct or general reference.

2.30 **Confidentiality of Medical Records**.

    i.    All Plan Member medical information will be treated in a confidential manner in accord with applicable state and federal laws, including, without limitation, the regulations of the U.S. Department of Health and Human Services concerning the privacy and security of health information.

    ii.    Medical Group acknowledges that it is a "covered entity" as that term is defined under the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-91) and regulations issued thereunder (collectively, "HIPAA"). Medical Group agrees to comply with the applicable provisions of HIPAA, including but not limited to the HIPAA standards for (i) privacy, (ii) code sets, (iii) data transmission standards, and (iv) security regarding physical storage, maintenance, transmission of and access to individual health information.

    iii.    Medical Group acknowledges that it is a "business associate" of Plan, as that term is defined under HIPAA, and shall enter into the HIPAA Business Associate Addendum attached hereto as Attachment E, which is attached hereto and incorporated herein by this reference.

2.31 **Expedited Review Process**. Medical Group shall comply with CMS, if applicable DMHC and other regulations pertaining to treatment authorizations in time sensitive situations. Time sensitive situations include medical conditions that require initial determinations to be made within seventy-two (72) hours upon Medical Group receiving a request for an expedited review from a Group Provider, Plan Member assigned to Medical Group or Plan. Medical Group agrees to submit to Plan, upon Plan request, on a monthly basis a report tracking the requests for expedited review and the time frame within which decisions were made by Medical Group. This section is subject to change as determined by CMS and if applicable DMHC regulations and policy.

2.32 **CMS Participation Requirements**. Medical Group is prohibited from employing or contracting with a provider who is excluded from participating in Medicare for the provision of any of the following: health care services, utilization review services, medical social work services and administrative services.

2.33 **Provider Private Contract**. Medical Group understands that Plan is prohibited by CMS from paying Capitation to, or including in its provider network, any provider that has entered into a private contract with a Medicare beneficiary for the provision of Covered Services.

2.34 **Financial Requirements**.

    i.    Medical Group agrees to submit to Plan an annual audited financial statement after the close of Medical Group's fiscal year. Medical Group shall also submit to Plan quarterly income statements and balance sheets (covering the immediately prior three (3) month period) no later than sixty (60) calendar days following the end of each of Medical Group's fiscal quarters.

    ii.    Medical Group agrees to maintain accounting records related to this Agreement in accordance with generally accepted accounting practices (GAAP). Medical Group shall calculate and record at least quarterly the estimate of incurred but not reported claims (IBNR). Methodology for computing IBNR shall be consistent with industry practices. Accounting for dollar amounts shall be in accordance

with generally accepted accounting practices (GAAP). Working papers that support the IBNR calculation shall be maintained as part of the records of Medical Group.

iii.    Medical Group agrees to maintain, at all times through the term of this Agreement: (i) a positive working capital (current assets net of related party receivables, less current liabilities); (ii) a positive tangible net equity, and (iii) such other financial standards as required by law or CMS instructions.

2.35    **Delegated Activities**.

i.    Plan hereby authorizes Medical Group to perform, and Medical Group agrees to perform on Plan's behalf, those activities ("Delegated Activities") delineated in Attachment D together with Attachments D-1 & D-2 (Credentialing) and D-3 (Utilization Management) and D-4 (Claims) which are attached hereto and incorporated herein by this reference.

ii.    Plan retains primary responsibility for Delegated Activities that are not specifically delegated to Medical Group. Medical Group shall cooperate and comply with Plan's performance of such activities, as reasonably necessary.

iii.    If Medical Group attains and maintains accreditation by an agency acceptable to Plan during the term of this Agreement, Plan agrees to exempt Medical Group from pre-delegation, annual, and follow-up onsite audits of Delegated Activities, except to the extent those Delegated Activities must be monitored by Plan as required by any regulatory agency having jurisdiction over Plan. Medical Group shall supply written evidence of such accreditation to Plan no less than once every twelve (12) months and upon renewal. Medical Group shall immediately notify Plan in the event such certification is revoked or is not renewed.

iv.    If Plan rescinds credentialing delegation, Plan shall propose the following charge to Medical Group: greater of $0.15 pmpm or $500 a month deducted from capitation payments. If Medical Group objects to such charge, or if Plan proposes a different amount which is subsequently rejected by Medical Group, the parties will follow the process stated in section 6.4 of this Agreement.

2.36    **Reimbursement of Plan Expenditures**. If Plan becomes aware of Medical Group's failure to pay a claim or other financial responsibility for a Covered Service that was Medical Group's responsibility, Plan may, upon fifteen (15) calendar days' prior written notice to Medical Group, make payment on behalf of Medical Group for such unpaid claim. If Plan shall make any such expenditure, or shall incur any other charges as a result of Medical Group's failure to perform any delegated functions hereunder, Plan may not deduct such expenditures from Medical Group's Capitation payment unless Medical Group provides advance written approval.

2.37    **Provider Manual**. Medical Group shall comply, and shall require each Group Provider to comply, with the standards and procedures set forth in the Provider Manual.

a)    Non-material changes - Plan may amend non-material terms in the Provider Manual and such changes shall be effective immediately.

b)    Material changes - Changes to any material term set forth in the Provider Manual shall require advance written approval of Medical Group unless otherwise stated in this Agreement. If the Plan and the Medical Group cannot agree to the change to the Provider Manual, the parties will initiate Dispute Resolution as stated in Article 7.

c)    Regulatory changes - Changes mandated by state law, federal law or regulations of a private sector accreditation organization shall be effective as required to comply with such regulatory entity.

No terminable offence stated in the Provider Manual shall be valid unless stated as a terminable offence in this Agreement.

If Provider Manual and Agreement are found to be in conflict, Agreement will supercede Provider Manual.

2.38    **Submission of Encounter Data**.  Medical Group agrees to require its Group Providers to furnish Plan with complete encounter data for all Covered Services rendered to Plan Members assigned to Medical Group in the CMS 1500 format or a mutually acceptable alternate format as described in the Provider Manual.  This encounter data will be furnished to Plan monthly and shall be received by Plan within timelines specified in the Provider Manual. Medical Group also agrees to furnish, and shall require its Group Providers to furnish, medical records that may be required to obtain any additional information to corroborate the encounter data.  The ultimate responsibility for assuring that Group Providers provide encounter data and medical records to Plan in accordance with Plan's requirements rests with Medical Group.

2.39    **Non-Covered Services**.  Medical Group agrees, and Medical Group shall assure that all Downstream Providers agree, never to charge any Plan Member assigned to Medical Group for any health care service that is not Medically Necessary or not appropriate after utilization review by Medical Group, unless the Plan Member specifically requests the service and acknowledges in writing that the service is not a Covered Service under the Plan Member's Benefit Agreement.

# ARTICLE 3
# PLAN OBLIGATIONS

3.1    **Plan Administrative Services**.  Plan will perform, or arrange for the performance of, all necessary accounting and enrollment functions with respect to marketing and administering the plan.  Plan will issue an identification card to each Plan Member covered under a Benefit Agreement and maintain a system for verifying eligibility.  Plan shall make trained personnel available to Medical Group to assist in quality management activities, the establishment of procedures for pre-admission medical review and concurrent medical review of Plan Members who require, or may require, hospitalization.

3.2    **Plan's Delegation of Activities**.  Plan agrees to delegate to Medical Group the Delegated Activities identified in Attachment D together with Attachments D1, D2, and D3 and D4.

3.3    **Claims Payment**. Plan shall review, adjudicate and pay all claims which are the financial responsibility of Plan within thirty working days of receipt of a clean claim from a non contracted provider and within or sixty days from a contracted provider, whichever timeframe is less.

3.4    **Eligibility Reports**.  Plan will maintain, update, and distribute each month one or more reports containing information on Plan Members who have selected Medical Group.  This report will identify the PCP selected by the Plan Member and the Plan Member's coverage type and shall be provided in the form of a paper report or computer file as agreed by the parties.  The reports will be sent to Medical Group by the tenth (10th) of each month identifying eligible Plan Members from the first (1st) of the month.  Notwithstanding the foregoing, the format and the delivery date for enrollment data for Plan Members may be controlled by CMS and that data regarding certain Plan Members may also be largely within the control of CMS.  While Plan will endeavor to obtain prompt and full delivery of such data, Medical Group acknowledges that Plan shall not be

liable for delays or incompleteness of such reports due to circumstances beyond Plan's reasonable control.

3.5    **Exclusivity**.  Plan shall receive Medical Group services, as defined in Attachment A "Division of Financial Responsibility", exclusively from Medical Group, in Medical Group Practice Area.

3.6    **Service Area Expansion**.  In the event that Plan expands its service area to include Stanislaus County and/or Merced County, Plan shall promptly inform Medical Group, and Medical Group shall have the right, exercisable within thirty (30) days of receipt of such notice, to elect to expand the Medical Group Practice Area to include one or both of such counties.

## ARTICLE 4
## ADDITIONAL PLAN AND MEDICAL GROUP OBLIGATIONS

4.1    **Utilization Management**.

i.    **Utilization Management Program**.  Medical Group shall adopt and implement a Utilization Management Program that is consistent with Plan's Utilization Management Program and applicable state and federal laws, regulations and CMS requirements.  Medical Group shall comply with and accept as final, the decisions of Plan's Utilization Management Plan, and pending resolution of any dispute through the dispute resolution process, comply with the decisions of Plan's Utilization Management Program.  The final determination of medical necessity and/or Evidence of Coverage compliance rests with Plan, subject to dispute resolution procedures and, upon appeal to the DMHC in applicable situations, the DMHC's determination.  Plan reserves the right to conduct an annual site visit or as necessary for the purpose of reviewing and approving Medical Group's internal procedures pertaining to utilization management.  Plan will provide findings, results, and recommendations from the reviews to Medical Group.

ii.    **Utilization Management Plan Procedures**.  Medical Group's Utilization Management Plan shall include procedures approved by Plan to identify, assess, establish, and implement a treatment plan for Members assigned to Medical Group with complex or serious medical conditions.  The Utilization Management Plan shall also contain procedures for direct access of Members assigned to Medical Group to any services as mandated by CMS and if applicable DMHC.  All Medical Group denial letters shall provide Members assigned to Medical Group with timely notice and shall contain appropriate Plan Member appeals rights as approved by CMS and if applicable DMHC.  Medical Group agrees to cooperate with Plan in furnishing the required reports identified in the Provider Manual.

iii.    **Utilization Management Committee**.  Medical Group shall establish a utilization management committee that shall review and document the quality, appropriateness, level of care and utilization of health care services provided to Members assigned to Medical Group.  The committee shall comply with the policies and procedures identified in the Utilization Management Plan. Plan staff and/or Medical Director may attend committee meetings as it pertains to or affect Plan Members.

4.2    **Coordination of Benefits**.    Coordination of Benefits ("COB") is intended to eliminate duplication of payment and assist patients to receive the maximum benefit to which they are entitled.  When the primary and secondary benefits are coordinated, determination of liability will

be in accordance with Medicare regulations, applicable state regulations, and recommendations of the National Association of Insurance Commissioners ("NAIC").

i.  Medical Group and Plan agree to coordinate with each other for proper determination of COB and to enable Plan or Medical Group to bill and collect from such other payors.

ii.  Medical Group agrees to coordinate with Plan for proper determination of COB and to bill and collect from other payors and third party liens such charges for which the other payor is responsible.  Medical Group agrees to establish procedures to effectively identify, at the time of service and as part of its claims payment procedures, individuals and Covered Services for which there may be a financially responsible party other than Plan. Medical Group will bill and collect from other payors those amounts for which the payer is responsible under the applicable COB provisions.  In no event shall the existence of such other payors cause Plan to delay or withhold Capitation payments.  Plan hereby assigns to Medical Group the collection any claims or demands against third parties for amounts due for services which are the financial responsibility of Medical Group as defined in Attachment A.

iii.  Plan will cooperate in providing COB information to Medical Group by collecting appropriate data from the Plan Member at the point of enrollment and supplying such data to Medical Group.  Plan will additionally notify Medical Group upon identification of other amounts payable by other entities not previously identified by Medical Group and will cooperate with Medical Group's collection efforts.

4.3    **Medical and Administrative Records**.

i.  **Disclosure of Records**.  Medical Group agrees to maintain and make available and to require its Group Providers to maintain and make available, books, documents, and records to Plan, CMS, and if applicable DMHC, the Secretary of the U.S. Department of Health and Human Services ("HHS"), any Peer Review Organization ("PRO") or accrediting organizations, the U.S. Comptroller General, their designees, and other representatives of regulatory/accrediting organizations for a period of ten (10) years from the termination of the Agreement.  For purposes of utilization management and quality improvement, Plan and officials referred to above shall have access to, and copies of, at reasonable times upon request, the medical records, books, charts, and papers relating to any Group Provider's provision of health care services to Members assigned to Medical Group, and payments received by that Provider from Members (or from others on their behalf). Plan, however, shall not have access to the cost of such services unless it receives written instructions from CMS to seek and obtain such information.  The records described herein shall be maintained at least for ten (10) years from the final date of the particular contract period, or from the completion of any government agency audit, whichever is later.

ii.  **Medical Records**.  Medical Group will require that all Group Providers establish and maintain for each Plan Member assigned to Medical Group and who has obtained care from such provider a medical record that contains such demographic and clinical information as is necessary, in the opinion of the Plan Medical Director and Medical Group Medical Director, to provide documentation as to the medical problems and Covered Services provided to the Plan Member.  Such record shall include a historical record of diagnostic and

therapeutic services recommended or provided by, or under the direction of, the provider. Such records shall be in such a form as to allow trained health professionals, other than the provider, to readily determine the nature and extent of the Plan Member's medical problem and the services provided and permit peer review of the care provided.

iii. **Right to Inspection**. It is understood that the medical records referred to in Section 4.3(ii) above will be and remain the property of Medical Group or Group Providers and will not be removed or transferred from their offices except in accordance with applicable laws. Plan or its designated representatives will have the right, upon request, to inspect, review, and make copies of such records at Plan's expense to facilitate Plan's obligation to conduct quality management, utilization monitoring, and peer review activities or its compliance with laws and regulations. If Plan requests that copies be made by Medical Group, the amount paid by Plan to Medical Group or the Group Provider for the copying of such records shall not be more than would have been paid by the federal Medicare program or the Medicare contracted PRO to obtain copies of such records. In instances where such requests for medical records are at the request of CMS, DMHC or other regulatory agencies, Plan shall incur no expense related to such record copying.

iv. **Confidentiality**. Medical Group and Plan agree to maintain the confidentiality of information contained in the medical records of Members assigned to Medical Group in accordance with the "Confidentiality of Medical Information Act," California Civil Code Sections 56 *et seq.* Medical records may be disseminated to authorized Group Physicians; to a hospital's morbidity, mortality, tissue, utilization review, judicial review, other quality of care and administrative review committees; to Plan itself; or to an appropriate Plan peer review, quality management or utilization management committee or subcommittee identified by Plan, or as otherwise required by law. Medical Group shall require that all Group Physicians comply with applicable state and federal laws regarding confidentiality and disclosure of mental health records, medical records, other health and Plan Member information for Members assigned to Medical Group. Medical Group and Group Providers shall develop policies and procedures to ensure that Members' medical records assigned to Medical Group are not disclosed in violation of any such laws. To the extent Medical Group or a Group Provider receives, maintains or transmits medical or personal information of Members electronically, Medical Group shall comply and shall require its Group Providers to comply with all state and federal laws relating to the protection of such information, including, but not limited to, the Health Insurance Portability and Accountability Act (HIPAA) provisions on security and confidentiality.

v. **Plan and Governmental Agency Access to Records**. Medical Group will cooperate with Plan and government officials in maintaining and providing medical, financial, administrative and other records of Members assigned to Medical Group as shall be requested by Plan or such agencies. Plan and such agencies will have access at reasonable times upon ten (10) days prior notice to the books, records and papers of Medical Group and Group Providers relating to Covered Services provided to Members assigned to Medical Group, the quality, appropriateness, timeliness, and any payments received by Medical Group or Group Providers for Covered Services provided to Members assigned to Medical Group, Plan, however, shall not have access to the cost of such services unless it receives written instructions from CMS to seek and obtain such information. Medical Group agrees to permit, and to require Group Providers to permit CMS

and any other unit of the U.S. Department of Health and Human Services, and if applicable DMHC to conduct a site evaluation of Medical Group's and Group Providers' facilities in accordance with the current state and federal laws and regulations and to comply with any agency's recommendations, if any.

vi.   **Availability of Records Upon Termination**.  The obligations contained in this Section 4.3 will continue despite the termination of this Agreement, whether by rescission or otherwise.  In the event of termination of this Agreement, Medical Group will provide Plan, Plan Member, Group Physicians, state and federal agencies and any duly designated third party with reasonable access to medical records of Members maintained by Medical Group or Group Physicians, for a period of ten (10) years after the termination of this Agreement, and at any time thereafter that such access is required in connection with a Plan Member's medical care who was assigned to Medical Group.  The cost of providing such copies will be paid by the receiving party, where such costs shall not exceed the amounts stated by law.

vii.  **Plan Member Access to Records**.  Medical Group and Group Providers shall ensure that Members assigned to Medical Group have access to their medical records in accordance with the requirements of state and federal laws.

4.4   **Joint Operations Meetings**.  Plan shall periodically convene a meeting of Plan and Medical Group representatives, including the Medical Group Medical Director and its Plan Liaison, to discuss operational issues.

4.5   **Plan Oversight**.  The delegation of the functions stated herein does not relieve Plan from any duty to monitor Medical Group's performance of such delegated duties under the Knox-Keene Act or other laws or regulations, nor does it impair Plan's authority to perform such obligations by itself.  Plan is authorized to perform and remains liable for the performance of such obligations, notwithstanding any delegation of some or all of those obligations to Medical Group.

4.6   **Anti-Fraud Plan**.  Plan has established an Anti-Fraud Plan to organize and implement an anti-fraud strategy to identify and reduce costs to Plan, Members, providers and others caused by fraudulent activities, and to protect consumers through the timely detection, investigation and prosecution of suspected fraud.  Medical Group agrees that it has received this Anti-Fraud Plan, shall abide by the requirements of the same (or shall maintain its own anti-fraud/compliance program that meets or exceeds the standards of Plan's Anti-Fraud Plan) and make the same available to its employees, Group Providers, contractors and agents involved in providing services under this Agreement.

4.7   **Products** – This Agreement is limited to Medicare Advantage ("MA"), Medicare Advantage Prescription Drug ("MA-PD") and Medicare Advantage Special Needs ("SNP") product of Plan.

## ARTICLE 5
## COMPENSATION

5.1   **Capitation Payments**.

i.   In consideration for Physician Services to be rendered under this Agreement to Plan Members who have selected Medical Group in accordance with Plan enrollment policies and procedures, and related administrative services that are the responsibility of Medical Group in accordance with Attachment A, Plan shall pay Medical Group the applicable Capitation amounts set forth in Attachment B hereto. Subject to sub section (v) below, no amounts will be withheld by Plan from Capitation amounts set forth in Attachment B.

EXHIBIT 2 - PAGE 22

Any such payments owed to Medical Group under this Agreement shall be made to Medical Group within five (5) calendar days from the date Plan receives payment from CMS, or if the fifth (5th) day falls on a weekend or holiday, the first business day thereafter. Such Capitation payments shall be adjusted by Plan for actual Members assigned to Medical Group who are enrolled in Plan for that month, in accordance with Plan enrollment and disenrollment policies and procedures. Notwithstanding anything herein to the contrary, during the first month of this Agreement, Plan shall make an additional payment to Medical Group as an advance against Capitation payments and/or other amounts that may become due for services rendered in subsequent periods (the "Advance"). The Advance shall be in an amount equal to the amount of the first Capitation payment owed hereunder, and shall be made to Medical Group within fifteen (15) calendar days from the first date after the Effective Date that Plan receives payment from CMS, or if the fifteenth (15th) day falls on a weekend or holiday, the first business day thereafter. Medical Group shall hold such Advance until after the termination or expiration of this Agreement, whereupon a reconciliation will occur as follows. Within thirty (30) days after the termination or expiration of this Agreement, the parties shall conduct a final reconciliation of the Advance against any and all other amounts then owed by Plan to Medical Group, and Medical Group shall promptly pay to Plan such portion of the Advance, if any, that has not been applied to satisfy other payment obligations of Plan to Medical Group. This reconciliation provision shall survive the termination or expiration of this Agreement.

ii.    Capitation for Members enrolled in the Medicare Advantage Plan may be adjusted in accordance with risk adjustments of CMS (concurrent or retroactive).

iii.    Medical Group shall accept payments specified in Attachment B as payment in full except for any applicable Coinsurance, Co-payments and Deductibles, and shall not hold any Plan Member liable for payment of any fees that are the legal obligation of the Plan, other than for applicable Coinsurance, Deductibles, or Co-payments, due to the Medical Group. Medical Group shall not bill, charge, collect a deposit or other sum or seek compensation, remuneration or reimbursement from, or maintain any action at law or have any other recourse against, or make any surcharge upon, a Plan Member or other person acting on a Plan Member's behalf to collect sums owed by Plan. For Plan Members eligible for both Medicare and Medicaid, Medical Group shall not hold such Plan Members liable for Medicare Part A and B cost sharing when the State is responsible for paying such amounts. For such Plan Members, Medical Group will (a) accept the Plan payment as payment in full, or (b) bill the appropriate State source. This provision shall survive termination of this Agreement whether by rescission or otherwise.

iv.    Medical Group agrees to hold harmless both CMS and Plan Members including dual eligible Plan Members in the event Plan cannot or will not pay for Covered Services which are the financial responsibility of Plan as defined in Attachment A.

v.    Plan shall be entitled to recover an overpayment of a claim from Medical Group in the manner prescribed by and allowed for in applicable law and regulation. Medical Group must reimburse Plan for an uncontested overpayment within ninety (90) working days from its receipt of Plan's written notice of overpayment consistent with section 9.8. Medical Group agrees that if Plan does not receive reimbursement for such uncontested overpayment within such ninety (90) working days, Plan shall have the right to offset such overpayment against payments that Plan owes to Medical Group, but only if Medical Group does not contest the overpayment determination. This right of Plan to offset from capitation does not extend to instances of retroactive disenrollment of Plan Medicare Members and any CMS directed amounts, and in such cases, Plan will provide

the capitation detail which typically explains all retroactive activities and is the standard mechanism for recording retroactive disenrollment of Plan Medicare Members.

5.2    **Physician Services and All Other Covered Benefits**.

    i.    Medical Group agrees to be financially responsible for all Physician Services which are defined as Medical Group financial responsibility in Attachment A hereto.

    ii.    Medical Group and Plan agree to establish procedures to effectively identify, individuals and services for which there may be a financially responsible party other than Plan.

5.3    **Third Party Liens.**  Medical Group shall make reasonable efforts to recover the value of Covered Services rendered to Members assigned to Medical Group whenever said Members are covered for the same services, either fully or partially, under any other contractual or legal entitlement including, but not limited to, a private group or indemnification program. Medical Group's pursuit and recovery under third party liens shall be conducted in strict accordance with the procedures set forth in the Provider Manual. All sums received must not exceed the amounts permitted under Section 3040 of the Civil Code.

5.4    **Plan Member Non-Liability**.  Medical Group agrees that Members assigned to Medical Group shall not be liable to Medical Group or Group Providers for any sums owed to Medical Group by Plan or owed to such providers by Medical Group. At no time will Medical Group, its Group Providers or any party with a claim against Plan or Medical Group for Covered Services, bill or otherwise seek compensation from Members for such services, except in the case of Copayments or in cases when a third-party payor is primarily responsible and has paid or may be obligated to pay a Plan Member for, or based on a Plan Member's receipt of, a Covered Service.

5.5    **Retroactive Cancellations and Additions**.  Plan will discourage retroactive cancellations or additions of any Plan Member. However, Plan may retroactively disenroll or add Members (i) as may be required by CMS and if applicable DMHC or (ii) no more than ninety (90) days following the effective date of the cancellation or addition when due to reasonable administrative processing requirements.

5.6    **Payment for Non-Covered Services**.  Medical Group and its Group Providers may seek payment from Members assigned to Medical Group for Non-Covered Services at usual and customary charges, in accordance with the procedures set forth in the Provider Manual and as permitted by law.

5.7    **Determination of Covered Services**.  The determination of whether a service or supply is a Covered Service rests with Plan, subject to the regulations and the appeals procedure established by CMS and if applicable DMHC. Medical Group shall refer Members who have inquiries or disputes regarding such coverage to Plan for response and resolution. This provision, however, does not and shall not be construed to prohibit any Group Provider from providing any medical treatment, or other advice that such Group Provider believes to be in the best interest of the patient.

5.8    **Medical Necessity Assistance**.  In all cases where Medical Group and/or a Group Provider has made a determination regarding whether a medical service requested or provided to a Plan Member is Medically Necessary, Medical Group shall, upon the request of Plan, assist Plan in determining whether such service is Medically Necessary and provide relevant medical records to Plan. Medical Group shall make best efforts to participate in any grievance, arbitration, and/or other proceedings in which such determination is an issue. Moreover, Medical Group agrees to

cooperate with and abide by, and to require its Group Providers to cooperate with and abide by, the determination of any external review entity to which Plan is either obligated by law to submit such disputes or for which Plan has implemented a program to submit such disputes to external review.

## ARTICLE 6
## TERM AND TERMINATION

6.1   **Term and Renewal.** The term of this Agreement shall commence on October 1, 2020 and shall expire on December 31, 2030; provided, however, that Medical Group shall have the right to extend the Term for such additional period(s) of time as it shall elect, in its sole and absolute discretion, by providing written notice of such election at any time prior to the expiration of the term, as the same may be extended from time to time.

6.2   **Termination Without Cause.** Notwithstanding any other provision of this Agreement, Medical Group shall have the right to terminate this Agreement without cause at any time, by providing Plan with written notice at least thirty (30) days prior to the effective date of such termination, or such longer period of time as may be required by applicable law.

6.3   **Plan's Right to Terminate Agreement With Cause.** Nothing herein will be construed as limiting the right of Plan to terminate this Agreement upon delivery of written notice of any of the following events subject to the process stated in section 6.4 of this Agreement:

   i.   the State of California or the United States Government revokes any certifications or licenses of Medical Group  that prevent the performance of Medical Group's obligations under this Agreement; or

   ii.   Plan reasonably determines that the health, safety, or welfare of Members assigned to Medical Group is jeopardized by continuation of this Agreement; or

   iii.   Plan ceases to operate in the Medical Group Practice Area; or

   iv.   fraud by Medical Group with respect to any of its material obligations under this Agreement; or

   v.   the suspension of Medical Group from participation in  Medicare or Medicaid; or

   vi.   the indictment or conviction of Medical Group or its principals for any crime or fraud, if either prevent the performance of Medical Group's obligations under this Agreement or prevents Plan from complying with its Benefit Agreement or a CMS order; or

   vii.   the loss or material limitation of Medical Group's professional liability insurance under Article 8 hereof which prevent the performance of Medical Group's obligations under this Agreement; or

   viii.   if Medical Group does not perform services satisfactorily as determined in writing by CMS, or

   ix.   if reporting and disclosure requirements specified in this Agreement are not met by Medical Group.

6.4   **Process for Terminating with Cause**

EXHIBIT 2 - PAGE 25

The party asserting cause for termination of this Agreement (the "Terminating Party") shall provide written notice of termination to the other party. The notice of termination shall specify the breach or deficiency underlying the cause for termination with sufficient information to allow the receiving party to identify the actions necessary to cure such breach.

If termination is however required by law or CMS or DMHC order, the following portion of this section 6.4 shall not apply, and termination shall occur on the timeline as stated in law.

If termination is however due to non-payment of compensation by Plan to Medical Group as defined in this agreement, the following portion of this section 6.4 shall not apply, and termination of the Agreement will occur five (5) days after Medical Group provides notice to Plan.

The party receiving the written notice of termination shall have thirty (30) calendar days from the receipt of such notice to cure the breach or deficiency to the reasonable satisfaction of the terminating party (the "Cure Period"). If such party fails to cure the breach or deficiency to the reasonable satisfaction of the Terminating Party within the Cure Period, the Terminating Party shall have the right to provide written notice of failure to cure the breach or deficiency to the other party following expiration of the Cure Period. This Agreement shall terminate five (5) calendar days following receipt of the written notice of failure to cure or at such later date as may be specified or otherwise required by applicable law. Notwithstanding the foregoing, in the event that Plan is the Terminating Party and Medical Group disputes whether Plan has cause for termination, Medical Group may opt to trigger the dispute resolution process under Article 7 by notifying Plan that it has done so within thirty (30) days of receiving notice. If Medical Group has timely opted to trigger the dispute resolution process, the time for cure shall be tolled (extended) from the date that the dispute notice is delivered to Plan until the resolution of the dispute resolution process, and the termination of this Agreement shall be held in abeyance until the resolution of such dispute resolution process. For the avoidance of doubt and notwithstanding anything herein to the contrary, a termination of this Agreement by Medical Group shall not be subject to foregoing process, and the time for cure, and termination of this Agreement, shall not be tolled pending resolution of the dispute resolution process set forth herein.

6.5    **Medical Group's Right to Terminate Agreement With Cause**. Nothing herein will be construed as limiting the right of Medical Group to terminate this Agreement upon delivery of written notice of the following events subject to the process stated in section 6.4 of this Agreement:

    i.    the State of California or the United States Government revokes any certification or license of Plan necessary for the performance of this Agreement; or

    ii.    Plan ceases to operate in the Medical Group Practice Area; or

    iii.    fraud by Plan with respect to any of its material obligations under this Agreement; or

    iv.    Plan revokes Medical Group's delegation, for either utilization management or claims adjudication for Covered Services which are Medical Group's financial responsibility as defined in Attachment A; or

    v.    Plan fails to compensate Medical Group as defined in this Agreement; or

    vi.    Plan materially breaches this Agreement or defaults in the performance of any material provision hereof.

6.6   **Medical Group's Right to Terminate Agreement for Nonpayment**. Notwithstanding anything herein to the contrary, in the event that Plan fails to compensate Medical Group timely in accordance with the terms and provisions set forth in this Agreement, Medical Group shall have the right to terminate this Agreement upon five (5) days' prior written notice to Plan. This termination right shall be in addition to, and not in limitation of, any other rights and remedies of Medical Group under this Agreement, at law or in equity.

6.7   Notwithstanding any other provision of this Agreement, Plan may immediately prohibit any Medical Group Provider from treating Plan Members assigned to Medical Group upon the occurrence of any of the following events:

    i.   A Medical Group Provider's conviction of a felony or misdemeanor of moral turpitude;

    ii.   A Medical Group Provider is diagnosed as suffering from a severe mental or emotional disturbance;

    iii.   A Medical Group Provider's loss or suspension of the license(s) required to provide the services required under this Agreement.

    iv.   A Medical Group Provider's failure to provide satisfactory personal or professional references and credentials, or to provide verifiable information regarding past employment, training, hospital affiliation or professional licensing;

    v.   A Medical Group Provider being found guilty of malpractice which has resulted in substantial judgments, settlements, or awards against the Medical Group Provider.

6.8   **Medical Group and Group Provider Obligations Following Termination**. In the event this Agreement is terminated, Medical Group agrees to continue to provide Physician Services to all Members assigned to Medical Group, including any Members who become eligible during the applicable notice period, until the services being rendered to that Plan Member are completed or reasonable and medically appropriate provision is made for the assumption of such services by another contracting provider. In such cases, Physician Services rendered to Members shall be paid to Medical Group at the actual rates negotiated between Plan and contracted providers.

6.9   **Continuation of Benefits**. Medical Group agrees that, in the event of Plan's insolvency or cessation of operations, it will provide or arrange, and require Group Providers to provide or arrange for Covered Services to Members assigned to Medical Group through the period for which Capitation has been paid or until the discharge of Plan Member from an inpatient facility. Covered Services to a Plan Member confined in an inpatient facility on the date of insolvency or other cessation of operations will continue until their appropriate discharge.

6.10   **Survival of Terms**. Notwithstanding anything herein to the contrary, the following sections of this Agreement shall survive the termination of this Agreement by either party for any reason: Section 2.31 (Confidentiality of Medical Records), Section 4.3 (Medical and Administrative Records – Maintenance and Inspection/Audit Rights), Article 7 (Dispute Resolution), Article 8 (Insurance and Indemnification), and Article 9 (General Provisions).

# ARTICLE 7
## DISPUTE RESOLUTION

7.1 **Dispute Resolution**. Disputes between Medical Group and Plan shall be resolved as provided herein. First, such disputes or controversies between Medical Group and Plan shall be resolved, to the extent possible, by informal meetings or discussions between appropriate representatives of the parties. Either party must submit a Notice of Dispute stating the nature of the dispute, the party's position, and requested remediation in writing to the other party before arbitration in 7.2 can be initiated. The party receiving the notice has 30 days to respond to the other party. If no written response is forthcoming, the initiating party may file for arbitration under Section 7.2 below. If a written response is sent, the parties have 30 days to meet and confer, or otherwise attempt to settle the dispute. If the matter remained unresolved after the 30 days, either party can file for arbitration under Section 7.2 below.

7.2 **Arbitration**. Any dispute, controversy, or disagreement arising out of or relating to this Agreement shall be settled exclusively by binding arbitration which shall be conducted in a location acceptable to both parties, and if both parties do not agree on such location shall be conducted in San Francisco, California in accordance with the American Health Lawyers Association ("AHLA") Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and which to the extent of the subject matter of the arbitration, shall be binding not only on the parties to the Agreement, but on any other entity controlled by, in control of or under common control with the party to the extent that such affiliate joins in the arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. It is agreed that the arbitrator shall be bound by applicable state and federal laws and that the arbitrator shall issue written findings of fact and conclusions of law. The arbitrator shall have no authority to award damages or provide a remedy that would not be available to such prevailing party in a court of law. Nothing herein shall prohibit a party from seeking equitable relief in a court of law to maintain the status quo while arbitration is pending hereunder. The prevailing party as determined by the arbitrator shall not be entitled to recover from the non-prevailing party any or all reasonable costs, fees and expenses of the arbitration, including its actual attorneys' fees. In no event shall either party initiate arbitration prior to the conclusion of the provider dispute resolution procedures set forth in Section 7.1 or after the date when the institution of legal or equitable proceedings based on such dispute would be barred by the applicable statute of limitations. For the avoidance of doubt, the provisions set forth in this Article 7 are expressly subject to the limitations described in the last sentence of Section 6.4.

# ARTICLE 8
## INSURANCE AND INDEMNIFICATION

8.1 **Medical Group Insurance**. Medical Group agrees to procure and maintain, at its own expense, policies of professional and general liability insurance covering Medical Group, directors and officers insurance covering Medical Group's Board of Directors and officers, property and casualty and stop-loss insurance covering Medical Group's Plan Members as may be required by Plan and set forth in the Provider Manual. A current copy of each such policy or policies will be provided to Plan upon request from Plan.

8.2 **Medical Group Provider Liability Insurance**. Medical Group agrees to require each Physician who is a Group Provider to maintain professional liability (malpractice) insurance and general liability insurance coverage in the minimum amount of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) annual aggregate per Physician per year. If Medical Group or a Physician who is a Group Provider has a claims made malpractice insurance policy, Medical Group agrees, and warrants that each such Group Provider has agreed, to keep the policy in effect for at least five (5) years past any termination of the Agreement or purchase "tail" coverage. Said "tail" coverage shall have the same policy limits as the primary professional

liability policy. For other Group Providers, Medical Group agrees to require each Group Provider to maintain professional liability (malpractice) insurance and general liability insurance coverage in the minimum amounts that are customary in the industry and shall provide proof of such coverage to Plan upon request.

8.3 **Liability Issues**. The coverage programs in Sections 8.1 and 8.2 hereof shall insure Medical Group, its Group Providers and their employees against any claim for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of, or the failure to perform any service provided by Medical Group, its Group Providers and their employees or agents.

8.4 **Plan Liability Insurance**. Plan, at its sole cost and expense, will procure and maintain policies of general liability and other insurance necessary, or programs of self-insurance, to insure Plan and its employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with, the use of any property and facilities or equipment provided by Plan, and the activities performed by Plan in connection with this Agreement. A copy of such insurance policies will be provided to Medical Group upon request.

8.5 **Indemnification**. Plan shall indemnify and hold Medical Group harmless against any claim, demand, loss, lawsuit, settlement, judgment, or other liability, and all related expenses which may accrue, arising from or in connection with a claim of a third party arising from a negligent or otherwise wrongful act or omission of Plan, its agents or employees. Medical Group agrees to indemnify and hold Plan harmless against any claim, demand, loss, lawsuit, settlement, judgment, or other liability, and all related expenses which may accrue, arising from or in connection with a claim of a third party arising from a negligent or otherwise wrongful act or omission of Medical Group, its agents or employees. If each party claims and is entitled to indemnity from the other, the liability of each to the other shall be determined according to principles of comparative fault. Indemnity shall include damages, reasonable costs, reasonable expenses, and reasonable attorneys' fees as incurred by the party indemnified. For purposes of this provision, claims to which indemnification shall extend include administrative penalties or fines imposed by a regulatory agency on one party when the administrative action is the result of conduct or misconduct of the other party. The foregoing indemnification provision will survive and remain in effect following the termination of this Agreement. Notwithstanding any other provision of this section, either Party will not seek indemnity, whether contractual or equitable, from the other Party for any liability which may be imposed against each other under California Civil Code Section 3428 for the other's alleged denial, delay or modification of the provision of a Medically Necessary health care service recommended for, or furnished to, a Plan Member, where the health care service is a benefit provided under the applicable Benefit Agreement.

8.6 **Notification of Claims**. Plan and Medical Group agree to promptly notify the other party hereto of any claims or demands which arise and for which indemnification hereunder is sought.

## ARTICLE 9
## GENERAL PROVISIONS

9.1 **Compliance with State and Federal Laws**. Medical Group shall comply with all applicable state and federal laws, licensing requirements and professional standards and shall provide or arrange and require its Group Providers to provide or arrange for the provision of Covered Services in accordance with generally accepted medical and surgical practices and standards in the applicable professional community at the time of treatment. Any provision required to be in this Agreement by any state or federal law or regulation shall bind Plan and Medical Group, whether or not specifically set forth in this Agreement.

9.2 **Plan Member Hold Harmless**. Medical Group agrees that in no event, including but not limited to nonpayment by Plan or its fiscal intermediary or breach of this Agreement, shall Medical Group or any Group Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Plan Member assigned to Medical Group or a person (other than Plan or its fiscal intermediary) acting on behalf of the Plan Member for services provided pursuant to this Agreement. Under no circumstances shall Medical Group or a Group Provider impose a surcharge upon Members for Covered Services provided pursuant to this Agreement. Whenever Plan receives notice of any surcharge imposed upon a Plan Member by Medical Group or a Group Provider, Plan will take appropriate action, including but not limited to requiring Medical Group or the Group Provider to promptly refund to the Plan Member the full amount collected. This Agreement does not prohibit the collection of Copayments, as specifically provided in the Evidence of Coverage, or fees for Non-Covered Services delivered on a fee-for-service basis to Members. This Agreement does not prohibit Medical Group or a Group Provider and a Plan Member from agreeing to continue services solely at the expense of the Plan Member, subject to Medical Group or the Group Provider, prior to rendering such service, specifically informing the Plan Member that Plan will not cover or will not continue to cover a specific service or services as long as this has been documented by the Plan. Except as provided herein, this Agreement does not prohibit Plan from pursuing any available legal remedy. This section shall survive termination of this Agreement, regardless of the cause of termination, and shall be construed to be for the benefit of Members.

9.3 **Confidentiality**. Medical Group and Plan agree to keep confidential, except as otherwise required by applicable law or this Agreement, the terms and conditions of this Agreement and any amendments thereto. Violation of the above shall be deemed a material breach.

9.4 **Waiver**. The waiver by either party of one or more defaults, on the part of the other, shall not be construed as a waiver of any future default, under the same or different terms, conditions or covenants contained in this Agreement.

9.5 **Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be construed and interpreted and enforced in accordance with, and governed by, the laws of the State of California, and the United States and all regulations promulgated pursuant thereto. Any provisions required to be in this Agreement by any of the above laws and regulations shall bind Plan and Medical Group whether or not expressly provided in this Agreement. The existence, validity and construction of this Agreement shall be governed by the internal laws of the State of California and Federal law as applicable.

9.6 **Assignment**. Neither party may assign or transfer, in whole or in part, this Agreement, or any rights, duties or obligations under this Agreement, without the prior written consent of the other party, and any attempted assignment or transfer without such consent shall be null and void; provided, however, that Plan shall be required to assign all or substantially all of its rights, duties or obligations hereunder to any entity ("Buyer") with which Plan has contracted for the sale, assignment or other disposition of all or substantially all of its assets ("Asset Sale"). In the case of such Asset Sale, the Plan agrees to assign such rights, duties and obligations hereunder to Buyer effective from and after the closing of such Asset Sale and promptly notify Medical Group of such assignment in writing. From and after the closing of the Asset Sale, Medical Group will continue to perform its obligations hereunder for the benefit of the Buyer as assignee of the Plan. In the event that Medical Group undergoes an Asset Sale, Medical Group may assign this Agreement to the applicable Buyer without Plan's prior written consent.

9.7 **Independent Parties**. None of the provisions of this Agreement is intended to create or will be deemed or construed to create any relationship between the parties hereto other than that of independent contractors, solely for the purposes of effecting the provisions of the Agreement.

EXHIBIT 2 - PAGE 30

Neither of the parties hereto, nor any of their respective officers, directors, or employees shall act as nor be construed to be the agent, the employee or the representative of the other.

9.8 **Notices**. All notices required or permitted to be given under this Agreement shall be in writing and shall be delivered to the party to whom notice is to be given either: (i) by personal delivery (notice shall be deemed given on the date of delivery), (ii) by Federal Express or other next day delivery service (notice shall be deemed given on the date of actual receipt), (iii) by first-class mail, postage prepaid certified or registered return receipt requested (notice shall be deemed given on the date of actual delivery) and (iv) by facsimile or e-mail with confirmation of transmission (notice shall be deemed given on the date of the transmission), as set forth below:

> **If to Plan:**
>
> > *Vitality Health Plan of California*
> > 18000 Studebaker Road, Suite 960, Cerritos, CA 90703
> > Attn: Chief Executive Officer
>
> **If to Medical Group:**
>
> > *Independent Physician Associates Medical*
> > *Group Incorporated d/b/a ("AllCare")*
> > 3320 Tully Rd., Ste. 1
> > Modesto, CA 95350
> > Attn: Chief Executive Officer

Either party may change its address as indicated above by giving written notice of such change to the other party in the manner specified in this Section 9.8.

9.9 **Integration of Entire Agreement**.   Both parties agree and understand that this Agreement includes the recitals and all Attachments referenced in this Agreement that are attached hereto and incorporated herein, and supersedes any and all prior agreements respecting the parties' rights and obligations.

9.10 **Non-Solicitation.**  Medical Group and its Participating Providers shall not engage in solicitation of Members without Plan's prior written consent.  Solicitation shall mean conduct by an officer, agent, employee or independent contractor (where independent contractor shall exclude another licensed health plan contracted with Medical Group) of Medical Group or its respective assignees or successors during the term of this Agreement which may be reasonably interpreted as designed to persuade Members to disenroll from Plan or discontinue their relationship with Plan. Notwithstanding any other provision of this Agreement, Medical Group agrees that Plan shall, in addition to any other remedies provided for under this Agreement, have the right to seek a judicial temporary restraining order, preliminary injunction, or other equitable relief against Medical Group to enforce its rights under this section in a manner consistent with and to the extent permitted by law.

Plan and its Affiliates or successor shall not engage in solicitation of Members assigned to Medical Group without Medical Group's prior written consent.  Solicitation shall mean conduct by an officer, agent, employee of Plan or an affiliate or their respective assignees or successors during the term of this Agreement, which may be reasonably interpreted as designed to persuade Members to disenroll from Medical Group.   Notwithstanding any other provision of this Agreement, Plan and its affiliates or successor agrees that Medical Group shall, in addition to any other remedies provided for under this Agreement, have the right to seek a judicial temporary restraining order, preliminary injunction, or other equitable relief against Plan, its affiliates or successor to enforce its rights under this section in a manner consistent with and to the extent

EXHIBIT 2 - PAGE 31

permitted by California law. Notwithstanding the foregoing, Medical Group and Group Providers shall be entitled to freely communicate with Members regarding any aspect of their health status or treatment.

9.11 **Invalidity or Unenforceability**. The invalidity or unenforceability of any terms or provisions hereof will in no way affect the validity or enforceability of any other term or provision.

9.12 **Captions and Headings**. The captions and headings used throughout this Agreement are for convenience or reference only and shall in no way be held or deemed to be a part of or affect the interpretation of this Agreement.

9.13 **Amendments**. Except as provided in this Section 9.13, this Agreement may be amended only by mutual, written consent of Plan and Medical Group. Notwithstanding the foregoing, if this Agreement must be modified to be in compliance with applicable federal or state law or regulations or the accreditation requirements of an industry recognized private accreditation organization, Plan may amend this Agreement by delivering to Medical Group a copy of the modifications, and such modification(s) shall be deemed accepted by Medical Group, however such modifications will not apply to Medical Group Compensation as defined in Attachment B, and shall not apply to modification of the financial responsibility as defined in Attachment A. In the event that the term of this Agreement is extended beyond December 31, 2020, on the request of Medical Group, the parties shall in good faith negotiate any amendments as may be reasonably required to account for such extension.

9.14 **Successors and Assigns**. Subject to the provisions of this Agreement regarding assignment, the terms, covenants and conditions contained herein shall be binding upon and inure to the benefit of the successors and assigns of the party hereto.

9.15 **Third Party Beneficiaries**. Both parties acknowledge that there is no intent by either party to create or establish any rights for a third party beneficiary. No third party may enforce any provision hereof.

9.16 **Contract Interpretation**. This Agreement shall be interpreted according to its terms and, in the event any term or provision should be found ambiguous, there shall be no presumption in favor or against either party on the grounds that one or the other was responsible for drafting any term or provision in this Agreement.

9.17 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day(s) and year set forth below.

**Independent Physician Medical Associates**
**Incorporated d/b/a ("AllCare")**
*("Medical Group")*

By: _____

Name: _MATT COURY_

Title: _CEO_

Address: _3320 Tully Rd._
_Modesto, CA 95350_

Date: _8/28/20_

Tax ID: _77-0243333_

**Vitality Health Plan of California**
*("Plan")*

By: _____

Name: _BRIAN BARRY_

Title: _President_

Address: _18000 Studebaker Road #960_
_Cerritos, CA 90703_

Date: _August 28, 2020_

## ATTACHMENT "A"
## DIVISION OF FINANCIAL RESPONSIBILITY FOR PLAN MEMBERS

### EFFECTIVE: October 1, 2020

This matrix of financial responsibility outlines the distribution of financial responsibility. It is not exhaustive, but serves as a guide by which broad categories of medical services are used to identify the distribution of financial responsibility for particular services.

| Service Description | Medical Group | Shared Risk | Plan |
|---|:---:|:---:|:---:|
| Allergy – Serum – OP | X | | |
| Allergy – Testing & Tx - OP – Prof | X | | |
| Ambulance (Air and Ground) – OP, transfer from OOA, Interfacility transfer, Medical Transfer for IPA pool services, Medical Transfer for Hospital Pool Services | | X | |
| Ambulance (Air and Ground) – OOA Emergency | | | X |
| Amniocentesis – OP – Fac | | X | |
| Amniocentesis – OP – Prof | X | | |
| Anesthesiology – IP & OP – Prof | X | | |
| Autologous Blood Services - OP - Fac & Prof | | X | |
| Biofeedback (Medically Necessary) – OP | X | | |
| Chemical Dependency (Detox) –Acute Care -  IP & OP – Fac | | X | |
| Chemical Dependency (Detox) – Acute Care - IP & OP – Prof | X | | |
| Chemical Dependency (Rehab) – Acute Care -   IP – Fac | | X | |
| Chemical Dependency (Rehab) – Acute Care - IP – Prof | X | | |
| Chemical Dependency (Rehab) – Acute Care -  OP – Fac | | X | |
| Chemical Dependency (Rehab) – Acute Care -  OP – Prof | X | | |
| Chemotherapy  (Injectable Chemotherapeutic Medications and Injectable Adjunct Pharmaceutical Therapies for Side Effects) – OP | | | X |
| Chemotherapy – OP – Prof. | X | | |
| Chemotherapy  (Injectable and Oral Chemotherapeutic Medications and Injectable Adjunct Pharmaceutical Therapies for Side Effects) - IP – Fac. | | X | |
| Chemotherapy – IP – Prof. | X | | |
| Chiropractic – Medical - OP - Fac & Prof | X | | |
| Chiropractic – Supplemental - OP - Fac & Prof | | | X |
| Circumcision – OP – Fac | | X | |
| Circumcision – OP – Prof | X | | |
| Diagnostic Tests, – OP – Prof, (unless otherwise stated herein) | X | | |
| Diagnostic Tests, – OP – Fac, (unless otherwise stated herein) | | X | |
| Diagnostic Tests – Cardiac Cath – OP – Fac | | X | |
| Diagnostic Tests – Cardiac Cath – OP – Prof | X | | |
| DME – IP | | X | |
| DME, Includes Ostomy/Colostomy Supplies, Glucometer/Insulin Pumps and test strips, Prosthetics/Orthotics – OP | | | X |
| Emergency Room - OP – Fac | | X | |

| Service Description | Medical Group | Shared Risk | Plan |
|---|---|---|---|
| Emergency Room – OP – Prof | | X | |
| Emergency Room-OP-Fac-OOA | | | X |
| Emergency Room-OP-Prof-OOA | | | X |
| Emergency Room-Urgent Care-Prof and Fac-OOA | | | X |
| Endoscopic Studies - IP – Prof | X | | |
| Endoscopic Studies – OP – Fac | | X | |
| Endoscopic Studies – OP – Prof | X | | |
| Experimental/Investigational – Cancer Clinical Trials – facility/professional | | | Not covered service |
| Family Planning – Abortions - OP – Fac | X | | |
| Family Planning – Abortions - OP – Prof | X | | |
| Family Planning – Contraceptive Devices – Insertion - OP – Prof | X | | |
| Family Planning – Contraceptive Devices – Non-Rx (eg. Norplant/IUD) – OP | | X | |
| Family Planning – Contraceptive Devices – Prescription – OP | | | X |
| Family Planning – GIFT/ZIFT/IVF - OP - Fac & Prof | | | X |
| Family Planning – Infertility Procedures - OP – Fac | | X | |
| Family Planning – Infertility Procedures - OP – Prof | X | | |
| Family Planning – Infertility Testing – OP – Prof | X | | |
| Family Planning – Sterilization - IP & OP – Prof | X | | |
| Family Planning – Sterilization - IP – Fac | | X | |
| Family Planning – Sterilization - OP – Fac | | X | |
| Fetal Monitoring – OP – Prof | X | | |
| Fetal Monitoring – OP – Fac (False Labor only) | | X | |
| Gastric Bypass – IP – professional | | X | |
| Genetic Testing | | X | |
| Health Education – OP | X | | |
| Health Eval/Physical | X | | |
| Hearing Aids/Molds – OP | | | X |
| Hearing Screening (Audiologic Evaluation) – OP | X | | |
| Hemodialysis / Dialysis - IP & OP – Prof | X | | |
| Hemodialysis / Dialysis - OP – Fac | | X | |
| Home Health Care / Home Infusion Therapy - OP – Prof & Facility | | X | |
| Hosp Based Phys Interpretative Serv Incl Radiology & Pathology – IP & OP – Prof | X | | |
| Hospice Services – IP and OP – Prof | | | Carved Out to Medicare |
| Hospitalization Services - IP– Fac | | X | |
| Immunizations & Inoculations Adult and Childhood – OP | X | | |
| Infusion Therapy – OP | | X | |
| Injectables and Self-Injectables – OP | | | X |
| Laboratory/Pathology (Diagnostic Only) – OP – Fac | X | | |
| Laboratory/Pathology (Diagnostic Only) – OP – Prof | X | | |

| Service Description | Medical Group | Shared Risk | Plan |
|---|---|---|---|
| Laboratory/Pathology – IP – Fac | | X | |
| Laboratory-IP or OP Surgical Tech Fees | | X | |
| Laser Procedures, Facility | | X | |
| Laser Procedures, Prof | X | | |
| Lithotripsy - OP – Fac | | X | |
| Lithotripsy - OP – Prof | X | | |
| Long Term Acute Care Facility | | X | |
| Med/Surg Supplies (casts, splints, bandages) - Office – OP | X | | |
| Med/Surg Supplies-IP | | X | |
| Medication – Prescription – OP | | | X |
| Mental Health – IP & OP – Fac | | | X |
| Mental Health – IP & OP – Prof. | | | X |
| Observation Room - OP – Fac | | X | |
| Oral Surgery / Dental Services – As covered by the Member's Medical Benefits- OP – Fac | | X | |
| Oral Surgery / Dental Services –As covered by the Member's Medical Benefits – OP – Prof | X | | |
| Out of Area - IP & OP – Fac | | | X |
| Out of Area - IP & OP – Prof | | | X |
| Outpatient Surgery - OP – Fac | | X | |
| Outpatient Surgery - OP – Prof | X | | |
| Physician Services (All Professional Services) - IP & OP – Prof, unless otherwise noted herein. | X | | |
| Podiatry- Facility | | X | |
| Preadmission Testing, associated with Admission | | X | |
| Prosthetics – Surgical Implants – OP | | X | |
| Radiation Therapy - IP & OP – Prof | X | | |
| Radiation Therapy - IP & OP – Fac | | X | |
| Radiology (Diagnostic Only) - OP – Fac | X | | |
| Radiology (Diagnostic Only) - OP – Prof | X | | |
| Radiology – IP – Fac | | X | |
| Reconstructive Surgery - IP & OP – Prof | X | | |
| Reconstructive Surgery - OP – Fac | | X | |
| Rehabilitation – Cardiac – OP – Prof | X | | |
| Rehabilitation – Cardiac – OP – Fac | | X | |
| Rehabilitation - OT/PT/RT/ST – OP – Fac/Prof | X | | |
| Skilled Nursing Facility - IP – Fac | | X | |
| Sleep Studies – OP | X | | |
| TMJ – Evaluation (excludes dental exams/treatment) - OP – Prof | X | | |
| Transfusions - OP – Fac | | X | |
| Transplant Candidacy and Maintenance; OP and IP Professional, In Area | X | | |
| Transplant Candidacy and Maintenance; OP and IP Professional, Authorized by Plan or Medically Necessary to be done Out of Area | | X | |
| Transplant Candidacy and Maintenance: OP and IP Facility | | X | |
| Transplant Evaluation OP and IP Professional. | | | X |

Vitality Health Plan Agreement

| Service Description | Medical Group | Shared Risk | Plan |
|---|---|---|---|
| Transplant Evaluation OP and IP Facility. | | | X |
| Transplant Procedure and Procurement OP and IP Professional Services. | | | X |
| Transplant Procedure and Procurement OP and IP Facility. | | | X |
| Transplant Related Transportation and Housing. | | | X |
| Transplant Follow-up OP and IP Professional; Year 1. | | | X |
| Transplant Follow-up OP and IP Facility; Year 1. | | | X |
| Transplant Years 2 – 5 Follow-Up, OP and IP Professional | X | | |
| Transplant Years 2 – 5 Follow-Up, OP and IP Facility | | | X |
| Urgent Care - OP – Fac & Prof | X | | |
| Vision – Medical Treatment - OP – Prof | X | | |
| Vision – Refraction for Contact Lenses/Frames - OP - Prof | X | | |
| Vision Care Materials - Contact Lenses/Frames (non-cataract) - OP | | | X |

## ATTACHMENT "B"
## MEDICAL GROUP COMPENSATION

## EFFECTIVE DATE: <u>OCTOBER 1, 2020</u>

### 1. <u>Compensation of Medical Group for Services</u>

Each month, Plan shall distribute the Premium that Plan receives on behalf of Plan Members who have selected Medical Group ("Medical Group Compensation") as follows:

| Medical Group Allocation | % of Premium |
|---|---|
| Medical Group Compensation | 39% |

"Premium" is defined as the monthly CMS payment for Medicare Part A and Part B services (including but not limited to risk adjusted premium, demographic premium, rebates, and other positive adjustments), premiums paid to Plan by the Member (if any), Medicaid (MediCal) payment for Part A and Part B services, and other like payments for or in respect of Members assigned to Medical Group. For the avoidance of doubt, "Premium" is intended to be read expansively, and shall include all funds received by Plan for services that would be characterized as for or in respect of Part A or Part B services, regardless of the source of such funds (ex. CMS, DHCS, Member, etc.).

### 2. <u>Compensation for Covered Services Rendered to Members Not Assigned to Medical Group</u>

Medical Group agrees that the following constitute the amounts to be paid by Plan for Covered Services rendered by Group Providers when Emergency Service or Self-Referred Urgently Needed Services are rendered to a Member assigned to another Physician Contracting Group ("PCG") other than Medical Group (the "Allowable Amounts").

The Allowable Amount for Covered Services rendered to Medicare members assigned to another PCG by Group Providers will be the lessor of the amount due the Group Provider under its contract with Medical Group during the term of this Agreement; or 100% of the Group Provider's billed charge; or the allowable amount available by law, minus the Member's applicable Copayment. This section 2 of Attachment B shall cease to apply following termination of this Agreement.

## ATTACHMENT "B-1"

## RISK POOL PROVISIONS

## EFFECTIVE DATE: <u>OCTOBER 1, 2020</u>

Plan shall establish an annual recurring risk pool for Medical Group in order to provide an incentive for the efficient and effective use of certain Covered Services. The risk pools will be calculated utilizing the terms defined below. The risk pools will compare actual expenses incurred for certain Covered Services provided to Medical Group Plan Medicare Members, to Plan's budget for such expenses for the Risk Pool Period. The services included in the risk pools are specified on Attachment A (Division of Financial Responsibility) in the column entitled "Hospital Budget".

Plan will apply a reasonable incurred but not reported ("IBNR") factor to Shared Risk Pool Expense prior to calculating the experience under the risk pool.

Compensation defined in this Attachment B-1 will be Shared Risk Services. During the term of this Agreement, and subject to written approval by Medical Group and by Plan, the funding for Hospital Budget may convert from Shared Risk to Full Risk (Full Risk defined as risk sharing agreement between Medical Group and a capitated hospital).

**<u>Shared Risk Program Between Plan and Medical Group</u>.** Both Plan and Medical Group shall be financially responsible for the utilization of Shared Risk Services, as defined below.

1. **<u>Shared Risk Services.</u>** The following are Shared Risk Services: all Covered Services specified on Attachment A (Division of Financial Responsibility) in the column entitled "Hospital Budget".

2. **<u>Shared Risk Pool Period.</u>** The Shared Risk Pool Period is October 1, 2020 through December 31, 2020. In the event that the term of this Agreement is extended beyond December 31, 2020, the Shared Risk Pool Period will be each consecutive twelve (12) month period, with the first beginning January 1, 2021, and the final Shared Risk Pool Period will be the period commencing on January 1 of the calendar year in which this Agreement expires or is terminated, and terminating on the date of this Agreement's expiration or termination.

3. **<u>Shared Risk Budget</u>.** The following is the Shared Risk Budget: **Forty five percent (45%)** of Premium received during the Shared Risk Pool Period.

4. **<u>Shared Risk Pool Expense</u>.** The following are Shared Risk Pool Expenses: (1) Actual amounts paid for Shared Risk Services during the Shared Risk Pool Period less Plan Medicare Member Copayments and any recoveries (including but not limited to overpayments, reinsurance, coordination of benefits, third party recoveries, work-related accidents or injuries), (2) The Clinic Services PMPM-Stanislaus expenses, (3) The Plan Clinic Services PMPM-San Joaquin expenses.

5. **Shared Risk Pool Surplus**. The following is a Shared Risk Pool Surplus: any Shared Risk Pool Period where Shared Risk Pool Expense is less than the Shared Risk Pool Budget, after subtracting any Deficit carry forward from prior Shared Risk Pool Periods.

6. **Shared Risk Pool Surplus Allocation**. The following is a Shared Risk Pool Surplus Allocation: Fifty percent (50%) of the net surplus shall be allocated to Medical Group, and fifty percent (50%) to Plan consistent with the Shared Risk Pool Settlement process outlined in Item #9 of this Attachment "B-1".

7. **Shared Risk Pool Deficit**. The following is a Shared Risk Pool Deficit: Any Shared Risk Pool Period, where Shared Risk Pool Expense is more than the Shared Risk Pool Budget.

8. **Shared Risk Pool Deficit Allocation**. The following is a Shared Risk Pool Deficit Allocation: Any Deficit in a given Fiscal Year will be forgiven and will not be applied to future Shared Risk Pool Periods. In the event of termination of this Agreement for any reason, any and all Deficits shall be the sole financial responsibility of Plan. In no event will Medical Group be financially responsible for Deficit.

9. **Shared Risk Pool Settlement.** The following is a Shared Risk Pool Settlement:

   a) Plan shall complete a reconciliation of all Shared Risk Pool Expenses, Shared Risk Pool Budget and add any necessary IBNR ("Proposed Settlement") within 120 calendar days following each Shared Risk Pool Period ("Reconciliation Period").

   b) Should there be a Shared Risk Pool Surplus, distribution of such surplus shall be in accordance with this hierarchy:

      (a) 1. Plan shall first allocate to Plan any Clinic Services PMPM-Stanislaus amounts paid to Medical Group for the current Shared Risk Pool Period.

      2. Plan shall then allocate to Plan any Plan Clinic Services PMPM-San Joaquin amounts paid to the current Shared Risk Pool Period.

      3. Plan shall be paid any remaining Shared Risk Pool Surplus up to any current or prior year Shared Risk Pool Deficit amounts.

      4. Any remaining Shared Risk Pool Surplus shall follow the Shared Risk Pool Surplus Allocation as described in Item #6 above.

   c) Plan will provide to Medical Group a Proposed Settlement within thirty (30) calendar days following the Reconciliation Period. Medical Group shall have 30 calendar days to review the Proposed Settlement ("Approval Period"). The Proposed Settlement shall include the calculation of the Shared Risk Pool Budget and Shared Risk Pool Expense and IBNR. Failure of Medical Group to notify Plan of objections in writing within the Approval Period will be deemed

acceptance of the Proposed Settlement by Medical Group "Medical Group Final Approval".

d) Should Medical Group object to the Proposed Settlement during the Approval Period, Plan shall confer with Medical Group to resolve such objection. Medical Group retains the option to audit the area of objection, or have audited through a mutually acceptable third party, all books and records applicable to Proposed Settlement.   Audits will include, but may not be limited to, verification of IBNR, Shared Risk Pool Expenses, Shared Risk Pool Budget, CMS Monthly Revenue report, IBNR proper allocation of financial responsibility for Covered Services, etc.  Should Plan and Medical Group fail to reach a mutually agreeable Proposed Settlement, Dispute Resolution may be pursued as defined in the Agreement, or other means may be pursued as mutually accepted in writing by Plan and Medical Group.  Should Plan and Medical Group reach a mutually agreeable Proposed Settlement, Shared Risk Distribution will then occur.

e) Should Medical Group give Plan Final Approval, the Shared Risk Pool Surplus shall be paid by Plan to Medical Group as specified in the Shared Risk Pool Allocation, within 30 days following Medical Group Approval (Shared Risk Distribution) of Proposed Settlement agreement.

f) Should the Proposed Settlement be a Shared Risk Pool Deficit, the Shared Risk Pool Deficit will be allocated as stated herein.

10. **Medical Group Stop Loss Program.** Stop Loss Program is designed to limit Medical Group's liability for providing Capitated Services to a specific Enrollee. Medical Group, at its option, may purchase its own stop-loss reinsurance. Plan reserves the right to review group's stop loss insurance for approval, where such approval will not be unreasonably withheld.   Medical Group shall provide a copy of reinsurance coverage to Plan, upon request.

# ATTACHMENT "C"
## CO-PAYMENTS AND DEDUCTIBLES
(Refer to Plan's Evidence of Coverage)

## ATTACHMENT "D"
**MEDICAL GROUP DELEGATED ACTIVITIES as it applies to Members assigned to Medical Group**

**1.     Delegation Criteria and Activities**

(a)            The performance of Delegated Activities by Medical Group and any Downstream Entity pursuant to this Agreement must be consistent with Plan's obligations to CMS.

(b)            Plan has developed and adopted criteria (the "Delegation Criteria") for the delegation of activities in the areas of Claims and Encounters, Utilization Management (UM), Medical Records Audits (MRA), Office Site Review (OSR), Members' Rights and Responsibilities (MRR), and Credentialing (CR). The Delegation Criteria are set forth in the Provider Manual and may be modified from time to time by Plan, subject to Section 4.5 of this Agreement.

(c)            Those activities for which Medical Group meets the Delegation Criteria and agrees to accept delegated responsibility and those activities whose performance is retained by Plan are listed in Attachment "D-1, D-2, D-3 and D-4." Attachment "D-1, D-2, D-3 and D-4" may be amended by Plan from time to time to reflect changes in those activities delegated to Medical Group, consistent with section 9.13 of the Agreement.

(d)            Medical Group represents that it currently meets those Delegation Criteria applicable to the activities for which Medical Group has been delegated and agrees to notify Plan of any change in its eligibility under the Delegation Criteria within no less than seven (7) business days, in the event it ceases, in whole or in part, to meet such criteria.

(e)            Plan retains final authority and responsibility for activities delegated under this Agreement.

(f)             Activities not expressly delegated herein by Plan or for which delegation is terminated are the responsibility of Plan. By way of example and without limitation, activities not delegated to Medical Group include final appeal decisions and benefit interpretations.

(g)            Medical Group may delegate any of the responsibilities and activities set forth herein to a Downstream Entity subject to prior written approval by Plan.

**2.     Performance and Monitoring**

(a)            Standards for the performance of Delegated Activities (the "Delegation Standards") developed and adopted by Plan are set forth in the Provider Manual. Medical Group agrees to perform the activities delegated to it in a manner consistent with the Delegation Standards applicable to activities for which Medical Group has been delegated.

(b)            Medical Group acknowledges Plan's responsibility to monitor Medical Group's eligibility for delegation according to the Delegation Criteria and performance of the Delegated Activities according to the Delegation Standards. Medical Group agrees to cooperate with Plan's monitoring of Medical Group's eligibility and performance of Delegated Activities.

(c)            Plan shall conduct regularly scheduled audits to determine Medical Group's continued compliance with the Delegation Standards. Medical Group shall cooperate with Plan and its designated agents in the performance of those audits, including, but not limited to, the provision of reasonable access during regular business hours to the Plan Member inquiry files, credentialing files, clinical and medical records of Members and reasonably necessary to evaluate Medical Group's performance of activities delegated to it. Cooperation shall include, but not be limited to, an annual evaluation and quarterly meetings between Plan and Medical Group staff.

(d)            Medical Group agrees to provide Plan with periodic reports on Delegated Activities performed by Medical Group. These reports shall be in a form and contain such information as shall be agreed upon between the parties.

(e)            Medical Group agrees to use its best efforts to take whatever corrective actions are identified by Plan through the audit review process as reasonably necessary.

**3.     Corrective Action**

(a)            In the event Plan is dissatisfied with good cause with Medical Group's performance of Delegated Activities, or the performance by any Downstream Entity of any Delegated Activity, Plan may, after consultation with Medical Group, but in its sole discretion, modify Medical Group's status (with respect to all or a particular delegated activity) from "fully delegated" to "delegated with corrective action." Such notice of

EXHIBIT 2 - PAGE 43

delegation with corrective action shall set forth the deficiencies perceived by Plan in Medical Group's performance of Delegated Activities, and Medical Group shall have ninety (90) days, unless CMS or (if applicable) DMHC requires less time, to correct such deficiencies to the reasonable satisfaction of Plan. In the event such deficiencies are not corrected to the reasonable satisfaction of Plan, Plan may, in its sole discretion, assume responsibility for delegated functions or extend the period given Medical Group to correct such deficiencies.

## ATTACHMENT "D-1"
## CREDENTIALS DELEGATION AGREEMENT

1. **Policy.** Plan is dedicated to providing the highest quality care to its members. Plan has established credentialing criteria to ensure the training, experience, skills, qualifications and character of its providers. Plan will delegate the credentialing process to medical groups and IPAs who agree to and show evidence of meeting Plan's credentialing program requirements.

2. **Plan's Responsibilities**

   a. **Pre-Delegation Review.** Plan will conduct an onsite credentialing audit prior to delegation. The Medical Group will be provided with the audit criteria prior to the audit. The audit will consist of the following areas:
      1) **Policies and Procedures.** Plan will review the Medical Group's credentialing program, including policies related to credentialing, recredentialing, fair hearing, suspensions and confidentiality. Plan will ensure that the Medical Group's policies meet the minimum requirements set forth by Plan.
      2) **Committee Minutes.** Plan will review minutes of the committee designated by the Medical Group to conduct credentialing to ensure appropriate review and actions are being taken with regards to credentialing, recredentialing and disciplining, as needed, of providers within the Medical Group.
      3) **Credentials Files.** Plan will randomly audit five percent (5%) or fifty (50), whichever is less, of the Medical Group's credentialing files. A minimum of twenty (20) files will be audited. Plan may also use the NCQA's 8/30 File Review Methodology and request a minimum of sixty (60) files for review. The audit will include files for initial credentialing, recredentialing, and health delivery organization, as appropriate.
      4) **Ongoing monitoring.** Plan will review evidence that the Medical Group had performed ongoing monitoring for sanction activities and adverse actions for Medical Group's contracted providers and implemented appropriate action, when applicable.
      5) **Oversight of sub-delegated credentialing activities.** Plan will review evidence of oversight of the Medical Group's sub-delegated activities to other organizations, including but not limited to the management services organization (MSO) and credentialing verification organization (CVO).

   b. **Annual Review.** Plan will conduct an audit of the Medical Group's credentialing program at least annually. Plan may conduct an audit more frequently, if deemed necessary. The audit will cover the same items as outlined in the Pre-Delegation Review above.

   c. **Facility Site Reviews.** Medical Group will conduct a facility site review of all Group Providers at the time of initial appointment. Site reviews will be conducted in accordance with Plan's policies and procedures.

   d. **Delegated Oversight Committee approval.** Results of the credentialing review of the Medical Group will be forwarded to the Delegated Oversight Committee for action and approval in accordance with Plan policy.

   e. **Database.** Plan will maintain a provider database to include all relevant information about the Medical Group's providers.

   f. **Inclusion in Network.** The Medical Group's providers will be included in Plan network.

3. **The Medical Group's Responsibilities.** The Medical Group agrees to the following:

   a. **Pre-Delegation and Annual Reviews.** The Medical Group agrees to submit to pre-delegation and annual audits of its credentialing program, as outlined above. The Medical Group agrees to provide copies of its policies and procedures to Plan and to allow access to minutes related to credentialing

actions and to credentials files.

b. **Minimum Credentialing Requirements.** The Medical Group agrees to the following minimum credentialing requirements:
1) **Initial Credentialing.**
   a) The Medical Group agrees to conduct primary source verifications for initial credentialing as outlined in Attachment D-1.
   b) The Medical Group agrees to include with each application:
      (1) An attestation by the provider as to the correctness/completeness of the application;
      (2) Questions regarding the following:
         (a) Reasons for inability to perform the essential functions of the position, with or without accommodation;
         (b) Lack of present illegal drug use;
         (c) History of loss of license and felony convictions; and
         (d) History of loss or limitations of privileges or disciplinary activities.

2) **Recredentialing.**

   a) All providers must be recredentialed no more than every thirty six (36) months according to their last credentialing approval date.
   b) The Medical Group agrees to conduct primary source verification for recredentialing as outlined in Attachment D-1.
   c) The Medical Group agrees to include with each application:
      (1) An attestation by the provider as to the correctness/completeness of the application;
      (2) Questions regarding the following:
         (a) Reasons for inability to perform the essential functions of the position, with or without accommodation;
         (b) Lack of present illegal drug use;
         (c) History of loss of license and felony convictions; and
         (d) History of loss or limitations of privileges or disciplinary activities.
   d) The Medical Group will provide evidence that data from the following sources are used in the recredentialing decision-making process for all Medical Group's contracted providers:
      (1) Member complaints and Quality Improvement (QI) activities; and
      (2) Three of the following six sources:
         (a) Plan Member Satisfaction;
         (b) Plan Member Complaints;
         (c) Utilization Review Activities;
         (d) Quality Improvement Activities;
         (e) Facility Site Reviews; or
         (f) Medical Record Reviews.

c. **Reports.**

1) **Profiles.** The Medical Group agrees to provide Plan with provider profiles upon approval of this Agreement and within thirty (30) days of adding a provider to the Medical Group's network. Profiles will include, at a minimum:
   a) Full name;
   b) Degree;
   c) Date of birth;
   d) Social security number;
   e) Approval date;
   f) Intentionally omitted.
   g) Specialties, identifying primary specialty, with board certification status;

    h) Provider type (i.e.: primary care physician, specialist or both);
    i) Education - name of the school and attendance dates;
    j) Primary practice address, including tax ID number, phone and fax numbers;
    k) Secondary and tertiary practice addresses, including tax ID numbers, phone and fax numbers;
    l) California medical license number and expiration date;
    m) DEA number and expiration date, if applicable;
    n) Malpractice insurance carrier, policy number, expiration date and coverage amounts;
    o) Hospital affiliations, identifying primary admitting hospital;
    p) Covering physicians;
    q) Languages spoken;
    r) Office hours

Plan reserves the right to request additional information to be included in this report.

2) **Termination/Change of Status.** The Medical Group will make best efforts to provide Plan with a report within thirty (30) days of the recredentialing, termination, resignation, change of status, change of address, etc., of a provider.

3) **License, DEA, Insurance Updates.** The Medical Group will provide Plan with an annual report of updated licenses, DEA certificates and malpractice insurance policies upon Plan request.

4) **Quarterly Reports.** Upon Plan request, Medical Group will provide Plan with a quarterly report that addresses the providers discussed and/or reviewed for initial and recredentialing, concerns, or problems and at a minimum, must include: the provider's complete name, professional degree, specialty, PCP/SCP designation, current license number, board certification specialty and expiration date (if applicable), credentialing/recredentialing approval date, and if there were suspensions/terminations/resignations, the date and reason. The schedule for the quarterly reports are: 1st Quarter due May 15th, 2nd Quarter due August 15th, 3rd Quarter due November 15th, and 4th Quarter due February 15th.

d. **Ongoing Monitoring.** The Medical Group must develop and implement policies and procedures for ongoing monitoring of practitioners sanctions, complaints and quality issues between recredentialing cycles and taking appropriate action against practitioners when it identifies occurrences of poor quality. At a minimum, the Medical Group must collect and review the following:
1) Medicare and Medicaid sanctions;
2) Sanctions or limitations on licensure;
3) Member complaints; and
4) Identified adverse events.

e. **Change in Credentialing Process.** The Medical Group will advise Plan of any changes in its credentialing process and criteria within thirty (30) days of the change. If Plan deems the changes material and not in compliance with the Plan's credentialing requirements, Plan will notify the Medical Group of such. The Medical Group will have thirty (30) days to come into compliance with the Plan requirements. Failure to comply with Plan credentialing requirements will be reported to the Delegated Oversight Committee for action, in accordance with Plan policy.

## ATTACHMENT D-2
## CREDENTIALS DELEGATION AGREEMENT
### *Initial/Recredentialing Verifications*

| ITEM | METHOD OF VERIFICATION | TIMEFRAMES | INITIAL | RECRED |
|---|---|---|---|---|
| Attestation Questionnaire includes:<br>• Statement attesting to the correctness/completeness of the application;<br>• Reasons for inability to perform the essential functions of the position, with or without accommodation;<br>• Lack of present illegal drug use;<br>• History of loss of license and felony convictions; and<br>• History of loss or limitations of privileges or disciplinary activities. | Application | 180 calendar days | X | X |
| Five (5) Years of Work (or work history since issuance of license, whichever, is less) | • Application; or<br>• Curriculum Vitae (CV).<br><br>The application or CV must include the beginning and ending month and year for each position in the work history and any gap of six (6) months or must be clarified either verbally or in writing; gap exceeding one (1) year must be clarified in writing. Primary source verification is not required. | 180 calendar days | X | |
| Current California Professional License | Online, written, or telephone verification directly with the state licensing agency. | 180 calendar days | X | X |
| Current DEA Certificate* | • Copy of current DEA certificate.<br>• Documented visual inspection of the original certificate<br>• Confirmation with the CDS Agency<br>• Entry in the National Technical Information Service (NTIS) database<br>• Confirmation with the state pharmaceutical licensing agency, where applicable | No time limit but must be valid at time of approval. | X | X |
| Board Certification*<br><br>If a provider indicated on the application that he/she is board certified, this board certification must be verified, but education and training verification is not required to be done except as stated here, unless the provider is not certified in the requested specialty to be credentialed in. | For MD or DO:<br>• Verify with an ABMS Official Display agent (i.e. CertiFACTS online and BoardCertifiedDocs.com website)<br>• AMA Physician Profile<br>• AOA Physician Profile<br>• Confirmation directly with the ABMS member boards<br><br>For DDS or DMD:<br>• Directly with the specialty board, however, board certification is not a substitute for verification of dental | 180 calendar days. | X | X |

| ITEM | METHOD OF VERIFICATION | TIMEFRAMES | INITIAL | RECRED |
|---|---|---|---|---|
| | education or training.<br><br>For DPM:<br>• Verify with the appropriate specialty board.<br><br>Non-Physician Medical Practitioner (i.e. PA, NP, NMW and CNS):<br>• Verify with the specialty board<br>• Verify with the state licensing agency, if the Medical Group obtains annual documentation that the state agency performs primary source verification.<br>• Verify with a registry, if the Medical Group obtains, annually, written documentation that the registry performs primary source verification. | | | |
| Education and training; only the highest level of training relevant to the requested specialty needs to be verified except for dentists. If the provider is board certified in the requested specialty, verification of board certification is sufficient. | For MD or DO:<br>• AMA Physician Profile<br>• AOA Physician Profile<br>• Verify completion of a residency or internship program with the training facility.<br>• Verify graduation from medical school with the medical school.<br><br>For DDS or DMD:<br>• Verify graduation from dental school with the dental school.<br>• Verify with completion of the residency with the training facility.<br>• Verify with the state licensing agency, but the Medical Group must obtain, annually, written confirmation from the state licensing agency that they perform primary source verification of the training.<br><br>For DPM:<br>• Entry in a podiatry specialty board master file, if the Medical Group obtain, annually, written confirmation from the specialty board that it performs primary source verification.<br>• Verify residency with the training facility.<br>• If the podiatrist has not completed a residency, verify graduation from podiatry school with the school, podiatry specialty board master file (if they do primary source verification), or state licensing agency (if they do primary source verification).<br><br>Non-Physician Medical Practitioner (i.e. PA, NP, NMW and CNS):<br>• Verify with the professional school. | No time limit but must be received prior to approval. | X | **Only if there is change since the last credential ing date.** |

| ITEM | METHOD OF VERIFICATION | TIMEFRAMES | INITIAL | RECRED |
|---|---|---|---|---|
| | • Verify with the state licensing agency, if the Medical Group obtains annual documentation that the state agency performs primary source verification.<br>• Verify with a specialty board or registry, if the Medical Group obtains, annually, written documentation that the specialty board or registry performs primary source verification. | | | |
| Malpractice Insurance (Coverage must be effective at time of credentialing.) | Copy of current insurance certificate that shows dates of coverage, including expiration date, and amounts of coverage (minimum of $1 million per occurrence/$3 million aggregate except for optometrists and audiologists, which require $1 million per occurrence/$2 million aggregate). | No time limit but must be received prior to approval. | X | X |
| Professional Liability Claims History | Directly with the insurance carrier(s) for five (5) years claim history or query of the National Practitioner Databank-Healthcare Integrity and Protection Databank (HIPDB-NPDP). | 180 calendar days. | X | X |
| Hospital Clinical Privileges (at primary admitting facility)* | Primary source verification of membership and clinical privileges in good standing via letter to facility, to include status, date of appointment, appointment expiration date, specialty, restrictions and recommendations/ actions.  If a PCP has no hospital clinical privileges, he/she must provide written proof of coverage by an appropriately licensed and contracted physician. | 180 calendar days. | X | X |
| NPDB | On-line query of National Practitioner DataBank (NPDB). | 180 calendar days. | X | X |
| Sanctions on Medical License | • Appropriate state licensing agency<br>• NPDB-HIPDB<br>• Federation of State Medical Boards (FSMB) (valid for MD, DO and PA only) | 180 calendar days. | X | X |
| Medicare/Medicaid Sanctions | • State Medicaid agency or intermediary and the Medicare intermediary<br>• List of Excluded Individuals and Entities (LEIE) maintained by the Office of Inspector General (OIG) (available on the internet)<br>• Medicare and Medicaid Sanctions and Reinstatement report<br>• Federal Employees Health Benefits Plan (FEHB) Program department record, published by the OIG<br>• NPDB-HIPDB<br>• FSMB<br>• AMA Physician Master Profile | 180 calendar days. | X | X |
| Medicare Opt-Out Report (If contracted for Medicare line of business) | • Most Recent "Quarterly Listings of Opt-Out Physicians" for Southern and Northern California (available on the internet on the Palmetto GBA website) | 180 calendar days. | X | X |

\*If applicable

\*\*All verifications must be valid at the time of credentialing approval.

\*\*\*Oral and on-line verification requires a dated and signed or initialed note by the Medical Group staff who verified the credentials. On-line verification must be with an NCQA approved source, which is either directly with the source or its official listing agent. When the website is not controlled by the approved source, the Medical Group must obtain a letter directly from the source that attests to the accuracy and timeliness of the information on the website.

## ATTACHMENT "D-3"
### Delegation of Utilization Management Responsibilities

IPA/Medical Group: _____    Date: _____

☐ Medical    ☐ Healthy Families    ☐ Commercial    ☐ Medicare Advantage

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| I. UM Program | ☒ Yes ☐ No | • Develop, implement and submit to Plan a UM Plan outlining structure, accountability, scope, adoption of criteria, processes and other NCQA components of UM function. | • Monitor and oversee delegated function to ensure regulatory standards are met. | • **Annually:** UM Program UM Program Evaluation UM Workplan • **Quarterly:** UM Quarterly Updates (Coalition Report) | • Pre-delegation audit utilizing annual audit tool • Annual audit utilizing annual audit tool | • Request Corrective Action Plan(s) (CAPs) • Sanctions per IPA's delegation agreement (i.e., CAP deduction from monthly capitation) • Termination of UM delegation if CAP objectives are not achieved. |
| II. Prospective, concurrent and retrospective review – outpatient specialty referrals | ☒ Yes ☐ No | • Conduct certification following approved UM criteria that are based on medical evidence and member benefit package. | • Establish, publish and distribute performance standards and guidelines to providers. | • **Monthly:** Referral Logs • **Quarterly:** UM Quarterly Updates (Coalition Report) | • Pre-delegation audit utilizing annual audit tool • Annual audit utilizing annual audit tool • Focused reviews to measure areas of non-compliance as warranted | • Request Corrective Action Plan(s) (CAPs) • Sanctions per IPA's delegation agreement (i.e, CAP deduction from monthly capitation) • Termination of UM delegation if CAP objectives are not achieved. |
| III. A. | ☒ Shared | • IPA to | • Review and | • Not applicable | • Not applicable | • Not applicable |

Vitality Health Plan Agreement

49

EXHIBIT 2 - PAGE 52

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| (Hospitalization) ▪ Inpatient concurrent review (Shared Risk) | responsibility | retrospectively forward final status of requests to Plan UM Dept. if such requests encompasses an inpatient Hospital Stay | make decision on referral requests for inpatient stay. • Obtain concurrent review and forward to IPAs. | | | |
| III. B. (Hospitalization) ▪ Inpatient concurrent review | Yes ☐ No | • Review & make decision on inpatient referral requests | • Not applicable | • Concurrently | • Concurrent Review • Discharge Planning | • Request Corrective Action Plan(s) (CAPs) • Sanctions per IPA's delegation agreement (i.e., CAP deduction from monthly capitation) • Termination of UM delegation if CAP objectives are not achieved. |
| IV. Prospective review – professional component of outpatient procedure referrals | Yes ☐ No | • Conduct certification following approved UM criteria that are based on medical evidence and member benefit package. • | • Establish, publish and distribute performance standards and guidelines. | • **Monthly:** Referral Logs • **Quarterly:** UM Quarterly Updates (Coalition Report) | • Pre-delegation audit utilizing annual audit tool • Annual audit utilizing annual audit tool • Focused reviews to measure areas of non-compliance as | • Request Corrective Action Plan(s) (CAPs) • Sanctions per IPA's delegation agreement (i.e., CAP deduction from monthly capitation) Termination of UM |

50

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 53

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| | | | | | warranted | delegation if CAP objectives are not achieved. |
| V. Denial of Service – Medical Necessity/ Covered Benefits | ▓ Yes ☐ No | • Establish standards for denial of service, notification of denial and timeliness of denials.<br>• Issue denials on the basis of clinical data reviewed or coverage limitations.<br>• Track denials to include all pertinent clinical information, involvement in denial<br>• Make determinations, alternative treatment plan and required appeal language.<br>• Monitor denial activities through UM Committee. | • Monitor and oversee delegated functions to ensure standards are met. | • **Monthly**<br>▪ Denial logs<br>▪ Denial letters, including patient clinical information<br>○ **Quarterly:** UM Quarterly Updates (Coalition Report) | • Ongoing review of denial log/denial files<br>• **Monthly** – utilizing Denial Focus Audit Tool and Annual Audit Tool | • Request Corrective Action Plan(s) for elements of non-compliance<br>• Sanctions per IPA's delegation agreement (i.e., CAP deduction from monthly capitation<br>• Plan may conduct discretionary review to re-measure former areas of non-compliance<br>• Termination of delegation if CAP objectives are not achieved within agreed timeframe. |
| VI. Linked Services (**For Medi-Cal LOB Only**) | ■ Yes ☐ No | IPA to identify the following and report number of cases to Plan:<br>○ CCS<br>○ DOT for TB<br>○ ESRD<br>○ Waiver | • Monitor and oversee delegated functions (referral and coordination of services). | • **Monthly Logs** | • Annual audit utilizing annual audit tool | • Request Corrective Action Plan(s) for elements of non-compliance<br>• Sanction per IPA's delegation agreement (i.e., CAP deduction from monthly |

51

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 54

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| | | Programs (home care, HIV/AIDS, etc)<br>○ Transplants<br>○ Mental Health<br>○ Drug/Alcohol<br>○ Hospice<br>○ Custodial (Long Term Care)<br>○ EPSDT<br>Supplemental Services<br>○ HCBS for DDS | | | | capitation)<br>• Termination of delegation if CAP objectives are not achieved within agreed timeframe. |
| VII. A.<br>Complex Case Management | ☐ Yes ■ No | • Not applicable | • Provide complex case management services to members meeting healthplan criteria. | • Not applicable | • Not applicable | • Not applicable |
| VII. B.<br>Basic Case Management | ■ Yes ☐ No | • IPA to provide basic case management to members not eligible for Plan Complex Case Management and Disease Management Programs. | • Evaluate delegated function annually and/or as requested to ensure regulatory standards are met | • Monthly Logs | • Annual audit utilizing annual audit tool | • Request Corrective Action Plan(s) for elements of non-compliance<br>• Sanctions per IPA's delegation agreement (i.e, CAP deduction from monthly capitation<br>• Plan may conduct discretionary review to re-measure former |

52

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 55

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| | | | | | | areas of non-compliance<br>• Termination of delegation if CAP objectives are not achieved within agreed timeframe. |
| VIII. Communicating with members | ■ Yes   ☐ No | • All member communication must be approved by Plan. | • Evidence of coverage of communication of regulatory and legislative changes that impact members, i.e., membership cards, welcome letters, newsletters, changes in network. | • Ongoing | • Ongoing | |
| IX. Member Appeals/ Grievances | ☐ Yes   ■ No | • Evidence of communication stating requests for appeals are forwarded to Plan upon receipt or per Plan guidelines. | • Review and resolve all appeals and grievances within established timeframes. | • Ongoing | • Not applicable | • Not applicable |

Vitality Health Plan Agreement

53

EXHIBIT 2 - PAGE 56

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| X. Concurrent review of treatment regimen already in place (inpatient/ ongoing/ambulatory services) | ■Yes ☐ No | • Continue the care until treating provider has been notified of group's decision, and care plan has been agreed upon by the treating provider. | • Evaluate delegated function annually to ensure regulatory standards are met | • Concurrently | • Annual audit utilizing annual audit tool | • Request corrective action plans (CAPs)<br>• Sanction per IPA's delegation agreement (i.e., CAP deduction from monthly capitation)<br>• Termination of UM delegation if CAP objectives are not achieved. |
| XI. Urgent Concurrent Review/Urgent Preservice Review | ■Yes ☐ No | • Review and make decision on referral requests for inpatient concurrent review.<br>• Not applicable Provide an initial oral notification of a denial decision to practitioners and members within 72 hours of an urgent preservice request and within 24 hours of an urgent concurrent request, as long as electronic or written notification is given no later than | • Establish, publish and distribute performance standards and guidelines to providers. | • Concurrently | • Annual audit utilizing annual audit tool | • Request corrective action plans (CAPs)<br>• Sanction per IPA's delegation agreement (i.e., CAP deduction from monthly capitation)<br>• Termination of UM delegation if CAP objectives are not achieved. |

54

| Delegated UM Activity | Delegated or Not Delegated | IPA/MG Responsibility | Plan Responsibility | Frequency of Reporting/Due Date | Plan Process for Performance Evaluation | Corrective Action if IPA/MG Fails to Meet Responsibilities |
|---|---|---|---|---|---|---|
| | | 3 calendar days after the oral notification. | | | | |
| XII. Evaluation of New Technology | ☐Yes ■No | • Not applicable | • Plan evaluates the inclusion of new technology and the new application of existing technology in its benefits plan, including medical and behavioral health procedures | • Not applicable | • Not applicable | • Not applicable |

55

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 58

## ATTACHMENT D-4
## CLAIMS DELEGATION AGREEMENT

Medical Group shall process claims for provider services according to all CMS requirements. Should this Attachment be out of compliance with any existing or newly enacted CMS standard or requirement, the CMS standard or requirement will supersede this Attachment. Plan will communicate any changes in requirements to Medical Group in writing.

Medical Group shall be required to have an oversight program for claims processing which includes written policies and procedures, a process for reporting fraudulent or unethical conduct, and an executive accountable for review of claims data and attesting to its accuracy. The oversight program shall include internal auditing of claims functions, and self reporting as outlined in the Provider Manual.

**Clean Claim** is one for which all information necessary to process it is available within Medical Group, Hospital or Plan. A Clean Claim is defined as one which can be paid as soon as it is received because it is complete in all aspects, including complete coding, itemization, dates of service and billed amounts. Emergency Services or Out-of-Area urgently needed services do not need prior authorization to be considered "clean," providing that the claims' ICD-9 diagnoses codes or accompanying medical records substantiate that they qualify as emergent, urgent or medically necessary. Under federal law, when a claim from an "unaffiliated," meaning non-contracted provider also happens to be clean, special requirements must be met.

**Unclean Claim** is one that does not meet all the criteria of a Clean Claim. A claim is also considered "unclean" if it appears to be fraudulent or is in a foreign language or currency.

**Denied Claim** is a claim where (a) one or more services will not be paid by Medical Group and (b) payment is the responsibility of the Enrollee. Examples of claims that are not denials and should not be reported, submitted or presented to Plan as "denied" claims include claims:

- for patients who remain enrolled with Plan but have transferred to another Medical Group and Medical Group is forwarding the claim,

- for which payment responsibility belongs to another contracting entity (Plan or Hospital) and Medical Group is forwarding the claim,

- that are duplicates,

- that are encounter only/capitated claims and no patient liability is involved, and

- that involve reduced payment amounts due to contract terms or allowed Medicare fee schedules.

**30-Day Claim Timeliness.** Medical Group shall pay all Clean Claims from unaffiliated providers or suppliers within thirty (30) calendar days of receiving the claim. Paid shall be deemed to mean to have paid and mailed the payment by the thirtieth (30th) calendar day since the earliest receipt by Medical Group, Plan or any of Plan's contracting providers or hospitals. (Note: Although denials of these claims are treated as 60-day claims, should a denial of a claim that otherwise qualified as a 30-day claims be overturned by Plan as part of the mail-in denial review process the original 30-day deadline would apply for any subsequent evaluation of timeliness.)

**60-Day Claim Timeliness.** Medical Group shall pay or deny Unclean Claims from unaffiliated providers or suppliers, claims from contracting providers or suppliers and Claims from Medicare fiscal intermediaries and

carriers within sixty (60) calendar days of receipt of such claims. Processing shall be deemed to mean either to have paid and mailed the payment by the sixtieth (60th) calendar day since the earliest receipt by Medical Group, Plan or any of Plan's contracting providers or hospitals, or to have denied the claim, and have mailed the denial letter to the Enrollee by the sixtieth (60th) day. In accordance with Federal Law and CMS regulations, failure to process such claims within sixty (60) calendar days of receipt automatically constitutes an "adverse" initial determination, which the Enrollee may appeal; thus, a denial notice must be mailed to the Enrollee.

**Payment Accuracy.** When paying non-affiliated providers, Medical Group shall employ only those Medicare fee schedules that HMOs/Medicare Advantage organizations are allowed to use by law. Medical Group shall pay one hundred percent (100%) of current year Medicare fee schedule unless a rate is negotiated between the non-affiliated provider and Medical Group. Whenever payments for thirty (30) day claims are mailed after the deadline, Medical Group will include interest at the current, Federal Prompt Payment Interest Rate, which changes every January and July. Interest is to be calculated based on (1) the number of days over thirty (30) the payment is being mailed and (2) amount paid rather than the amount billed, and the interest must either be included with the claim payment or mailed within two weeks of mailing the claim payment.

**Denied Claims.** Decisions to deny claims which result in liability for the Enrollee must be made in accordance with CMS guidelines. Whenever such decisions are made, the currently approved notice or letter format must be used, including approved denial reasons. Under no circumstances shall Medical Group deny a claim for the second time as a consequence of responding to a request for reconsideration ("Appeal") from an Enrollee; instead, Medical Group must direct the Enrollee to submit the request directly to Plan.

**Compliance Requirement.** Medical Group is required to score ninety-five percent (95%) or greater for claims delegation in order to remain in compliance with claims delegation requirements.

**Claims Forwarding.** Medical Group shall forward any claims that are not it's payment responsibility to Plan within ten (10) calendar days of receipt.

# ATTACHMENT "E"
## Business Associate Agreement
## INDEPENDENT PHYSICIAN MEDICAL ASSOCIATES
## INCORPORATED D/B/A ("ALLCARE")
## AND
## VITALITY HEALTH PLAN OF CALIFORNIA

This Agreement is made between **Vitality Health Plan of California** (hereinafter known as "Covered Entity") and **Independent Physician Associates Medical Group Incorporated, d/b/a AllCare** (hereinafter known as "Business Associate"). Covered Entity and Business Associate shall collectively be known herein as "the Parties".

## RECITALS

1.  WHEREAS, Covered Entity wishes to commence a business relationship with Business Associate whereby Business Associate will provide services to Covered Entity pursuant to a separate agreement;

2.  WHEREAS, the nature of the prospective contractual relationship between Covered Entity and Business Associates may involve the exchange of Protected Health Information ("PHI") as it is defined under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), including all pertinent regulations issued by the Department of Health and Human Services ("HHS");

3.  WHEREAS, Covered Entity and Business Associate intend to protect the privacy and provide the security of PHI disclosed to Business Associate in compliance with HIPAA and its regulations;

4.  WHEREAS, the HIPAA laws and regulations were strengthened and amended in the Health Information Technology for Economic and Clinical Health Act and its implementing regulations (collectively "HITECH"), adopted as part of the American Recovery and Reinvestment Act of 2009, 42 U.S.C. §§17921-17954, which imposes certain further requirements on business associates;

5.  WHEREAS, Covered Entity and Business Associate desire to enter into this Agreement to set forth their understandings regarding Business Associate's duties with respect to the PHI that it receives from Covered Entity.

## AGREEMENTS

1.  <u>Compliance with HIPAA and HITECH Rules</u>

    Business Associate shall comply with the HIPAA and HITECH business associate rules (in current or amended form) in using and disclosing PHI that it receives from Covered Entity. Those obligations extend to fully complying with all laws and regulations relating to HIPAA and HITECH.

2.  <u>Specific Obligations of Business Associate under HIPAA</u>

    Business Associate shall perform the following duties in accordance with the HIPAA business associate rules:

    2.1.    Use or disclose PHI only in order to: (i) perform its services under its separate agreement; (ii) assist in its own proper management and administration; or (iii) carry out its legal responsibilities.  In the event of disclosure under Subsection (ii) or (iii), Business Associate will obtain assurances from the recipient that the PHI will be used or further disclosed only as required by law or for the purpose for which it was disclosed to the recipient, and that the

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 61

recipient will notify Business Associate of any breach of confidentiality of which the recipient becomes aware.

   2.2. Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic PHI that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA security regulations.

   2.3. Use appropriate safeguards to prevent use or disclosure of PHI for purposes other than the performance of the services.

   2.4. Report to Covered Entity any use or disclosure of PHI for purposes other than the performance of the services (See Section 3 for significant additional reporting responsibilities under HITECH.)

   2.5. Report to Covered Entity any security incident with respect to electronic PHI of which Business Associate becomes aware (See Section 3 for significant additional reporting responsibilities under HITECH.).

   2.6. Ensure that any agent, including a subcontractor, to whom Business Associate provides PHI, agrees to the same restrictions and conditions that apply to Business Associate.

   2.7. Ensure that any agent, including a subcontractor, to whom Business Associate provides electronic PHI, agrees to implement reasonable and appropriate safeguards to protect such information.

  3. Specific Obligations of Business Associate under HITECH:

   3.1 HITECH imposes certain requirements on business associates with respect to privacy, security and breach notification and contemplates that such requirements shall be implemented by regulations to be adopted by HHS. Such provisions of HITECH and the regulations adopted thereunder applicable to business associates may be referred to collectively herein as the "HITECH BA Provisions". Each of the HITECH BA Provisions applies commencing on February 17, 2010 or on such other respective dates as may be specified in the applicable HITECH BA Provision (the "Applicable Effective Dates").

   3.2 Business Associate agrees that it shall be subject to each of the HITECH BA Provisions commencing on the respective Applicable Effective Date.

   3.3 The provisions of HITECH that apply to business associates are required to be incorporated into the Business Associate Agreement. Accordingly, the following provisions are hereby incorporated into this Agreement as of the respective Applicable Effective Dates including, without limitation, 42 U.S.C. Sections 17935(b), (c), (d) & (e), and 17936(a) & (b).

   3.4 Without limitation of the foregoing, as of the respective Applicable Effective Dates:

   (a) Pursuant to 42 U.S.C. Section 17931(a), the following sections of the Security Rule shall apply to Business Associate in the same manner as they apply to the Covered Entity:

- Section 164.308 – Administrative safeguards;
- Section 164.310 – Physical safeguards;
- Section 164.312 – Technical safeguards; and

- Section 164.316 – Policies and procedures and documentation requirement.

(b)      Pursuant to 42 U.S.C. Section 17934(a), Business Associate may use or disclose PHI that it obtains or creates only if such use or disclosure, respectively, is in compliance with each applicable requirement of Section 164.504(e) of the Privacy Rule.

(c)      Pursuant to 42 U.S.C. Sections 17931(b), 17934(b) & 17934(c), Section 164.504(e)(1)(ii) of the Privacy Rule shall apply to Business Associate with respect to compliance with such subsection, in the same manner that such section applies to the Covered Entity, with respect to compliance with the standards in sections 164.502(e) and 164.504(e) of the Privacy Rule, except that in applying such Section 164.504(e)(1)(ii) each reference to Business Associate, with respect to a contract, shall be treated as a reference to the Covered Entity. To the extent necessary to achieve the purposes of the foregoing, Business Associate shall have the right to terminate the Agreement and all contracts to which it relates if the Covered Entity is in material breach or violation of the Agreement and fails to cure such breach or violation.

(d)      42 U.S.C. Sections 17931(b) & 17934(c) each apply to Business Associate with respect to its status *as* a business associate to the extent set forth in each such Section.

(e)      Pursuant to 42 U.S.C. Section 17932, without unreasonable delay, and in any event no later than sixty (60) calendar days after Discovery, Business Associate shall notify Covered Entity of any Breach of unsecured PHI. The notification shall include, to the extent possible and subsequently as the information becomes available, the identification of all individuals whose unsecured PHI is reasonably believed by Business Associate to have been breached along with any other available information that is required to be included in the notification to the patient or the patient's representative, HHS and/or the media, all in accordance with the data breach notification requirements set forth in 42 U.S.C. § 17932 and 45 C.F.R. Parts 160 & 164 subparts A, D, & E.

4.    <u>Obligations to Covered Entity</u>

Business Associate shall perform the following obligations with respect to Covered Entity:

4.1.    Give Covered Entity or the patient access to the health records, as required by the patient access provisions of the HIPAA privacy rules [45 C.F.R. §164.524].

4.2.    Allow Covered Entity, at the patient's request, to require amendment of the health records in the time and manner that it designates [45 C.F.R. §164.526].

4.3.    Document any disclosures by it of PHI and provide the resulting documentation to Covered Entity in order to allow Covered Entity to respond to the patient's request for an accounting of disclosures [45 C.F.R. §164.528].

5.    <u>Records</u>

Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI available to Covered Entity, or, at the request of Covered Entity, to the Secretary of the Department of Health and Human Services, in a time and manner designated

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 63

by Covered Entity or the Secretary, to assist the Secretary in determining Covered Entity's compliance with the HIPAA privacy and security regulations.

6.    Term and Termination

6.1.    This Agreement shall continue as long as the Medical Service Agreement between the Parties remains in effect.

6.2.    In the event that Business Associate violates this Agreement, Covered Entity may immediately terminate its relationship with Business Associate, including any agreement or contract between them obligating Business Associate to furnish the services and Covered Entity to compensate Business Associate for them, but only after completion of the requirements specified in Section 6.4 of the Medical Services Agreement "Process For Terminating With Cause".

6.3.    Following any termination of this Agreement, Business Associate shall, if feasible, return or destroy all PHI (including copies) received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity.  If it is not feasible to return or destroy the PHI, Business Associate shall continue to protect the PHI under this Agreement and shall limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

7.    Entire Agreement

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter covered herein, and supersedes any prior agreements, written or oral, the parties may have previously entered into with respect to such subject matter.

8.    Amendment

Covered Entity and Business Associate shall amend this Agreement from time to time as necessary to comply with the HIPAA privacy and security regulations.

Vitality Health Plan Agreement

EXHIBIT 2 - PAGE 64

EXHIBIT 3

## AMENDMENT TO MEDICAL SERVICES AGREEMENT
## FOR MEDICARE SERVICES

This Amendment (this "Amendment") is effective _____, 2021 (the "Effective Date"), and amends that certain Medical Services Agreement for Medicare Services (as the same may be amended from time to time, the "Agreement"), effective October 1, 2020, by and between Vitality Health Plan of California, a California corporation ("Plan"), and Independent Physician Associates Medical Group Incorporated, d/b/a AllCare, a California professional medical corporation ("Medical Group"). Plan and Medical Group are each referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS**, pursuant to the terms of the Agreement, Medical Group is obligated to provide or arrange for the provision of certain health care and related services as more specifically described in the Agreement (the "Services"), on the terms and subject to the conditions set forth therein.

**WHEREAS**, the term of Agreement is set to expire on January 14, 2021.

**WHEREAS**, on December 18, 2020, Plan filed a Chapter 11 bankruptcy proceeding ("Bankruptcy Case") in the Bankruptcy Court for the Central District of California ("Court"), Case No. 2:20-bk-21041.

**WHEREAS**, Plan believes that it is in the best interests of Plan and its Medicare Advantage enrollees to extend the term of the Agreement.

**WHEREAS**, Medical Group is willing to extend the term of the Agreement if and only if the Agreement is amended and set forth herein.

**WHEREAS**, the Parties to desire to amend the Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and incorporating the recitals set forth above, the Parties hereto hereby agree as follows:

1.  <u>Acknowledgment of Medical Group's Full Performance</u>. Plan and Medical Group acknowledge and agree that (i) Medical Group has fully performed all of its obligations under the Agreement and in accordance with applicable law, (ii) Plan has no claim against Medical Group under the Agreement or otherwise in connection with Medical Group's performance of its obligations thereunder, and (iii) all amounts paid to and/or received by Medical Group pursuant to the Agreement are not subject to any right of offset, clawback, recoupment, reconciliation, or retroactive adjustment.

2.  <u>Relief</u>. Plan hereby agrees that Medical Group may enforce any of its rights and remedies to which it may be entitled under the terms of the Agreement (including without limitation its rights under Article 6 thereof) and this Amendment, without the need for any further relief from or order of the Court. Without limiting the generality of the foregoing, Plan hereby agrees for itself and all other parties which may be entitled to the benefits of the automatic stay in connection with the Agreement or this Amendment, that Medical Group shall not be required to seek relief from the automatic stay before enforcing any of its rights and remedies to which it may be entitled under the terms of the Agreement (including without limitation its rights under Article 6 thereof) and this

Amendment.

3.      <u>Priority of Claims</u>.  Medical Group's rights and remedies under or in connection with the Agreement, including without limitation, its rights to receive payments and advances under the Agreement, shall be free and clear of all liens and encumbrances and to the extent not otherwise paid shall constitute administrative expense claims (and shall be granted priority in accordance therewith).  Medical Group and the Agreement shall not be subject to any substantial contribution claim pursuant to Bankruptcy Code Section 506 or otherwise.

4.      <u>Limitation on Further Amendments</u>.  The terms of the Agreement, including Medical Group's rights and obligations thereunder, shall not be modified or otherwise amended by any subsequent order, ruling, plan or lien or other encumbrance without Medical Group's prior express written consent, which may be withheld in its sole and absolute discretion.

5.      <u>Assumption and Assignment</u>.  Neither the Agreement nor this Amendment may be assumed and assigned pursuant to Bankruptcy Code Section 365 or otherwise, unless otherwise consented to by Medical Group.

6.      <u>Extension of Term</u>.  The term of the Agreement is hereby extended until March 31, 2021.  For the avoidance of doubt, Medical Group reserves its right to further extend the term of the Agreement in its sole and absolute discretion consistent with Section 6.1 of the Agreement.

7.      <u>Effectiveness Contingent on Court Approval</u>.    The effectiveness of this Amendment (including, for the avoidance of doubt, the term extension contemplated herein) is conditioned upon the entry of a final and non-appealable order from the Court approving this Amendment, as determined by and in form and content acceptable to Medical Group in its sole and absolute discretion.

8.      <u>Replenishment of Deposit</u>.  The Parties acknowledge and agree that (i) pursuant to Section 5.1 of the Agreement, Plan paid an Advance to Medical Group in such amount and on such terms and conditions as are set forth in such section, for the purpose of securing Plan's payment obligations to Medical Group under the Agreement, and (ii) Medical Group retained a portion of such Advance as was required to ensure that Medical Group received the full amount of capitation due under the Agreement for the month of November 2020.  As a condition of Medical Group's entering into this Amendment, Medical Group requires, and Plan agrees that it shall, replenish the Advance as follows: in addition to capitation payments due under the Agreement, Plan shall pay Medical Group (a) Sixty-Nine Thousand Three Hundred Seven Dollars and Forty-One Cents ($69,307.41), on or within one (1) calendar day after the Effective Date; and (b) an amount equal to (x) the capitation payment due and owing for February 2021, *minus* (y) Sixty-Nine Thousand Three Hundred Seven Dollars and Forty-One Cents ($69,307.41), concurrently with Plan's payment to Medical Group of the capitation payment for February 2021.  Plan acknowledges and agrees that Medical Group shall be entitled to terminate the Agreement pursuant to Section 6.6 thereof in the event that Plan fails to replenish the Advance as and at such times as set forth in this Section 8.

9.      <u>Entire Agreement; Binding Effect</u>.  This Amendment and the Agreement, as amended hereby, contain the entire understanding of the Parties hereto with respect to the subject matter contained herein and therein, and except as set forth above, all other terms

and conditions of the Agreement remain in full force and effect. There are no restrictions, promises, warranties, covenants, or undertakings other than those expressly provided for herein and therein. This Amendment and the Agreement supersede all prior agreements and undertakings between the Parties with respect to such subject matter, and will inure to the benefit of and be binding upon the Parties and their respective successors, assigns, grantees, administrators and trustees, including any trustee or liquidating agent appointed in the Bankruptcy Case or otherwise by the Court, provided that, except as otherwise expressly set forth herein or in the Agreement, Plan may not assign, delegate or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Medical Group.

10.    <u>Counterparts</u>. This Amendment may be executed in one or more counterparts executed and delivered via facsimile transmission or via email with scan attachment and will become effective when one or more counterparts have been signed by each of the parties.

11.    <u>Governing Law</u>. This Amendment will be construed and enforced in accordance with the substantive laws of the State of California without giving effect to the conflicts of laws principles of any jurisdiction.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be effective as of the date above.

PLAN:                                   MEDICAL GROUP:

Vitality Health Plan of California      Independent Physician Associates Medical
                                        Group Incorporated, d/b/a AllCare


By: _____           By: _____
Name:                                   Name:
Title:                                  Title:

*[Signature Page to Amendment to Management Services Agreement]*

EXHIBIT 3 - PAGE 4

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO AMENDMENT TO MEDICAL SERVICES AGREEMENT FOR MEDICARE SERVICES BETWEEN DEBTOR AND ALLCARE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF BRIAN BARRY IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 15, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ryan A Baggs**    rbaggs@wghlawyers.com, jmartinez@wghlawyers.com
- **Ronald K Brown**    ron@rkbrownlaw.com
- **Sara Chenetz**    schenetz@perkinscoie.com, dlax@perkinscoie.com;cmallahi@perkinscoie.com
- **Evelina Gentry**    evelina.gentry@akerman.com, rob.diwa@akerman.com
- **Matthew B Holbrook**    mholbrook@sheppardmullin.com, amartin@sheppardmullin.com
- **Garrick A Hollander**    ghollander@wghlawyers.com, jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- **Christopher D Hughes**    chughes@nossaman.com
- **Dare Law**    dare.law@usdoj.gov
- **Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY ELECTRONIC MAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**3.  SERVED BY** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on __, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 15, 2021 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

248947

| | | |
|---|---|---|
| Vitality Health Plan of California, Inc.<br>18000 Studebaker Road, Suite 960<br>Cerritos, CA 90703 | United States Trustee (LA)<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, CA 90017-3560 | **Vitality – Debtor – 20 Lgst – UST – RSN - NEF**<br>**Doc No. 248815** |
| Christopher Do, M.D.<br>a Professional Corporation<br>Sole Proprietor<br>1569 Lexann Ave.<br>San Jose, CA 95121 | Convey Health Solutions<br>T. Fairbanks, CFO<br>100 SE 3rd Avenue, 26th Floor<br>Fort Lauderdale    FL 33394 | Doctors Hospital of Manteca<br>1205 E. North Street<br>Manteca, CA 95336-4932 |
| El Camino Hospital<br>Joan Kezic, VP<br>2500 Grant Rd.<br>Mountain View, CA 94040 | Good Samaritan Hospital<br>James Johnston<br>2425 Samaritan Dr.<br>San Jose, CA 95124-3908 | Heritage Oaks Hospital<br>4250 Auburn Blvd<br>Sacramento, CA 95841 |
| Kaiser Foundation Hospital<br>700 Lawrence Expy<br>Santa Clara, CA 95051-5173 | Kindred at Home<br>Attn:  Regional Director<br>4030 Moorpark Ave., Suite 251<br>San Jose, CA 95117 | Medcore HP<br>Maria Martinez, COO<br>2609 E. Hammer Lane<br>Stockton, CA 95210 |
| MedImpact Healthcare Systems<br>James Gollaher, CFO<br>10181 Scripps Gateway Court<br>San Diego, CA 92131 | O'Connor Hospital<br>George Hurrell<br>2105 Forest Ave<br>San Jose, CA 95128 | Physician Partners IPA<br>Attn:  Ann Nguyen<br>14221 Euclid Ave. Suite G<br>Garden Grove, CA 92843 |
| Regional Medical Center of San Jose<br>James Johnston<br>225 North Jackson Ave.<br>San Jose, CA 95116-1603 | Santa Clara County IPA<br>Janet Pulliam<br>1051 E Hillsdale Blvd, Suite 750<br>Pasadena, CA 91101 | Santa Clara Valley Medical<br>George Hurrell<br>751 S. Bascom Ave.<br>San Jose, CA 95128-2604 |
| Satellite Healthcare Silver Creek<br>1620 East Capitol Expressway<br>San Jose, CA 95121 | St. Louise Regional Hospital<br>George Hurrell<br>9400 No Name Uno<br>Gilroy, CA 95020 | Stanford Medical Center<br>Attn:  President<br>300 Pasteur Dr, MC 5500<br>Stanford, CA 94305-2200 |
| UCSF Medical Center<br>505 Paranusus Ave.<br>San Francisco, CA 94143-0810 | Washington Hospital<br>2000 Mowry Ave.<br>Fremont, CA 94538-1716 | |
| **NEF SERVICE LIST**<br>Medcore HP<br>c/o Christopher D. Hughes, Esq.<br>NOSSAMAN LLP<br>621 Capitol Mall, Ste. 2500<br>Sacramento, CA 95814 | **NEF SERVICE LIST**<br>Sara L. Chenetz, Esq.<br>Perkins Coie LLP<br>1888 Century Park East, Suite 1700<br>Los Angeles, CA 90067 | **NEF [43] and RSN SERVICE LIST**<br>Convey Health Solutions, Inc.<br>c/o Akerman LLP<br>Evelina Gentry, Esq.<br>601 West Fifth Street, Suite 300<br>Los Angeles, CA 90071 |

248947

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

**RSN 01/05/2021 [45]**
MedImpact Healthcare Systems, Inc.
Keith C. Owens, Esq.
FOX ROTHSCHILD LLP
10250 Constellation Blvd., Suite 900, Los Angeles,
CA 90067

**RSN 01/05/2021 [45]**
MedImpact Healthcare Systems, Inc.
Lori Winkelman, Esq.
Elizabeth Fella, Esq.
THE PHOENIX LAW GROUP, PLC 8765 E. Bell
Road, Suite 101
Scottsdale, AZ  85260

**RSN 01/04/2021 [42]**
Convey Health Solutions, Inc.
c/o Akerman LLP
Catherine Douglas Kretzschmar, Esq.
201 East Las Olas Blvd., Suite 1800
Ft. Lauderdale, FL 33301

248947

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO AMENDMENT TO MEDICAL SERVICES AGREEMENT FOR MEDICARE SERVICES BETWEEN DEBTOR AND ALLCARE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF BRIAN BARRY IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 19, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ryan A Baggs**    rbaggs@wghlawyers.com, jmartinez@wghlawyers.com
- **Ronald K Brown**    ron@rkbrownlaw.com
- **Sara Chenetz**    schenetz@perkinscoie.com, dlax@perkinscoie.com;cmallahi@perkinscoie.com
- **Evelina Gentry**    evelina.gentry@akerman.com, rob.diwa@akerman.com
- **Jonathan P Hersey**    jhersey@slaterhersey.com, hkader@slaterhersey.com
- **Matthew B Holbrook**    mholbrook@sheppardmullin.com, amartin@sheppardmullin.com
- **Garrick A Hollander**    ghollander@wghlawyers.com, jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- **Christopher D Hughes**    chughes@nossaman.com
- **Dare Law**    dare.law@usdoj.gov
- **Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY ELECTRONIC MAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 19, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Alan Martin, Esq. - AMartin@sheppardmullin.com**
**Matthew Goldman - MGoldman@sheppardmullin.com**

**3. SERVED BY (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on __, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 19, 2021 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| Date | Printed Name | Signature |

248947