GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Case No. 2:20-bk-21041-WB |
| VITALITY HEALTH PLAN OF CALIFORNIA, INC., a California corporation, | Chapter 11 Proceeding |
| | **DEBTOR'S <u>EMERGENCY</u> MOTION FOR ORDER AUTHORIZING POST-PETITION SECURED LOAN PURSUANT TO 11 U.S.C. § 364(C)(1), (2) AND (3) ON ALL ASSETS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRIAN BARRY AND ERIC J. WEISSMAN IN SUPPORT HEREOF** |
| Debtor and Debtor-in-Possession | **[11 U.S.C. § 364(c) (1), (2), (3); Local Bankruptcy Rule 6004-1(b)(1)]** |
| | DATE:        March 18, 2021<br>TIME:         3:00 p.m.<br>PLACE:[1]   255 E. Temple Street<br>                   Courtroom 1375<br>                   Los Angeles, CA  90012 |

---

[1] The hearing on the Motion will be scheduled to be heard via Zoom.  Please check the Court's calendar just prior to the hearing to confirm. http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/.

Vitality Health Plan of California, Inc., a California corporation, the debtor and debtor-in-possession the debtor and debtor-in-possession in the above Chapter 11 proceeding (the "Debtor"), hereby moves this Court, on an emergency basis (the "Motion"), pursuant to the provisions of Sections 364(b), 364(c), 503(b), and 507(b) of the Bankruptcy Code, and Rule 9006 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 9075-1, for an Order in a form substantially similar to the one attached as **Exhibit 1** to the Declaration of Brian Barry filed concurrently herewith, granting the following relief:[1]

1.  Authorizing, on an interim basis pending final hearing on notice to creditors, the Debtor to enter immediately into a loan agreement attached as **Exhibit 2** to the Barry Declaration and borrow up to $1,250,000 ("Loan Amount") from Atrio HP, Inc., or its designee (the "Lender"), pursuant to the terms and conditions as set forth herein;

2.  Allowing the Lender an administrative expense claim with priority over any or all administrative expenses of the kind specified in §503(b) or §507(b) pursuant to 11 U.S.C. § 364(c)(1), to the extent of the funds advanced post-petition by the Lender to the Debtor;

3.  Authorizing the Debtor to grant in favor of the Lender a first priority lien on property of the estate that is not otherwise subject to a lien pursuant to 11 U.S.C. § 364(c)(2), to the extent of the funds advanced post-petition by the Lender to the Debtor;

4.  Authorizing the Debtor to grant in favor of the Lender a junior lien on property of the estate that is subject to a lien pursuant to 11 U.S.C. § 364(c)(3), to the extent of the funds advanced post-petition by the Lender to the Debtor;

5.  Setting a final hearing on this request for post-petition financing to be held on not less than fifteen (15) days' from the interim hearing on this Motion;

---

[1] Rule 9075-1(a) and (b) of the Local Bankruptcy Rules for the Central District of California provides for hearings on an emergency basis or, alternatively, on notice shorter than would otherwise be required under the Local Bankruptcy Rules.

MAINDOCS-#250165-v2-Vitality_DIP_financing

6.      Granting the foregoing relief with appropriate findings of the Court establishing that the credit was extended in good faith, and that the Lender is entitled to the protection afforded by Bankruptcy Code Section 364(e); and

7.      Granting such other and further relief as the Court deems just and proper.

Concurrently with the filing of this motion, the Debtor will serve, <u>via overnight mail</u>, a copy of the motion on the twenty (20) largest unsecured creditors, all secured creditors, and the Office of the United States Trustee.  The Debtor will serve, via overnight mail, facsimile transmission, e-mail, or telephone, notice of the date and time of the hearing on this motion.

This motion is made and based the Memorandum of Points and Authorities attached hereto, the Declarations of Barry Declaration (the "Barry Declaration") and Eric J. Weissman (the "Weissman Declaration") appended hereto, and any other such evidence, both oral and documentary, as the Court may consider prior to or at the hearing on this motion.

**WHEREFORE**, the Debtor prays that the Court enter an order granting the relief requested above, and such additional relief as the Court deems just and proper.

DATED: March 16, 2021                    **WINTHROP GOLUBOW HOLLANDER, LLP**


By:____*/s/  Garrick A. Hollander*_____
         Garrick A. Hollander
         General Insolvency Counsel for Debtor and Debtor-in-Possession

250165

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### NEED FOR SHORTENED TIME

The Debtor does not have sufficient cash to meet its ongoing operating expenses, including the company payroll due on March 19, 2021, which is funded to its payroll company one day before (i.e., March 2021).  The Lender will not fund until the Court enters an order authorizing the loan.  In order to ensure the loan is funded in time to make this payroll, the hearing on the Motion should be heard no later than March 18, 2021.  Consequently, this Motion must be granted as soon as possible to allow sufficient time for the Debtor to meet its payroll obligation since the proposed financing will only be made once the court enters an order approving the same.

In addition, unless the Debtor can obtain immediate post-petition financing, the Debtor will not be able to pay its medical providers, subjecting its members to the denial of medical care, and resulting in the likely defection of members, and likely demise of its business.  If the Debtor's business were to close and result in a liquidation of assets, employees' jobs would be lost and the ultimate value realized from the Debtor's business would be substantially less than the going-concern value of the Debtor's assets, resulting in creditors receiving a fraction, if any portion, of their claims.

In the course of the Debtor's pursuit to find a buyer, the Debtor has successfully negotiated the terms of debtor in possession financing with one of the prospective buyers, who has agreed to lend $1,250,000 to the Debtor.  This loan will fund the Debtor's operations through the anticipated closing of the sale of its business.  The Debtor is currently negotiating the terms of its plan of reorganization that will provide the estate with millions of dollars for the sale of its business, which the Debtor expects to be filed in less than a month.

The proposed funding will preserve the going concern value and maximize value for creditors.  The Debtor respectfully submits that on the facts of this case, granting this Motion on shortened time is both necessary and appropriate.

250165

## II.

## STATEMENT OF FACTS

### A.    Background of Debtor

The Debtor owns and manages a full-service private Medicare Advantage HMO plan for the benefit of its Medicare-eligible members.  The Debtor employs approximately 33 employees and contractors in its Cerritos headquarters located in Cerritos, California.   The Debtor currently services Medicare-eligible members primarily in Santa Clara County and San Joaquin County, California.

The Debtor enrolls Medicare-eligible members in its HMO plan, which provides its members with access to prescription medications, medical care and more.  The Debtor contracts with physicians, hospitals, and other medical providers to provide medical care to the Debtor's members.  The Center for Medicare and Medicaid Services ("CMS"), on behalf of the Federal Government, and the State of California, each pay the Debtor a monthly fee (commonly known as capitation payments) to cover the medical services contracted and paid for by the Debtor.

### B.    Events Precipitating the Filing of the Chapter 11

The Debtor's goal since its inception in 2016 was to enroll and provide a Medicare Advantage health plan to Medicare-eligible members in its local area (Los Angeles), which is a very profitable market.  However, there are significant barriers to entry into the HMO industry, in general (e.g., significant capital required for front loaded fixed administrative fees, broker acquisitions costs, and other start-up costs, obtaining licenses, and securing relationships and contracts with medical providers), which are even more exacerbated in the Los Angeles County area.  Accordingly, the Debtor decided to first pursue a smaller and easier to penetrate market in Northern California as soon as it obtained its required licenses to operate its plan.  This strategy allowed the Debtor to secure relationships with medical providers and gain traction in the industry.  The Debtor was wildly successful in the enrollment of new members in Northern California.  In fact, in its first year of operation, the Debtor enrolled approximately 9,900 new members in Santa Clara and San Joaquin County, which is the largest enrollment for a Medicare Advantage health plan start-up in the last 30 years.

250165

1    Unfortunately, however, the market in these two counties were not profitable, in large part,

2  due to what appears to be CMS's underfunding of capitation payments to the Debtor based on a

3  high proportion of health diagnoses in these two counties that were never documented nor

4  submitted to CMS.  CMS pays HMO plans based on their members health risk scores.  The

5  healthier the members, the smaller the payments to the health plan.  Prior to enrolling members,

6  the Debtor expected that a large portion of its members would schedule annual wellness visits with

7  their physicians, which the Debtor had arranged at no cost for its members.  As it turned out,

8  physicians in the Northern California area are not incentivized by their medical groups to

9  encourage patients to visit the office to obtain their annual exams, and as a result, a large portion of

10  the Debtor's plan members did not take advantage of this free annual wellness visit.  It is believed

11  that many health diagnoses that could have been diagnosed, such as depression, peripheral artery

12  disease, Nash liver disease, and much more, went unreported to the government.  Consequently,

13  the Debtor's plan members appeared to have lower-than-average health risk scores, thereby

14  resulting in less revenues realized by the Debtor.  In fact, the Debtor generated only 70% of the

15  Medicare benchmark.  Unfortunately, the members incurred medical expenses in excess of the

16  capitation payment received by the Debtor, for which the Debtor was responsible.  As a result, the

17  Debtor sustained significant losses.

18    Based on the historical losses and the resulting cash flow deficit, however, the Debtor has

19  not been able to pay many of its medical providers and its pharmacy vendor.  This has created two

20  potentially fatal consequences: (i) the Debtor's failure to pay its medical providers subjects the

21  Debtor to the risk of potential termination of contracts with critical medical providers; and (ii) the

22  Debtor's arguable insolvency subjects the Debtor to losing its state licenses to operate.  In order to

23  stay any termination of a contract and to ensure that its members have access to medical care,

24  while enabling the Debtor to restructure its debt and obtain additional funding so as to avoid any

25  argument over insolvency, on December 18, 2020, the Debtor filed a voluntary petition for relief

26  under Chapter 11 of the Bankruptcy Code.  The Debtor's filing saved employee jobs, preserved the

27  Debtor's going concern, maximize value for creditors, and enabled the Debtor's members to obtain

28  ongoing medical care.

250165

### C.    Liquidity Crisis and Anticipated Sale

The Debtor is facing liquidity constraints and does not have the financial wherewithal to operate its business throughout a prolonged Chapter 11 process.  The Debtor has determined that the best, if not only, way to maximize value for its creditors and protect the health and well-being of its members is to preserve its going concern through a prompt consummation of a sale of its business.  The Debtor believes that, unless a sale of the business is expeditiously consummated, the Debtor will not have sufficient funds to pay creditors and survive, resulting in a likely deterioration, if not complete loss, in the value of the business.  Accordingly, a prompt sale is essential in this case.  Fortunately, the Debtor has received interest from several buyers, and has been negotiating the terms of a sale.  In the meantime, the Debtor needs to obtain debtor in possession financing in order to bridge to a sale.

### D.    Secured Debt

Except for MedImpact, one of the Debtor's vendors, who may hold a secured claim against the Debtor's rights to rebates, the Debtor is not aware of any secured claims held or asserted by creditors.

### III.

### PROPOSED POST-PETITION DEBTOR-IN-POSSESSION FINANCING

The Lender has agreed to provide financing to the Debtor pursuant to that certain Debtor-in-Possession Loan and Security Agreement, a true and correct copy of which is attached as **Exhibit 2** to the Barry Declaration and incorporated herein by this reference.  The following is a summary of the terms by which the Lender has agreed to advance funds to the Debtor, as well as disclosure about the Lender.

### A.    Summary of Terms of Loan Proposal

Amount of Loan:  Up to $1,250,000.

Interest Rate:  Interest shall accrue at the rate of 10% per annum

Maturity Date:  Principal and interest is due on the earlier of: (i) August 31, 2021; (ii) occurrence of an event of default; or (iii) the Effective Date of a plan of reorganization.

250165

Authorized Use.  The Debtor may use the proceeds from the DIP Financing and cash collateral as set forth in the cash flow budget ("Budget") attached as **Exhibit 3** to the Declaration of Eric J. Weissman.

Priority/Security:  The loan shall be afforded administrative priority under §364(c)(1). As additional security, the loan shall be secured against all assets of the estate pursuant to §364(c) (2) and (3).

### B.    Disclosure About the Lender

Chicago Pacific Founders ("CPF") is an investment advisor that invests and manages $1 billion of private funds focusing exclusively on healthcare services.  CFE's leadership team is made up of former healthcare Chief Executive Officers and senior executives.  In 2019, CPF invested $25 million in Atrio Health Plans (the Lender).  The Lender, which started in 2004, is a health plan headquartered and operated out of Salem, Oregon.  The Lender currently has 21,000 members.  In alliance with Lender, CFP currently manages a health plan in Tennessee, Louisiana, Nevada and Oregon.  Neither the Lender, CFP, nor any of their respective officers or directors hold a claim against or interest in the Debtor or serve on the Debtor's Board of Directors.

## IV.

### THIS COURT IS AUTHORIZED TO ALLOW THE DEBTOR TO ENTER INTO POST-PETITION SECURED FINANCING ARRANGEMENT

Section 364 of the Bankruptcy Code empowers the Court to authorize the Debtor to incur debt with priority over certain administrative expenses and secured by lien on property of the estate.  In particular, Bankruptcy Code section 364 provides, in pertinent part:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

(1)  with priority over any or all administrative expense of the kind specified in Section 503(b) or 507(b) of this title;

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien.

250165

(3) secured by a junior lien on property of the estate that is subject to a lien.

## A.    **The Loan May be Afforded Priority and Security Pursuant to §364(c)(1), (2) and (3)**

A common test for evaluating requests under section 364(c) is: (1) the debtor cannot obtain unsecured administrative credit; (2) the credit is necessary to preserve the assets of the estate; and (3) the terms of the credit are fair and reasonable.  In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

### 1.    The Loan Is Necessary to Preserve the Assets of the Estate

The proposed financing is absolutely critical to the viability of the Debtor's operations. The Debtor is worth more alive than dead.  If this financing is not obtained, the Debtor will not be able to pay its administrative expenses, which would likely lead to the Debtor not being able to keep its medical providers, resulting in the loss of its members.  This would prevent the Debtor from consummating a sale of its business as a going concern, and in that scenario, the creditors would realize significantly less from this bankruptcy proceeding.  In contrast, the proposed financing will bridge the gap to the closing on the sale of the Debtor's business.  Consequently, the financing will preserve the Debtor's estate and maximize the highest return to the Debtor's creditors.

### 2.    The Debtor Cannot Obtain Unsecured Administrative Credit

The Debtor has attempted to obtain financing for the Debtor's business, but has been unable to obtain financing on an unsecured basis.  and such financing is critical to the viability of its operations, the approval of this post-petition financing is necessary to preserve the assets of the estate and to pave the way to distributions to creditors.  See Weissman Declaration filed concurrently herewith.

### 3.    The Terms of the Post-Petition Financing are Fair and Reasonable

The terms of the post-petition financing are better than any alternative, and are fair and reasonable, particularly given the Debtor's current financial condition.  The Debtor cannot obtain unsecured financing or any other financing on better terms than those of the DIP Financing.  The

250165

interest rate and other terms of the loan are commensurate with the market.  See Weissman

Declaration filed concurrently herewith.

4.    Conclusion

Based on the foregoing, the proposed post-petition financing is clearly in the best interests

of the estate, as it represents an actual necessary cost and expense of preserving the estate, and is in

the best interest of the Debtor's creditors.  Therefore, the Court should approve the loan with the

protection afforded in Section 364(c)(1), (2) and (3).

**V.**

**THE DIP FINANCING DOES NOT CONTAIN**

**PROVISIONS PROSCRIBED BY THE LOCAL RULES**

Local Bankruptcy Rule 4001-2(b) provides that a financing motion must provide whether

the proposed form of order and/or loan agreement contains any provision that:

(1)  Grants cross-collateralization protection;
(2)  Binds the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor;
(3)  Waives or limits the estate's rights under 11 U.S.C. § 506(c);
(4)  Grants to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549;
(5)  Deems prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);
(6)  Provides disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out; or
(7)  Primes any secured lien.  If an order is sought to prime a lien, the financing motion must:
(A) Identify the location of any such provision in the proposed form of order, cash collateral stipulation, and/or loan agreement; and
(B) Contain specific justification for the priming of the lien.

The DIP Financing prohibits the Debtor from pursuing any rights under Section 506(c).  In

addition, the DIP Financing grants a lien against avoidance actions arising under Chapter 5.

Otherwise, the DIP Financing does not contain any of the other provisions set forth in Local

Bankruptcy Rule 4001-2(b).

250165

# VI.

## <u>THE LENDER IS ENTITLED TO A GOOD FAITH</u>

## <u>DETERMINATION PURSUANT TO SECTIONS 364(e)</u>

Section 364(e) of the Bankruptcy Code provides that entities that extend credit in good faith are entitled to certain protections, as follows:

> (e)  The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

The purpose of Section 364(e) is to overcome a good faith lender's reluctance to extend financing in a bankruptcy context by permitting reliance on a bankruptcy judge's authorization.  <u>In re Cooper Commons, LLC</u>, 430 F.3d 1215, 1219 (9th Cir. 2005) (citing <u>Matter of EDC Holding Co.</u>, 676 F.2d 945, 947 (7th Cir.1982)).

"[T]o determine good faith we look to the integrity of an actor's conduct during the proceedings.  Misconduct defeating good faith includes fraud, collusion, or an attempt to take grossly unfair advantage of others.  A creditor fails to act in good faith if it acts for an improper purpose.  Knowledge of the illegality of a transaction also defeats good faith."  <u>In re Adam's Apple</u>, 829 F.2d 1484, 1489 (9th Cir. 1987) (citations and internal marks of quotation omitted). Importantly, <u>Adams Apple</u> establishes that the Court presume the post-bankruptcy creditor's good faith and then inquire to see whether the presumption can be overcome.  <u>Id.</u> at 1490-91.  <u>See also</u> <u>In re Cooper Commons, LLC</u>, 424 F.3d 963, 969 (9th Cir. 2005) (opinion amended and superseded by 430 F.3d 1215, 1219 (9th Cir. 2005)).

Applying the standards set forth in <u>Adams Apple</u> and the question of good faith, this Court should find that the Lender is a good faith lender.  There is no fraud, collusion, self-dealing nor any attempt to take grossly unfair advantage of others.  The proposed DIP Financing is not illegal, nor is there any improper purpose.  The proposed DIP Financing was negotiated at arm's-length by

250165

the parties, each of which was represented by counsel.  Based on the foregoing, the Lender should be entitled to a good faith finding in accordance with Sections 364(e) of the Bankruptcy Code.

## VII

### EMERGENCY RELIEF IS AUTHORIZED UNDER THESE CIRCUMSTANCES

Procedural authorization for an emergency hearing on this emergency motion is found in Rule 9006[1] of the Federal Rules of Bankruptcy Procedure, and in Local Bankruptcy Rule 9075-1.[2] As discussed herein and as set forth in the Barry and Weissman Declarations appended hereto, the Debtor respectfully submits that, on the facts of this case, emergency relief is both necessary and appropriate.

## VIII.

### CONCLUSION

Based on the foregoing, the proposed post-petition financing is clearly in the best interest of the estate, as it represents an actual necessary cost and expense of preserving the estate. Therefore, the Court should approve the loan pursuant to Section 364(c)(1), (2) and (3).

DATED: March 16, 2021                    **WINTHROP GOLUBOW HOLLANDER, LLP**


By:_____/s/  Garrick A. Hollander_____
        Garrick A. Hollander
        General Insolvency Counsel for Debtor and Debtor-
        in-Possession

---

[1] Bankruptcy Rule 9006(c) provides, in pertinent part:
"when an act is required or allowed to be done at or within a specified time by these rules or be a notice given thereunder or by order of the court, the court for cause shown may in its discretion with or without motion or notice *order the period reduced*."
[2] Rule 9075-1(a) and (b) of the Local Bankruptcy Rules for the Central District of California provides for hearings on an emergency basis or, alternatively, on notice shorter than would otherwise be required under the Local Bankruptcy Rules.

250165

## **DECLARATION OF BRIAN BARRY**

I, Brian Barry, hereby declare and state as follows:

1.      I am the President and Chief Executive Officer of Vitality Health Plan of California, Inc., the Debtor and Debtor in Possession herein ("Debtor").  I submit this declaration in support of the Debtor's Motion for Order Authorizing Post-Petition Secured Loan Pursuant to 11 U.S.C. § 364(c)(1), (2) and (3) (the "Motion").  The facts stated herein are within my personal knowledge, and if called upon to testify to such facts, I could and would testify competently thereto.

2.      I believe that hearing and granting the Debtor's Motion on shortened time, and entering the order attached hereto as **Exhibit 1**, are necessary to preserve the going concern value of the Debtor's business and assets for the reasons listed below.

3.      The Debtor owns and manages a full-service private Medicare Advantage HMO plan for the benefit of its Medicare-eligible members.  The Debtor employs approximately 33 employees and contractors in its Cerritos headquarters located in Cerritos, California.   The Debtor currently services Medicare-eligible members primarily in Santa Clara County and San Joaquin County, California.

4.      The Debtor enrolls Medicare-eligible members in its HMO plan, which provides its members with access to prescription medications, medical care and more.  The Debtor contracts with physicians, hospitals, and other medical providers to provide medical care to the Debtor's members.  The Center for Medicare and Medicaid Services ("CMS"), on behalf of the Federal Government, and the State of California, each pay the Debtor a monthly fee (commonly known as capitation payments) to cover the medical services contracted and paid for by the Debtor.

5.      Currently, the Debtor does not have sufficient cash to meet its ongoing operating expenses, including the company payroll due on March 19, 2021, which is funded to its payroll company one day before (i.e., March 18, 2021).  The lender will not fund until the Court enters an order authorizing the loan.  In order to ensure that the loan is funded in time to make this payroll, the hearing on the Motion should be heard no later than March 18, 2021.  Consequently, I believe that the Motion should be granted as soon as possible to allow sufficient time for the Debtor to

250165

meet fulfilling its payroll obligation since the proposed financing will only be made once the court enters an order approving the same.

6.     In addition, unless the Debtor can obtain immediate post-petition financing, the Debtor will not be able to pay its medical providers, subjecting its members to the denial of medical care, and resulting in the likely defection of members, and likely demise of its business. If the Debtor's business were to close and result in a liquidation of assets, employees' jobs would be lost and the ultimate value realized from the Debtor's business would be substantially less than the going concern value of the Debtor's assets, resulting in creditors receiving a fraction, if any, portion, of their claims.  In contrast, the proposed financing will bridge the gap to a closing on the sale of the Debtor's business.

7.     In the course of the Debtor's pursuit to find a buyer, the Debtor has successfully negotiated the terms of debtor in possession financing with one of the prospective buyers, who has agreed to lend $1,250,000 to the Debtor.  This loan will fund the Debtor's operations through the anticipated closing of the sale of its business.  The Debtor is currently negotiating the terms of its plan of reorganization that will provide the estate with millions of dollars for the sale of its business, which the Debtor expects to be filed in less than a month.

8.     The proposed funding will preserve the going concern value and maximize value for creditors.

9.     The Debtor's goal since its inception in 2016 was to enroll and provide a Medicare Advantage health plan to Medicare-eligible members in its local area (Los Angeles), which is a very profitable market.  However, there are significant barriers to entry into the HMO industry, in general (e.g., significant capital required for front loaded fixed administrative fees, broker acquisitions costs, and other start-up costs, obtaining licenses, and securing relationships and contracts with medical providers), which are even more exacerbated in the Los Angeles County area.  Accordingly, the Debtor decided to first pursue a smaller and easier to penetrate market in Northern California as soon as it obtained its required licenses to operate its plan.  This strategy allowed the Debtor to secure relationships with medical providers and gain traction in the industry.  The Debtor was wildly successful in the enrollment of new members in Northern

250165

California.  In fact, in its first year of operation, the Debtor enrolled approximately 9,900 new members in Santa Clara and San Joaquin County, which is the largest enrollment for a Medicare Advantage health plan start-up in the last 30 years.

10.    Unfortunately, however, the markets in these two counties were not profitable, in large part, due to what appears to be CMS's underfunding of capitation payments to the Debtor based on a high proportion of health diagnoses in these two counties that were never documented nor submitted to CMS.  CMS pays HMO plans based on their members health risk scores.  The healthier the members, the smaller the payments to the health plan.  Prior to enrolling members, I expected that a large portion of the Debtor's members would schedule annual wellness visits with their physicians, which the Debtor had arranged at no cost for its members.  As it turned out, physicians in the Northern California area are not incentivized by their medical groups to encourage patients to visit the office to obtain their annual exams, and as a result, a large portion of the Debtor's plan members did not take advantage of this free annual wellness visit.  I believe that many health diagnoses that could have been diagnosed, such as depression, peripheral artery disease, Nash liver disease, and much more, went unreported to the government.  Consequently, the Debtor's plan members appeared to have lower-than-average health risk scores, thereby resulting in less revenues realized by the Debtor.  In fact, the Debtor generated only 70% of the Medicare benchmark.  Unfortunately, the members incurred medical expenses in excess of the capitation payment received by the Debtor, for which the Debtor was responsible.  As a result, the Debtor sustained significant losses.

11.    Based on the historical losses and the resulting cash flow deficit, however, the Debtor has not been able to pay many of its medical providers and its pharmacy vendor.  This has created two potentially fatal consequences: (i) the Debtor's failure to pay its medical providers subjects the Debtor to the risk of potential termination of contracts with critical medical providers; and (ii) the Debtor's arguable insolvency subjects the Debtor to losing its state licenses to operate.  In order to stay any termination of a contract and to ensure that its members have access to medical care, while enabling the Debtor to restructure its debt and obtain additional funding so as to avoid any argument over insolvency, on December 18, 2020, the Debtor filed a voluntary

250165

1    petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor's filing saved employee

2    jobs, preserved the Debtor's going concern, maximized value for creditors, and enabled the

3    Debtor's members to obtain ongoing medical care.

4         12.    The Debtor is facing liquidity constraints and does not have the financial

5    wherewithal to operate its business throughout a prolonged Chapter 11 process.  I have determined

6    that the best, if not only, way to maximize value for the Debtor's creditors and protect the health

7    and well-being of the Debtor's members is to preserve the Debtor's going concern through a

8    prompt consummation of a sale of its business.  I believe that, unless a sale of the business is

9    expeditiously consummated, the Debtor will not have sufficient funds to pay creditors and survive,

10    resulting in a likely deterioration, if not complete loss, in the value of the business.  Accordingly, a

11    prompt sale is essential.  Fortunately, the Debtor has received interest from several buyers, and

12    has been negotiating the terms of a sale.  In the meantime, the Debtor needs to obtain debtor in

13    possession financing in order to bridge to a sale.

14         13.    Except for MedImpact, who may hold a secured claim against the Debtor's rights to

15    rebates, I am not aware of any secured claims held or asserted by creditors against the Debtor.

16         14.    The Lender has agreed to provide financing to the Debtor pursuant to that certain

17    Debtor-in-Possession Loan and Security Agreement, a true and correct copy of which is

18    attached as **Exhibit 2** to this declaration and incorporated herein by this reference.

19         15.    Chicago Pacific Founders ("CPF") is an investment advisor that invests and

20    manages $1 billion of private funds focusing exclusively on healthcare services.  CFE's

21    leadership team is made up of former healthcare Chief Executive Officers and senior

22    executives.  In 2019, CPF invested $25 million in Atrio Health Plans (the Lender).  The Lender,

23    which started in 2004, is a health plan headquartered and operated out of Salem, Oregon.  The

24    Lender currently has 21,000 members.  In alliance with Lender, CFP currently manages a

25    health plan in Tennessee, Louisiana, Nevada and Oregon.  Neither the Lender, CFP, nor any of

26    their respective officers or directors hold a claim against or interest in the Debtor or serve on

27    the Debtor's Board of Directors.

28

250165

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16.    I believe that the proposed post-petition financing is in the best interest of the estate and represents an actual necessary cost and expense of preserving the estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 16th day of March 2021, at Cerritos, California.

_____
Brian Barry

## <u>DECLARATION OF ERIC J. WEISSMAN</u>

I, Eric J. Weissman, hereby declare and state as follows:

1.      I am the President of Wilshire Pacific Capital Advisors LLC ("Wilshire Pacific").  I submit this declaration in support of the Debtor's Motion For Order Authorizing Post-Petition Secured Loan Pursuant to 11 U.S.C. § 364(c)(1), (2) and (3) (the "Motion").  The facts stated herein are within my personal knowledge, and if called upon to testify to such facts, I would testify competently thereto.

2.      On February 3, 2021, the above-captioned bankruptcy court (the "Court") entered an order approving the Debtor's employment of Wilshire Pacific as Debtor's financial advisor and investment banker [Docket No. 98].

3.      Wilshire Pacific is a FINRA licensed broker dealer that specializes in the healthcare industry.  Having advised debtors, creditors, secured lenders and prospective bidders in chapter 11 proceedings, Wilshire Pacific's professionals have significant experience in providing financial advisory and investment banking services to distressed healthcare companies, including sale transactions, financings and balance sheet restructurings.  I supervise all activities at Wilshire Pacific.

4.      As financial advisor to the Debtor, I have carefully reviewed the Debtor's cash flow budget (the "Budget"), a copy of which attached hereto as **Exhibit 3**.  As is apparent in the Budget, the proposed financing is critical to the viability of the Debtor's operations.  Accordingly, I believe that the approval of the proposed post-petition financing is necessary to preserve the going concern of the Debtor's business, to facilitate a sale and to maximize value to creditors.

5.      As the Debtor's investment banker, I have assisted the Debtor in conducting an exhaustive search for potential lenders and buyers.  I have received several proposals for post-petition financing.  All of these proposals required a lien on all of the Debtor's assets.

6.      Based on my familiarity with financing transactions of distressed companies in general, and the offers received with respect to this Debtor, I believe the terms of the proposed post-petition financing (the "Financing") are reasonable in the context of the market, particularly in light of the Debtor's current financial condition.

250165

7.    To the extent the proposed lender receives a "superpriority" lien in connection with the Motion, I believe the proposed lender's interest is being adequately protected.

8.    I, along with the assistance of Debtor's counsel, was involved in the negotiations of the proposed financing.  There was no fraud, self-dealing, nor any attempt by Atrio HP, Inc. to take unfair advantage of the Debtor.  The proposed Financing was negotiated at arm's-length by the parties, each of which was well-represented by counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 16th day of March 2021, at Beverly Hills, California.

Eric J. Weissman

250165

EXHIBIT 1

1  GARRICK A. HOLLANDER – State Bar No. 166316
   ghollander@wghlawyers.com
2  **WINTHROP GOLUBOW HOLLANDER, LLP**
   1301 Dove Street, Suite 500
3  Newport Beach, CA 92660
   Telephone: (949) 720-4100
4  Facsimile: (949) 720-4111

5  General Insolvency Counsel for
   Debtor and Debtor-in-Possession

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

10

| | |
|---|---|
| In re:<br><br>VITALITY HEALTH PLAN OF CALIFORNIA, INC.,<br>a California corporation,<br><br>       Debtor and<br>       Debtor-in-Possession | Case No. 2:20-bk-21041-WB<br><br>Chapter 11 Proceeding<br><br>**ORDER AUTHORIZING POST-PETITION SECURED LOAN PURSUANT TO 11 U.S.C. § 364(C)(1), (2) AND (3) ON ALL ASSETS**<br><br>**[11 U.S.C. § 364(c) (1), (2), (3); Local Bankruptcy Rule 6004-1(b)(1)]**<br><br>DATE:     TBD<br>TIME:     10:00 a.m.<br>PLACE:   255 E. Temple Street<br>              Courtroom 1375<br>              Los Angeles, CA  90012 |

1       This matter comes before the Court on the Motion (the "<u>Motion</u>") of Vitality Health Plan

2   of California, Inc., (the "<u>Debtor</u>"), the debtor-in-possession in this chapter 11 case (the

3   "<u>Bankruptcy Case</u>"), requesting entry of an interim order (this "<u>Interim Order</u>") and a final order

4   (the "<u>Final Order</u>") pursuant to sections 105, 362, and 364 of title 11 of the United States Code (as

5   amended, the "<u>Bankruptcy Code</u>") and Rules 2002, 4001, and 9014 of the Federal Rules of

6   Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Rules of this Court (the "<u>Local</u>

7   <u>Bankruptcy Rules</u>") (i) authorizing the Debtors to obtain post-petition financing (the "<u>DIP</u>

8   <u>Facility</u>") from Atrio HP, Inc., an Oregon corporation (the "<u>Lender</u>"), consisting of a credit

9   facility in the principal amount of up to $1,250,000 (the "<u>DIP Facility</u>"); (ii) approving the terms

10  of the DIP Facility, including superpriority claims and liens in favor of the Lender, on an interim

11  basis; and (iii) setting a final hearing on the Motion.

12      The terms and conditions of the DIP Facility have been agreed to by and between the

13  Debtor and the Lender pursuant to the terms of the Debtor-in-Possession Secured Credit

14  Agreement (the "<u>DIP Financing Agreement</u>") attached as an **Exhibit 2** to the Declaration of Brian

15  Barry in support of the Motion, and any related agreements or documents that have been or may

16  be entered into pursuant to the DIP Financing Agreement (the "DIP Financing Agreement together

17  with all such other documents, the "<u>DIP Documents</u>").

18      Based upon the Court's review of the Motion, the DIP Financing Agreement, the

19  declarations and other papers filed in support of the Motion, and all matters brought to the Court's

20  attention at the interim hearing pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "<u>Interim</u>

21  <u>Hearing</u>"),

22      The Court **HEREBY FINDS AS FOLLOWS:**

23      A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and

24  1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is

25  proper before this Court under 28 U.S.C. §§ 1408 and 1409.  The Debtor has operated its business

26  and managed its property as debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No

27  request has been made for the appointment of a trustee or examiner in this Bankruptcy Case.  No

28

1   official committee of unsecured creditors nor any other committee has been appointed pursuant to

2   section 1102(a) of the Bankruptcy Code.

3        B.     Notice of the Motion and of the Interim Hearing as provided by the Debtor was

4   appropriate and adequate in the particular circumstances, and is sufficient for all purposes under

5   the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules in respect to the

6   interim relief requested.

7        C.     The Lender and the Debtor have negotiated at arms' length and in good faith

8   regarding the terms of the DIP Facility, which are fair and reasonable and the best available under

9   the present circumstances, reflect the Debtor's exercise of prudent business judgment consistent

10   with its fiduciary duty, and are supported by reasonably equivalent value and consideration.  The

11   terms of the post-petition financing under the DIP Financing Agreement have been entered into in

12   good faith by and among the Debtor and the Lender, have been extended in good faith as that term

13   is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its

14   estate and creditors.

15        D.     The Debtor has sought to obtain financing from other sources and has been

16   unable to obtain credit allowable under sections 503(b)(1), 364(a) and (b) of the Bankruptcy

17   Code, and no source of credit on terms as favorable as those offered by the Lender are available

18   to the Debtor at this time.  The Debtor is also unable to obtain secured credit allowable under

19   sections 364(c) or (d) of the Bankruptcy Code without granting the Lender the DIP Liens (defined

20   below) and the DIP Superpriority Claims (defined below) under the terms and conditions set forth

21   in this Interim Order and in the DIP Documents.

22        E.     The Debtor does not have sufficient unencumbered cash or other assets to continue

23   to operate its business during this Bankruptcy Case.  The Budget (defined below) reflects that the

24   Debtor's post-petition expenses are expected to exceed available cash and projected receipts.  The

25   Debtor has an immediate need for cash to fund essential expenses.  The Debtor will be

26   immediately and irreparably harmed if it is not granted the authority to obtain post-petition

27   financing from the Lender in accordance with the terms of the DIP Documents on an interim basis

28   through the date of the final hearing on the Motion in order to maintain its assets, pay necessary

EXHIBIT 1 - PAGE 3    -3-

4828-6580-2465.1                                                                DIP FINANCING INTERIM ORDER

expenses, including those of its employees, service providers and other vendors, and other expenses necessary to maximize the value of its estate, and would likely be required to cease operations immediately.  The access of the Debtor to sufficient working capital and liquidity made available through the DIP Facility is vital to the preservation and maintenance of the going concern value of the Debtor and to a successful conclusion to the Bankruptcy Case.

F.    Good cause has been shown for entry of this Order, for the reasons set forth in the Motion and supporting papers, and as stated on the record at the hearing and herein.

**IT IS HEREBY ORDERED** that:

1.    <u>Disposition</u>.  The Motion is GRANTED on an interim basis on the terms set forth in this Interim Order.  Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled on the merits, without prejudice, however, to any such objection or reservation of rights being reasserted in connection with the hearing on entry of the final order.

2.    <u>Authorization to Incur Post-petition Indebtedness</u>.  The Debtor is authorized obtain post-petition financing from the Lender in accordance with the terms of this Interim Order, the DIP Documents and the Budget up to the principal amount of $1,250,000 (the "<u>DIP Facility</u>") pursuant to sections 364(c) and (d) of the Bankruptcy Code, pending the final hearing scheduled for the date and time set forth below (the "<u>Final Hearing</u>").

3.    <u>DIP Documents</u>.  Subject to the terms and conditions contained in this Interim Order, the Debtor is hereby expressly authorized and directed to execute and deliver to the Lender the DIP Documents, and such additional documents, instruments, and agreements as may be reasonably required by the Lender to implement the terms, and effectuate the purposes, of this Interim Order.  The terms and conditions of the DIP Documents, are hereby approved and ratified, and the Debtor is authorized and directed to comply with and perform all of the terms and conditions contained therein.  The failure to reference or discuss any particular provision of the DIP Documents in this Interim Order shall not affect the validity or enforceability of any such provision.  In the event of a conflict between this Interim Order and the DIP Documents, the terms and conditions of this Interim Order shall govern.

EXHIBIT 1 - PAGE 4    -4-

4828-6580-2465.1                                                    DIP FINANCING INTERIM ORDER

4.  <u>Conditions Precedent</u>.  The obligations of the Lender under the DIP Documents, including but not limited to the obligation(s) of the Lender to provide any advance of funds, shall not become effective until the date on which each condition to effectiveness set forth in the DIP Documents has been satisfied or waived by the Lender.  The obligations of the Lender from and after the date of the Final Hearing are subject to entry of a final order on the Motion in a form acceptable to the Lender in its sole discretion.

5.  <u>DIP Superpriority Claims</u>.  In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code, all obligations of the Debtor under the DIP Documents (the "<u>DIP Obligations</u>") shall constitute claims (without the need for the DIP Lender to file a proof of claim or take any further action) against the Debtor and the Bankruptcy Estate, as applicable (the "<u>Lender Superpriority Claim</u>"), with priority over any and all other obligations, liabilities, and indebtedness against the Debtor and the Bankruptcy Estate, as applicable, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order, as that term is defined below), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by the Debtor or the Bankruptcy Estate, as applicable, and shall at all times be senior to the rights of the Debtor, the Debtor's estate and any successor trustee, estate representative, or any creditor, in the Bankruptcy Case or any subsequent cases or proceedings under the Bankruptcy Code (excepting only that portion of any claim held by the Debtor's counsel arising from and pursuant to the *Order Granting Application of Debtor and Debtor-in-Possession for Authority to Amend Terms of Employment and Compensation of Winthrop Golubow Hollander, LLP* [Docket no. 114] (the "<u>Carve Out</u>")).  The Lender Superpriority Claim shall have recourse to and be payable from all prepetition and post-petition assets of the Debtor and/or the Bankruptcy Estate, including, but not limited to, the Collateral.

6.  <u>DIP Liens</u>.  As security for the Debtor's DIP Obligations arising under or in connection with the DIP Documents, except for the lien securing the Carve Out, the Lender is

EXHIBIT 1 - PAGE 5
-5-
4828-6580-2465.1                                                            DIP FINANCING INTERIM ORDER

1    hereby granted first priority liens and security interests pursuant to section 346(c)(2) (c)(3) and (d)

2    of the Bankruptcy Code (the "<u>DIP Liens</u>") on all Collateral set forth in the DIP Financing

3    Agreement or otherwise provided in the DIP Documents that is not subject to valid, perfected, and

4    non-avoidable liens as of the Petition Date (the "<u>DIP Collateral</u>"), which shall include but not be

5    limited to:

6        a.  All Accounts, Chattel Paper, Contracts, Documents, Equipment, Fixtures, General

7            Intangibles, goods, Instruments, Inventory, Intellectual Property, Investment

8            Property, Letters of Credit as these terms are defined in the California Commercial

9            Code, either owned now by the Debtor or acquired subsequently.

10        b.  Commercial Tort Claims arising after the Petition Date.

11        c.  Any and all avoidance, recovery, subordination, or other claims, actions, or

12            remedies which the Debtor, the debtor-in-possession, the Bankruptcy Estate, or

13            other appropriate parties-in-interest have asserted or may assert under sections 502,

14            510, 542, 544, 545 or 547 through 553 of the Bankruptcy Code or under similar or

15            related state or federal statute or common law.

16        d.  All policies of insurance and any and all proceeds thereof.

17        e.  All money, cash or cash equivalents, except for any Capitation Payment (as defined

18            in the DIP Financing Agreement), but only prior to receipt by the Debtor, after

19            which and such Capitation Payment shall be Collateral and without limitation of the

20            provisions of paragraph 3.1 of the DIP Financing Agreement.

21        f.  Intellectual Property, as set forth in "a.", above includes, but is not limited to: all

22            trademarks, patents, design patents, copyrights, trade secrets, and licenses to the

23            same, and all physical embodiments of the same, including notebooks, and

24            descriptions of such intellectual property.

25        g.  All intellectual property described in the Bankruptcy Schedules file by the

26            Borrower.

27        h.  To the extent not otherwise included, all proceeds and products of the foregoing and

28            all accessions to, substitutions and replacements for, and rents and profits of, each

EXHIBIT 1 - PAGE 6 -6-

4828-6580-2465.1                                                    DIP FINANCING INTERIM ORDER

of the foregoing.

7.    <u>Budget</u>.  Use of funds advanced under the DIP Facility shall be used solely for the purposes expressly provided in the DIP Documents.  The Debtor shall provide the Lender with a new proposed Budget no less than two (2) weeks prior to the expiration of the Initial Budget or the operative Budget, as applicable.  The Debtor shall further provide the Lender with a report containing a reconciliation by line-item of actual cash expenditures for the prior month two-week period compared to the corresponding budgeted expenditures for such month two-week period (each, a "<u>Variance Report</u>").  Each Budget and all expenses proposed to be incurred and the payments proposed to be made by and through any such Budget shall be subject to the express written approval of the DIP Lender, which approval will not be unreasonably withheld.

8.    <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without application or motion to, or further order from, this Court, the occurrence of any Event of Default as provided in the DIP Documents, including but not limited to Section 7.1 of the DIP Financing Agreement, or any failure of the Debtor to comply with any of the terms of this Order, shall be an Event of Default under this Order.

9.    <u>Remedies</u>.  Without limitation of any further or additional Remedies provided in the DIP Documents, the Lender shall be entitled to the following remedies.

a.    In the event of an Event of Default, or should the Debtor should default in the performance of any of the Obligations (as defined in the DIP Documents), the Lender shall provide written notice of any such default to the Debtor and its counsel via e-mail (each such notice, a "<u>Default Notice</u>") at the addresses provided in the DIP Financing Agreement.  The Debtor shall have a grace period of five (5) business days following the date of any email constituting a Default Notice (each, a "<u>Grace Period</u>") within which to cure each and every of the Event(s) of Default identified in the Default Notice.  If the Debtor timely cures such Event(s) of Default, the Lender shall provide written acknowledgement of the Debtor's cure to the Debtor and its counsel.

b.    In the event that the Debtor should fail to cure all of the Event(s) of Default

EXHIBIT 1 - PAGE 7    -7-

1    identified in the Default Notice within the Grace Period (an "<u>Uncured Default</u>"), the

2    Lender may file with the Bankruptcy Court a motion seeking an adjudication of the

3    existence of an Event of Default, accompanied by a declaration asserting an

4    Uncured Default (collectively, a "<u>Declaration of Default</u>").  The Debtor shall,

5    within three (3) business days of the filing of a Declaration of Default, be entitled to

6    oppose the Declaration of Default by filing a written opposition thereto (an

7    "<u>Opposition</u>") and requesting a hearing thereon on shortened time, which shortened

8    time the Lender will support and not oppose.  Pending the adjudication of the

9    Declaration of Default by this Court, any and all obligations of the Lender, arising

10   under the DIP Documents, this Order, or otherwise, shall be suspended, including

11   but not limited to any and all obligation(s) of the Lender to advance funds.  The

12   basis for any such Opposition shall be limited to: (i) whether the asserted Event(s)

13   of Default occurred; (ii) whether the asserted Event(s) of Default were or have been

14   excused; and/or (iii) whether the Debtor timely cured the asserted Event(s) of

15   Default.

16       c.   Unless expressly waived by the Lender, if the Debtor does not timely file and serve

17            an Opposition in accordance with the foregoing, any and all obligations of the

18            Lender, arising under DIP Documents, this Order, or otherwise, shall be terminated,

19            including but not limited to any and all obligation(s) of the Lender to advance

20            funds.

21       d.   If the Debtor timely files an Opposition and the Bankruptcy Court finds that the

22            Debtor did not commit an Event of Default, was excused from committing an Event

23            of Default, and/or timely cured an Event of Default, the Lender shall be required to

24            continue to perform its obligations under DIP Documents.  If, however, the

25            Bankruptcy Court finds that an Event of Default has occurred, that the Event of

26            Default was not excused, and/or that the Event of Default was not timely cured,

27            unless such Event of Default is expressly waived in writing by the Lender, any and

28            all obligations of the Lender, arising under the DIP Documents, this Order, or

EXHIBIT 1 - PAGE 8 -8-

DIP FINANCING INTERIM ORDER

1   otherwise, shall be terminated, including but not limited to any and all obligation(s)

2   of the Lender to advance funds.

3       10.   <u>No Further Action Required</u>. The approval of this Interim Order by the Court shall

4   be sufficient and conclusive evidence of the validity, extent, enforceability, and perfection of the

5   and the DIP Liens granted to the Lender, whether or not the Lender elects to file or record

6   financing statements or any other documents that may otherwise be required under federal or state

7   law in any jurisdiction, or to take such other steps as may otherwise be required to obtain,

8   evidence, or perfect such liens under applicable law; <u>provided</u>, <u>however,</u> that on the request of the

9   Lender, the Debtor shall execute such other documents as may be reasonably requested to

10   evidence, perfect, and provide public notice of such liens; that the Lender may, in its sole

11   discretion, but shall not be required to, file a certified copy of this Interim Order in any filing or

12   recording office in any jurisdiction in which the Debtor has real or personal property; that the

13   Debtor is authorized and directed to execute, or cause to be executed, all such financing statements

14   or other documents upon the Lender's reasonable request; and that such filing or recording shall be

15   accepted and shall constitute further evidence of perfection of the Lender's liens and security

16   interests. No obligation, payment, transfer, or grant of security under this Interim Order shall be

17   stayed (other than by court order in an appeal from this Interim Order), restrained, voidable,

18   avoidable, or recoverable under the Bankruptcy Code or under any otherwise applicable state law,

19   or subject to any defense, reduction, setoff, recoupment, or counterclaim.

20       11.   <u>Bankruptcy Code Sections 506(c) and 552(b)</u>.  Subject to entry of and as provided

21   in the Final Order, in light of the Lender's agreement to subordinate its DIP Superpriority Claims

22   to the Carve Out and to make post-petition loan advances under the DIP Documents, the Lender is

23   entitled to (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy

24   Code and (b) a waiver by the Debtor of the provisions of section 506(c) of the Bankruptcy Code

25   and any other surcharge by the Debtor on the Collateral.

26       12.   <u>Modification of Stay</u>. The automatic stay imposed by Section 362 of the

27   Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Lender to take

28   any action expressly authorized or contemplated by the DIP Documents or this Interim Order.

EXHIBIT 1 - PAGE 9    -9-

13.    <u>Fees and Expenses</u>.  The Debtor and the bankruptcy estate, as appropriate, shall reimburse the DIP Lender for all costs and expenses as set forth in Section 10.3 of the DIP Financing Agreement, without the need for any further approval or order of the Bankruptcy Court.

14.    <u>Preservation of Rights</u>.  If any or all of the provisions of this Interim Order are, at any time, modified, vacated or stayed, such stay, modification, or vacation shall not affect the validity, extent, priority, and enforceability of any lien, priority, or other benefit conferred under this Interim Order prior to such stay, modification, or vacation.

15.    <u>Binding Effect</u>.  This Interim Order shall be binding on all creditors and parties in interest in these Bankruptcy Cases, including, but not limited to, the Debtor and any successors thereto.  This Order shall be binding upon, and inure to the benefit of, any and all successors, designees, transferees, endorsees and/or assignees of the Lender.  Subject to entry of the Final Order, the security interests and liens provided for in this Order shall be and remain valid and perfected, and the claims of the Lender hereunder valid and enforceable in accordance with the terms hereof, notwithstanding any discharge that the Debtor may receive pursuant to section 1141 of the Bankruptcy Code, the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case or any subsequent chapter 7 case or the release or transfer of any Collateral from the bankruptcy estate.  No claim or cause of action of any kind or nature may be asserted against the Lender in its capacity as lender under the DIP Financing, or related to the liens and claims hereunder granted to the Lender under or in connection with to the DIP Financing.  All waivers by the Debtor of any rights or notices that are expressly provided in the DIP Documents are hereby approved and are effective without further order of this Court.

16.    <u>Section 364(e) Protections</u>.  Pursuant to section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed, such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, security interests or liens granted by the Debtor to the Lender prior to the effective date of any such stay, modification or vacation, or the validity and enforceability or priority of any lien or security interest authorized, granted or created pursuant to this Interim Order.

EXHIBIT 1 - PAGE 10    -10-
4828-6580-2465.1                                                          DIP FINANCING INTERIM ORDER

17. <u>No Competing Liens</u>. Except as set forth herein, the Debtor shall not grant liens on, or security interests in, the DIP Collateral to any other party, pursuant to Section 364 of the Bankruptcy Code or otherwise, without the consent of the Lender.

18. <u>Right to Credit Bid</u>. In connection with the sale or other disposition of all or any portion of the Debtor's assets, whether under Section 363 of the Bankruptcy Code, Section 1129 of the Bankruptcy Code or otherwise, pursuant to Section 363(k) of the Bankruptcy Code, the Lender shall have the right to use the any and all amounts owing under the DIP Facility, or any part thereof, to credit bid with respect to any sale or other disposition.

19. <u>Reservation of Rights</u>. Except as provided in this Interim Order, neither the Debtor, the Lender nor the any committee that may be appointed pursuant to Section 1102 of the Bankruptcy Code waives any of its rights under the Bankruptcy Code, any applicable law, DIP Documents, as applicable, including, without limitation, the right of the Debtor, the Lender or the any such committee at any time to seek any relief (or to oppose any such relief) under the Bankruptcy Code, or the right of the Debtor, the Bond Trustee or any such committee to exercise any of its rights and remedies under the Bankruptcy Code at any time.

20. <u>Further Relief</u>. Nothing in this Interim Order shall preclude the Lender from seeking any other relief that it may deem appropriate, including relief from the automatic stay.

21. <u>No Control</u>. Nothing in this Interim Order shall cause the Lender to be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person," "managing agent," or "owner or operator" (as such terms or any similar terms are used in any Federal or state statute) with respect to the operation or management of the Debtor, notwithstanding its consent to this Interim Order or its extension of financial accommodations of any type, kind, or nature under this Interim Order and the DIP Documents.

22. <u>No Third-Party Beneficiaries</u>. Except as expressly provided herein or in the DIP Documents, no rights are created hereunder or by the DIP Documents for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary.

23. <u>Effectiveness</u>. The rights and obligations of the parties under this Interim Order shall be effective and enforceable as of the Petition Date. This Interim Order shall be deemed

EXHIBIT 1 - PAGE 11
-11-
4828-6580-2465.1                                                        DIP FINANCING INTERIM ORDER

1  effective immediately and, for the avoidance of doubt, Bankruptcy Rule 6004(h) shall not apply

2  hereto.  If any or all of the provisions of this Interim Order are hereafter reversed, modified,

3  vacated or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity,

4  extent, priority, or enforceability of any obligations incurred prior to the actual receipt of written

5  notice by the Lender of the effective date of such reversal, modification, vacatur, or stay, or (ii) the

6  validity, extent, or enforceability of the liens and claims granted hereunder.

7          24.    <u>Final Hearing; Objections</u>.  The Final Hearing on the Motion shall be held before

8  the Bankruptcy Court on _____ __, 2021 at __:__ _.m.  Any objections shall be filed and served

9  on counsel for the Debtor and counsel for the Lender pursuant to the Local Bankruptcy Rules

10  based on the date of the Final Hearing.

11          25.    <u>Notice of Final Hearing</u>.  The Debtor shall, within two (2) business days after entry

12  of this Interim Order, provide a notice of the entry of this Interim Order, together with a notice of

13  the Final Hearing, by overnight courier, U.S. Mail, or NEF to (a) the Office of the United States

14  Trustee; (b) the attorneys for the Lender; (c) all creditors known to Debtor who have or may assert

15  liens against the Debtor's assets; (d) the United States Internal Revenue Service; (e) the twenty

16  (20) largest unsecured creditors of the Debtor; and (f) all parties in interest who have filed a notice

17  of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy

18  Procedure or the Local Rules of this Court.  Such notice shall be sufficient notice of the Final

19  Hearing.

20          26.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to decide all disputes

21  arising under or related to this Order and the DIP Documents.

22                                          # # #

23

24

25

26

27

28

EXHIBIT 1 - PAGE 12        -12-
4828-6580-2465.1                                                                DIP FINANCING INTERIM ORDER

EXHIBIT 2

**CONFIDENTIAL SETTLEMENT COMMUNICATION – SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND ANY AND ALL OTHER APPLICABLE FEDERAL AND STATE LAW(S)**

---

DEBTOR-IN-POSSESSION SECURED CREDIT AGREEMENT

Dated March __, 2021

by and between

VITALITY HEALTH PLAN OF CALIFORNIA, INC.,

Debtor and Debtor in Possession

as Borrower,

and

Atrio HP, Inc.

as DIP Lender

---

**THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER FOR ANYTHING, SHALL NOT BE BINDING AND SHALL OTHERWISE BE SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION WHICH IS NOT DRAFTED NOR AGREED TO. FURTHER, THIS TERM SHEET DOES NOT CONTAIN ALL OF THE TERMS OF A PROPOSED PLAN OF REORGANIZATION. THIS TERM SHEET SHALL <u>NOT</u> BE CONSTRUED AS (I) AN OFFER CAPABLE OF ACCEPTANCE; (II) A BINDING AGREEMENT OF ANY KIND; (III) A COMMITMENT TO ENTER INTO, OR OFFER TO ENTER INTO, ANY AGREEMENT; OR (IV) AN AGREEMENT TO FILE ANY CHAPTER 11 PLAN OF REORGANIZATION OR LIQUIDATION OR DISCLOSURE STATEMENT, CONSUMMATE ANY TRANSACTION, OR TO VOTE FOR OR OTHERWISE SUPPORT ANY PLAN OF REORGANIZATION OR LIQUIDATION.** This Agreement does not purport to contain or summarize all of the necessary or requisite terms, conditions, representations, warranties or provisions, and is expressly subject to further negotiation between the parties, preparation and execution of definitive documentation reflecting the

EXHIBIT 2 - PAGE 1

agreement between the parties and Bankruptcy Court approval of any and all such documentation.

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT, is dated as of March __, 2021, between Vitality Health Plan of California, Inc., a California corporation, as debtor and debtor-in-possession (the "Borrower" or the "Debtor"), and Atrio HP, Inc., an Oregon corporation, or a designee thereof, as the debtor-in-possession lender (the "DIP Lender").

The effective date of this agreement (the "Agreement") shall be the later of (1) the date upon which the bankruptcy court presiding over the Bankruptcy Case, as that term is defined below (the "Bankruptcy Court"), enters an Interim Borrowing Order, which term is defined below, approving this Agreement and (2) the date upon which this Agreement is signed by all parties (the "Effective Date").

<u>RECITALS</u>

The Borrower filed for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on December 18, 2020 (the "Petition Date"), in the Central District of California, which filing commenced case number 2:20-bk-21041-WB (the "Bankruptcy Case").

The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

The Debtor is a party to the Contract With Eligible Medicare Advantage (MA) Organization Pursuant to Sections 1851 Through 1859 of The Social Security Act For The Operation of a Medicare Advantage Coordinate Care Plan(s), and any and all amendment(s) or addendum(s) thereto (collectively, the "H Contract");

The Borrower has requested that the DIP Lender provide the DIP Financing Facility, as that term is defined below, subject to the terms and conditions contained herein, and the DIP Lender is willing to provide the DIP Financing Facility, as that term is defined below, to Borrower in accordance with and on the terms and conditions set forth herein;

The Debtor has an immediate need to obtain the DIP Financing Facility, as that term is defined below, from the DIP Lender in order to satisfy, among other things, the payroll expenses of the bankruptcy estate of the Debtor (the "Bankruptcy Estate").  The payment of payroll and other administrative expenses is necessary to enable the Debtor to avoid irreparable harm to the Bankruptcy Estate;

Given the current financial condition of the Debtor, the Debtor is unable to obtain unsecured credit allowable under 11 U.S.C. 503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without the Debtor granting, pursuant to 11 U.S.C. 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in 11 U.S.C. 503(b) and 507(b), other than as described below, and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to 11 U.S.C. 364(c) and 364(d). Given the foregoing, the Debtor believes it is necessary and appropriate to obtain an ongoing infusion of cash from the DIP Lender in order to fund payroll and other administrative expenses of the Bankruptcy Estate;

2

EXHIBIT 2 - PAGE 2

The terms of the DIP Financing Facility, and each of the DIP Credit Advances, as set forth herein, are fair and reasonable, reflect the Debtor's exercise of its business judgment consistent with its' fiduciary duties and constitute reasonably equivalent value and fair consideration; and

The terms of the DIP Financing Facility, and each of the DIP Credit Advances, as set forth herein, have been the subject of negotiations conducted in good faith and at arm's length among the Debtor and the DIP Lender, and all of the obligations and indebtedness to the DIP Lender arising under or in connection with the DIP Loan have been extended by the DIP Lender in "good faith" as such term is used in 11 U.S.C. 364(e), and in express reliance upon the protections set forth therein, and the DIP Lender is entitled to the full protection of 11 U.S.C. 364(e) in the event that the Interim Borrowing Order and/or the Final Borrowing Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1.    AMOUNT AND TERMS OF CREDIT

1.1    <u>DIP Financing Facility</u>.

(a)    Subject to the conditions set forth in this Agreement, particularly as set forth in Section 3, the Borrower may borrow from the DIP Lender a total of one million two hundred fifty thousand dollars and zero cents ($1,250,000.00) (the "DIP Financing Facility"), in advances of up to two hundred fifty thousand dollars and zero cents ($250,000.00) each on and pursuant to the terms set forth herein. Any advance made under subparagraph (a) shall constitute a "DIP Credit Advance." In the event that all of the requisite conditions set forth in this Agreement have been satisfied by the Debtor and/or waived by the DIP Lender, as applicable, the Debtor may obtain a DIP Credit Advance by transmitting the form appended hereto as "**<u>Exhibit A</u>**" (a "Draw Request") via email at least three (3) business days before the funds are expected to be advanced. Every request must be signed by Brian Barry, CEO of the Debtor, and will be deemed a "DIP Credit Advance Request." Assuming the Debtor has satisfied the conditions precedent to borrow the funds requested by and through the DIP Credit Advance Request, the DIP Lender will wire the funds to the Debtor's debtor-in-possession bank account designated as the cash collateral account below (and as shall be reflected in the Debtor's most recent monthly operating report).

(b)    A DIP Credit Advance Request may not be submitted fewer than ten (10) calendar days after the immediately preceding DIP Credit Advance has been funded;

(c)    Every DIP Credit Advance Request shall represent the obligation of the Debtor to repay the amount of the DIP Credit Advance in accordance with the terms of this Agreement and/or the Interim Borrowing Order (as that term is defined below), as applicable.

1.2    <u>Use of DIP Loan Proceeds</u>. Any and all of the DIP Credit Advances shall be used solely to pay the following claims and/or expenses, as applicable, and only as set forth in the Budget:

(a) Claims incurred post-petition for clinical services and prescription drug costs as defined at 42 CFR 422.2420 (individually, and collectively, the "Medical Claims"), unless there is a good faith basis to deny and/or dispute such Medical Claims (individually and collectively, as applicable, the "Valid Claims");

3

EXHIBIT 2 - PAGE 3

(b)    Any and all expenses incurred with respect to post-petition services necessary to ensure the continued uninterrupted operations of the Debtor, including but not limited to payroll and claims arising from or related to administrative service providers (the "Ordinary Course Expenses"), so long as and only to the extent such expenses are set forth in the budget, a copy of which is appended hereto as "**Exhibit B**" (the "Budget"), and with respect to insider payroll, only if and to the extent such payments are authorized by and through an operative Notice of Insider Compensation;

(c)    Any and all fees and expenses of any and all professionals of the Bankruptcy Estate (collectively, and each individually, as applicable, the "Professionals"), up to three hundred thousand dollars and zero cents ($300,000.00), on a *pari passu* basis with any and all other claimants holding allowed administrative expense claims against the Bankruptcy Estate, incurred in the Bankruptcy Case, so long as such fees and expenses are authorized to be paid pursuant to a Final Order of the Bankruptcy Court; and

1.3    <u>Interest and Fees</u>.

(a)    Interest shall accrue on any and all unpaid DIP Credit Advances and on any and all unpaid fees and costs described below in subsection (b), at a rate of ten percent (10%) per annum, non-compounded.  Such interest shall be payable on the Maturity Date, as that term is defined below.

(b)    Any and all fees and expenses to which the DIP Lender is entitled pursuant to Section 10.3 of this Agreement shall also be due and payable on the Maturity Date.

1.4    <u>Maturity Date</u>.  If not sooner paid, the full amount of all obligations arising under this Agreement, including, but not limited to any and all obligations arising under the DIP Financing Facility and/or under any and all DIP Credit Advances, fees, expenses, and unpaid interest (collectively, the "DIP Loan") shall be due and payable on the earlier of (1) August 31, 2021 (2) the occurrence of any Event of Default, as that term is defined below and (3) effective date of a plan of reorganization consistent with the Restructuring Support and Acquisition Agreement, as that term is defined below (the "Maturity Date");

1.6    <u>Application of Payments</u>.

(a)    <u>Application of Payments</u>.  All payments under this Agreement shall be applied to reduce the DIP Loan until such loan is satisfied in full.  Amounts applied to reduce the balance of the DIP Loan shall, in the absence of a specific determination by the DIP Lender, be applied to amounts then due and payable in the following order: (1) to the fees and expenses of the DIP Lender as set forth in Section 10.3 of this Agreement; 2) to interest on the DIP Loan; (3) to the principal of the DIP Loan; (4) to any and all outstanding amounts due and owing under the DIP Loan and (5) to all other obligations owing to the DIP Lender.

4

EXHIBIT 2 - PAGE 4

**2.**      **STATUS OF OBLIGATIONS; PERFECTION AND PRIORITY OF SECURITY INTERESTS**

2.1     <u>Grant of Security Interest</u>. To the fullest extent permitted by the Bankruptcy Code, the Debtor hereby grants to the DIP Lender a senior security interest in the personal property identified inSchedule 2.1 hereto (collectively, the "Collateral") as security for each and every of the Debtor's obligations under this Agreement (collectively, the "Obligations").

2.2     <u>Superpriority Claims</u>. Subject only to the entry of the Interim Borrowing Order, as that term is defined below, the Obligations are entitled (without the need for the DIP Lender to file a proof of claim or take any further action) to a superpriority claim against the Debtor and the Bankruptcy Estate, as applicable, with priority over any and all other obligations, liabilities, and indebtedness against the Debtor and the Bankruptcy Estate, as applicable, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Borrowing Order, as that term is defined below), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by the Debtor or the Bankruptcy Estate, as applicable, and shall at all times be senior to the rights of the Debtor, the Debtor's estate and any successor trustee, estate representative, or any creditor, in the Bankruptcy Case or any subsequent cases or proceedings under the Bankruptcy Code, except for that portion of any claim held by the Debtor's counsel arising from and pursuant to the Order Granting Application of Debtor and Debtor-in-Possession for Authority to Amend Terms of Employment and Compensation of Winthrop Golubow Hollander, LLP [Docket no. 114] (the "Lender Superpriority Claim"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and post-petition assets of the Debtor and/or the Bankruptcy Estate, including, but not limited to, the Collateral.

2.3     <u>Lien on Assets</u>. Subject only to the entry of the Interim Borrowing Order, as that term is defined below, the Obligations are, pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date and such liens are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements immediately upon entry of the Interim Borrowing Order, as that term is defined below. Notwithstanding the foregoing, the Debtor agrees, promptly upon request by the DIP Lender, to take any and all actions necessary or advisable to provide public notice of the security interests granted hereunder. The Debtor hereby consents to the execution by the DIP Lender of any and all documents reasonably determined by the DIP Lender to be necessary to document and perfect the security interests granted herein, without need for further consent from the Debtor or (further) order of the Bankruptcy Court.


**3.**      **CONDITIONS PRECEDENT**

3.1     <u>Conditions to Effectiveness</u>. The obligation(s) of the DIP Lender with respect to the DIP Financing Facility, including but not limited to any obligation(s) of the DIP Lender to provide any DIP Credit Advance shall not become effective until the date on which each of the following conditions has been satisfied or waived in writing by the DIP Lender:

5

EXHIBIT 2 - PAGE 5

(a)      Initial Budget. The Debtor shall be operating in accordance with the initial budget appended hereto as Exhibit B, which has been approved by the DIP Lender (the "Initial Budget")

(b)      Budget and Projections.  No later than two (2) weeks prior to the expiration of the Initial Budget, the Debtor shall have provided the DIP Lender with a proposed budget and any and all related projections that governs the thirteen (13) weeks following the expiration of the Initial Budget, the form and substance of which shall ultimately be subject to the DIP Lender's review and approval (each, a "Budget").

(c)      Collateral Requirements.  The DIP Lender shall have received evidence satisfactory to it that it has, or concurrently with the Effective Date shall have, a perfected lien on, and security interest in, the Collateral as set forth in Section 2, including but not limited to evidence demonstrating the establishment and the existence of an additional debtor-in-possession bank account (the "Cash Collateral Account") that is not the bank account into which the payments received on account of the H Contract (the "Capitation Payments") are directed.  No less than one time per business day, any and all of the capitation payment(s) remaining after any and all Valid Medical Claims have been satisfied with such funds shall be swept into the Cash Collateral Account.  The DIP Lender shall fund any and all DIP Credit Advances based on DIP Credit Advance Requests made by the Debtor even if the Cash Collateral Account has not yet been created, so long as the Debtor is making good faith efforts to open the Cash Collateral Account; however, the failure of the Debtor to open and be utilizing the Cash Collateral Account in accordance with this Agreement prior to March [  ], 2021 shall constitute an Event of Default, as that term is defined below.  .  For the avoidance of doubt, at no point shall the DIP Lender have any control, practically or legally, over any portion of any Capitation Payment unless and until the proceeds of any such payment are required to be transferred to the Cash Collateral Account;

(d)      Litigation. Except for the Bankruptcy Case, there shall not exist any pending or threatened litigation, proceeding, or investigation that (i) would prohibit, enjoin, or contest the transactions contemplated by this Agreement or (ii) could have a material adverse effect on the bargain to which the DIP Lender is entitled under this Agreement.

(e)      Regulatory Compliance. Demonstrate compliance with any and all obligations imposed on the Borrower and/or the Debtor, as applicable, by any and all government and/or regulatory agencies, including but not limited to those set forth in the H Contract;

(f)      Approvals. The DIP Lender has received satisfactory evidence that the Debtor has obtained any and all consents and approvals required for the Debtor to enter into this Agreement;

(g)      Court Approval. The Bankruptcy Court has approved this Agreement and each and every material term herein;

6

EXHIBIT 2 - PAGE 6

(h)    Pleadings.  No pleadings or applications have been filed in the Bankruptcy Court by any party - that are not withdrawn, dismissed or denied within three (3) calendar days after the filing thereof - that seek: (i) to dismiss or convert the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code; (ii) to appoint a trustee or examiner in the Bankruptcy Case; (iii) to grant a claim or a lien pari passu with or senior to that of the DIP Lender, except that the Debtor shall not be prohibited from filing a motion seeking approval to obtain a loan under the Paycheck Protection Program ("PPP"); (iv) to stay, reverse, vacate, or otherwise modify the Interim Borrowing Order and/or the Final Borrowing Order; (v) relief from the automatic stay (or any other injunction having similar effect) so as to allow a third party to proceed against the Debtor, any property or assets of the Debtor and/or the bankruptcy estate (collectively, the "Estate Assets") and/or any of the property or assets in which the DIP lender has, or has been granted, a security interest, including but not limited to the Collateral, except for the matters described on Schedule 3.1; or (vii) to sell any Estate Assets and/or any of the Collateral.  Notwithstanding the foregoing, in every instance, the DIP Lender shall be entitled to oppose or object to any and all pleadings identified herein, and in no instance shall the failure of the DIP Lender to oppose or make any such objection constitute a waiver of its right to object to any other pleading.

3.2    Further Conditions to Each DIP Credit Advance.  Except as otherwise expressly provided herein, the DIP Lender shall not be obligated to comply with any portion of the DIP Financing Facility or fund any DIP Credit Advance if any Event of Default has occurred, whether or not such Event of Default is continuing.

## 4.    REPRESENTATIONS AND WARRANTIES

To induce the DIP Lender to extend the DIP Financing Facility and make the DIP Credit Advances available, the Debtor makes the following representations and warranties, each of which shall survive the execution and delivery of this Agreement.  For purposes of this Agreement, the phrase "to Debtor's knowledge" means the actual knowledge of the President and the chief financial officer of the Debtor after due inquiry.

4.1    Authority and Compliance with Law.  Except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on this Agreement, the Debtor  (a) is a corporation duly organized and in good standing under the laws of its jurisdiction of organization; (b) has obtained all licenses or approvals from, and has given all notices to, governmental authorities required to operate its business, except with respect to those licenses and/or approvals to be obtained from and/or notices to be given to the Department of Managed Healthcare ("DMHC"); (c) is in compliance with its charter and bylaws; and (d) is in compliance with all applicable provisions of law, except those provisions governing the Debtor's relationship with DMHC.

4.2    Financial Statements.  All financial statements concerning the Debtor delivered to the DIP Lender have been prepared in accordance with GAAP consistently applied throughout the periods covered and fairly present in all material respects the Debtor's financial position.

4.3    Ownership of Property; Liens.  The statements and schedules the Borrower filed with the Bankruptcy Court, which will be amended to include those items described on Schedule 4.3completely and fully disclose all assets of the Borrower and any and all liens against such assets.  The Debtor owns good and marketable fee simple title to all of the Estate Assets and all of the Collateral.  Copies of all material contracts, or a summary of terms thereof impacting on the Debtor's true ownership of its assets, have been provided to the DIP Lender prior to the Effective Date.  There are no facts, circumstances or

7

EXHIBIT 2 - PAGE 7

conditions that are currently anticipated to result in any liens on any of the Estate Assets, including but not limited to the Collateral.

4.4 <u>Labor Matters</u>. As of the Effective Date, all obligations owed by the Debtor to its employees and all payments due from the Debtor for employee health and welfare insurance have been disclosed on the statements and schedules or otherwise satisfied in full as demonstrated to the DIP Lender to its satisfaction.

4.5 <u>Ventures, Subsidiaries and Affiliates</u>. The Debtor is not engaged in any joint venture or partnership with any person and/or entity or any affiliate of any person or entity.

4.7 <u>Intellectual Property</u>. The Debtor owns or has exclusive rights to use all intellectual property necessary to continue to conduct its business as now or heretofore conducted by it or proposed to be conducted by it, and each patent, design, trademark, copyright and license to intellectual property is disclosed in the statements and schedules. The Debtor conducts its business and affairs without infringement of or interference with any intellectual property of any other person. Except as identified in the statements and schedules, there is no infringement claim by any other person with respect to any intellectual property used by or on behalf of the Borrower or the Debtor, as applicable.

4.8 <u>Full Disclosure</u>. No information contained in this Agreement, the statements and schedules, any document or information provided to the DIP Lender in accordance with the terms of this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were or will be made.

## 5. FINANCIAL STATEMENTS AND INFORMATION

5.1 <u>Reports and Notices</u>. From the Effective Date up to and through the date the Obligations are satisfied in full, the Debtor shall deliver the following to the DIP Lender:

(a) Its monthly, quarterly and year-end financial statements no later than thirty (30) days after the end of the applicable period;

(b) Any and all reports, whether generated by a third-party administrator or otherwise and exclusive of any content protected from disclosure by Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), reflecting (1) the status of any and all Medical Claims, including but not limited to those that have been paid (whether partially or in full), those that have not been denied and those as to which a good-faith dispute regarding payment exists and (2) the date(s) on which such Medical Claims were incurred (the "Claims Report"). The Debtor shall be provided with the Claims Report within three (3) calendar days of the Debtor having created the Claims Report or received the Claims Report from a third party administrator, and in no event less than every thirty (30) days.; and

(c) Such other information and/or documentation as may be requested by the DIP Lender, including but not limited to notices and projections.

5.2. <u>Communication with Professionals and Bankruptcy Estate Representatives</u>. The Debtor hereby authorizes the DIP Lender to communicate directly with any and all professionals of the Bankruptcy Estate, including but not limited to the Professionals, and authorizes and shall instruct those

8

EXHIBIT 2 - PAGE 8

professionals to disclose to the DIP Lender any and all financial statements and other supporting financial documents relating to the Borrower, the Debtor, the Bankruptcy Estate, the Estate Assets and/or the Collateral, as applicable.  For the avoidance of doubt, this paragraph shall include communications with Moss Adams, Ken Watkins and/or their respective representatives.

**6.    AFFIRMATIVE COVENANTS**

The Debtor agrees that from and after the date hereof and until the Obligations in favor of the DIP Lender are satisfied in full:

6.1    <u>Maintenance of Existence and Conduct of Business</u>. The Debtor shall not take any action other than operating its business in the ordinary course unless it first obtains the prior written consent of the DIP Lender to do so.  Actions beyond the ordinary course of business include, but are not limited to, selling any asset other than inventory, taking any action(s) that may reasonably be expected to result in the termination of any license held by or on behalf of the Debtor and excusing any employee (other than administrative assistants) from employment other than for good cause.  The Debtor shall preserve its corporate existence, rights and franchises; continue to conduct its business substantially as now conducted; protect and maintain all of its assets, including but not limited to any and all licenses; and transact business only in those corporate and trade names that are disclosed in the statements and schedules.

6.2    <u>Insurance</u>.  The Debtor shall, at its sole cost and expense, maintain the policies of insurance described in its statements and schedules as in effect on the date hereof or otherwise in form and amounts and with insurers acceptable to the DIP Lender.  If the Debtor hereafter fails to maintain any of the policies of insurance required above or to pay all premiums relating thereto, the DIP Lender may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto which the DIP Lender deems advisable.  The DIP Lender shall have no obligation to obtain insurance for the Debtor, or any affiliate thereof, or pay any premiums related thereto.  By doing so, the DIP Lender shall not be deemed to have waived any Event of Default arising from the failure of the Debtor to maintain such insurance or pay any premiums, and any funds expended by the DIP Lender for this purpose shall be entitled to the same treatment and priority as any and all of the Obligations identified and/or contemplated herein.

6.3    <u>Compliance with Laws</u>.  The Debtor shall comply with all federal, state, local and foreign laws and regulations applicable to it, including those relating to ERISA and labor matters and environmental laws.

6.5    <u>No Surcharge</u>.  In accordance with the Interim Borrowing Order and the Final Borrowing Order, the Debtor may not assert any claims to any surcharge of the security interests of the DIP Lender in the Collateral under Section 506(c) of the Bankruptcy Code or otherwise.

6.6    <u>Budgets and Variance Reports</u>.  The Debtor shall provide the DIP Lender with a Budget no less than two (2) weeks prior to the expiration of the Initial Budget or the operative Budget, as applicable. The Debtor shall further provide the DIP Lender with a report containing a reconciliation by line-item of actual cash expenditures for the prior two-week period compared to the corresponding budgeted expenditures for such two-week period (each, a "Variance Report").  The expenses proposed to be incurred and the payments proposed to be made by and through any such budget shall be subject to the express written approval of the DIP Lender, which approval will not be unreasonably withheld.

9

EXHIBIT 2 - PAGE 9

## 7.      EVENTS OF DEFAULT: RIGHTS AND REMEDIES

7.1      <u>Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court, the occurrence of any of the following events shall constitute an Event of Default under this Agreement:

(a)      The Debtor fails to make any payment of principal of, or interest on, or fees owing in respect of, the DIP Loans when due and payable hereunder.

(b)      The Debtor fails to perform any other provision of this Agreement for ten (10) or more days after the performance thereof is due.

(c)      Any information the Debtor provides to the DIP Lender is untrue or incorrect in any respect (other than inadvertent immaterial errors causing damage to the DIP Lender in an amount less than two thousand dollars and zero cents ($2,000.00)), or any representation or warranty herein or in the schedules or statement of financial affairs is untrue or incorrect in any material respect as of the date such representation and/or warranty was made.

(d)      With respect to the Bankruptcy Case, the entry of an order, which has not been withdrawn, dismissed or reversed within ten (10) days of entry, or the filing by or on behalf of the Debtor of a motion to effect an order:

(i)      authorizing the Debtor in the Bankruptcy Case to obtain additional financing under Section 364 (d) of the Bankruptcy Code, or authorizing any person or entity to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or

(ii)      appointing an interim or permanent trustee or an examiner in the Bankruptcy Case; or

(iii)      approving any claim having any priority over, or being *pari passu* with, the administrative expense priority of the DIP Loans, except as set forth herein (e.g., a PPP loan)

(e)      <u>Lack of Security Interest</u>. Any lien created under the Interim Borrowing Order or the Final Borrowing Order, as applicable, shall cease to be, or shall be asserted by the Debtor not to be, a valid and perfected lien, with the priority required by this Agreement, the Interim Borrowing Order and/or the Final Borrowing Order, as the case may be, except as a result of a disposition of the applicable collateral in a transaction permitted under, or expressly contemplated by, this Agreement.

(f)      The timely provision of any Budget or Variance Report in accordance with Section 6.6.

(g)      The failure to adhere to the Initial Budget and/or any Budget.

(h)      <u>Dismissal of Cases; Appointment of Trustee</u>. The Bankruptcy Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or the Debtor shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or

10

EXHIBIT 2 - PAGE 10

otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof

(i)     Any order by the Bankruptcy Court shall be entered, terminating or modifying the exclusivity right of the Debtor to file a chapter 11 plan of reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender.

(j)     <u>Superpriority Claims</u>. An order is entered in the Bankruptcy Case granting any person or entity a claim which is *pari passu* with or senior to any claim(s) of the DIP Lender against the Debtor and/or the Bankruptcy Estate or any lien or security interest that is *pari passu* with or senior to the liens and security interest granted hereunder, or the Debtor takes any action seeking or supporting the grant of any such claim, lien, or security interest, except as expressly permitted hereunder.

(k)     <u>Interim DIP Order</u>.  The Bankruptcy Court has entered the order appended hereto as Exhibit C  or an order in similar form and substance that has been approved by the DIP Lender authorizing the transaction contemplated in this Agreement and such interim borrowing order has become a Final Order[1] (the "Interim Borrowing Order").  The Interim Borrowing Order shall have been entered by the Bankruptcy Court no later than March 18, 2021 and be in full force and effect and shall not have been vacated or stayed in any manner without the prior written consent of the DIP Lender.

(l)     <u>Final DIP Order</u>. The Final Borrowing Order shall not have been entered by the Bankruptcy Court on or before May 1, 2021

(m)     <u>Restructuring Support and Acquisition Agreement</u>. A Restructuring Support and Acquisition Agreement between the Debtor and the DIP Lender consistent with the Term Sheet appended hereto as "Exhibit _____ " (the "Plan Term Sheet") (the "RSA") is not filed by the Debtor on or before April ___, 2021.

(n)     <u>Cross Default.</u>  Any default under the Term Sheet or the RSA shall constitute a default hereunder, entitling the DIP Lender to exercise any and all remedies provided hereunder.

---

[1] Final Order shall mean an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket in the Bankruptcy Case, or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or the new trial, reargument or rehearing has been denied or resulted in no modification of such order.

11

EXHIBIT 2 - PAGE 11

(o)    Challenge to Order. The Interim Borrowing Order or Final Borrowing Order, as applicable, shall fail to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim Borrowing Order or Final Borrowing Order, (ii) amending or modifying the Interim Borrowing Order or Final Borrowing Order in a manner that is adverse to the DIP Lender without the express written consent of the DIP Lender, or (iii) staying for a period in excess of seven (7) days the Interim Borrowing Order or Final Borrowing Order (as applicable).

(p)    Relief from the Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay under section 362 of the Bankruptcy Code to allow any one or more creditors or parties-in-interest to execute upon or enforce liens on or security interests in any Estate Assets and/or Collateral, except as otherwise described herein.

(q)    Prepetition Payments. The Debtor shall make any payment(s) for pre-petition claims , unless authorized by the Bankruptcy Court or expressly consented to, in writing, by the DIP Lender.

(r)    Sale of Assets. The Debtor shall file a motion seeking, or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order authorizing the sale of all or substantially all of the Debtor's assets (unless, in the case of each of the foregoing, either (i) (A) the DIP Lender has expressly consented to the filing of such motion, in writing, and (B) any order approving such a sale expressly provides for application of cash proceeds in accordance with the terms of this Agreement and is otherwise in form and substance reasonably acceptable to the DIP Agent or (ii) the order approving such sale contemplates payment in full in cash of the Obligations upon consummation of such sale).

(s)    Plan of Reorganization. If the Debtor files a plan of reorganization that does not provide for the DIP Loan being paid in full on the effective date of such plan, or supports, or fails to oppose, any plan filed by a person other than the Debtor that does not provide for the DIP Loan being paid in full on the effective date of such plan.

(t)    Actions in Support of Breach. The Debtor shall file any application or pleading with the Bankruptcy Court or otherwise consents to or fails to oppose any matters set forth above that would constitute an Event of Default (unless the DIP Lender consents to such filing or consent).

7.2    Remedies.

(a)    In the event that the Debtor should default in the performance of any of the Obligations, the DIP Lender shall provide written notice of any such default to the Debtor and its counsel via e-mail (each, a "Default Notice").  The Debtor shall have a grace period of five (5) business days following the date of any email constituting a Default Notice (each, a "Grace Period") within which to cure each and every of the Event(s) of Default identified in the Default Notice.  If the Debtor timely cures such Event(s) of Default, the DIP Lender shall provide written acknowledgement of the Debtor's cure to the Debtor and its counsel.

(b)    In the event that the Debtor should fail to cure all of the Event(s) of Default identified in the Default Notice within the Grace Period (an "Uncured Default"), the DIP Lender may file with the Bankruptcy Court a motion seeking an adjudication of the existence of an Event of Default, accompanied

12

EXHIBIT 2 - PAGE 12

by a declaration asserting an Uncured Default (collectively, a "Declaration of Default").  The Debtor shall, within three (3) business days of the filing of a Declaration of Default, be entitled to oppose the Declaration of Default by filing a written opposition thereto (an "Opposition") and requesting a hearing thereon on shortened time, which shortened time the DIP Lender will support and not oppose.  Pending the adjudication of the Declaration of Default by the Bankruptcy Court, any and all obligations of the DIP Lender, arising under this Agreement or otherwise, shall be suspended, including but not limited to any and all obligation(s) of the DIP Lender to honor a DIP Credit Advance Request.  The basis for the Opposition shall be limited to: (i) whether the asserted Event(s) of Default occurred; (ii) whether the asserted Event(s) of Default were or have been excused; and/or (iii) whether the Debtor timely cured the asserted Event(s) of Default.

(c)    Unless expressly waived by the DIP Lender, if the Debtor does not timely file and serve an Opposition in accordance with the foregoing, within two (2) Court days after receipt of the Declaration of Default, any and all obligations of the DIP Lender, arising under this Agreement or otherwise, shall be terminated, including but not limited to any and all obligation(s) of the DIP Lender to honor a DIP Credit Advance Request or make any further DIP Credit Advances.

(d)    If the Bankruptcy Court finds that the Debtor did not commit an Event of Default, was excused from committing an Event of Default and/or timely cured an Event of Default, the DIP Lender shall be required to continue to perform its obligations under this Agreement.

(e)    If, however, the Bankruptcy Court finds that an Event of Default has occurred, that the Event of Default was not excused and/or that the Event of Default was not timely cured, unless expressly waived by the DIP Lender, any and all obligations of the DIP Lender, arising under this Agreement or otherwise, shall be terminated, including but not limited to any and all obligation(s) of the DIP Lender to honor a DIP Credit Advance Request or make any further DIP Credit Advances.

7.3    <u>Waivers by Borrower</u>.  Except as otherwise provided for in this Agreement or by applicable law, the Debtor hereby waives: (a) notice of acceleration, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtor may in any way be liable, and (b) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 8.    ASSIGNMENT

8.1    <u>Assignment and Participations</u>.  The Debtor's signature hereto constitutes its consent to the DIP Lender's assignment of the DIP Lender's rights under this Agreement.  Upon assignment, the DIP Lender shall be relieved of its obligations hereunder without the need for (further) order of the Bankruptcy Court.  The Debtor hereby acknowledges and agrees that any assignment will give rise to a direct obligation of the Debtor and/or the Bankruptcy Estate, as applicable, to the assignee and that the assignee shall be considered to be a "DIP Lender" if and to the extent such assignee has expressly agreed to assume any and all obligations of the DIP Lender under this Agreement.

## 9.    SUCCESSORS AND ASSIGNS

9.1    <u>Successors and Assigns</u>.  This Agreement shall be binding on and shall inure to the benefit of the Debtor, the DIP Lender and their respective successors and assigns. The Debtor may not

13

EXHIBIT 2 - PAGE 13

assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder without the prior express written consent of the DIP Lender. Any such purported conveyance by the Debtor without the prior express written consent of the DIP Lender shall be void *ab initio*. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Debtor and the DIP Lender with respect to the transactions contemplated hereunder and no one shall be a third-party beneficiary of any of the terms and provisions of this Agreement, unless (expressly) identified as such hereunder.

## 10. MISCELLANEOUS

10.1    <u>Complete Agreement; Modification of Agreement</u>.    This Agreement constitutes the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in <u>Section 10.2</u> below.

10.2    <u>Amendments and Waivers</u>.  No termination or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the DIP Lender and the Debtor, without the need for (further) order of the Bankruptcy Court. No amendment to this Agreement shall be effective without the prior written consent of the DIP Lender and the approval of the Bankruptcy Court.

10.3    <u>Fees and Expenses</u>.    Costs and expenses referenced in this paragraph include all: reasonable fees of attorneys, accountants, appraisers, investment bankers, management consultants and paralegals; court costs; duplication expenses; court reporter fees; long distance telephone charges; air express charges; telegram or telecopy charges; and reasonable expenses for travel, lodging and food paid in connection with the performance of such legal or other advisory services. The Bankruptcy Estate shall reimburse the DIP Lender for all such costs and expenses incurred by the DIP Lender in connection with the negotiation, preparation and approval of this Agreement.  The Debtor shall also reimburse the DIP Lender for all its costs and expenses in connection with:

(a)    the negotiation, preparation and approval of this Agreement;

(b)    the forwarding to the Debtor by the DIP Lender  the proceeds of the DIP Financing Facility and/or the DIP Credit Advances;

(c)    any amendment, modification or waiver of, or consent with respect to this Agreement or advice in connection with the administration of this Agreement;

(d)    any litigation or dispute, suit, proceeding or action in any way relating to this Agreement or any other agreement to be executed or delivered in connection herewith;

(e)    any attempt to enforce any remedies of the DIP Lender against the Debtor, the Bankruptcy Estate, or anyone and everyone else who may be obligated to the DIP Lender by virtue of this Agreement and/or any documents attendant hereto;

(f)    the Bankruptcy Case (including, without limitation, the on-going monitoring by the DIP Lender of the Bankruptcy Case, including the attendance by the DIP Lender and its counsel at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court in respect thereof) and the DIP Lender's interests with respect to the Debtor (including, without limitation,

the on-going review of the Debtor's business, assets, operations, prospects, or financial conditions as the DIP Lender shall deem necessary), the Collateral, the Estate Assets, the DIP Financing Facility and/or any and all DIP Credit Advances.

10.4    Broker.  The Debtor represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the DIP Financing Facility other than Wilshire Pacific Capital Advisors, LLC (the "Broker"), whose fees shall be paid by the Bankruptcy Estate in accordance with the terms of this Agreement.  The Debtor shall indemnify and hold the DIP Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person (including the Broker) that such person acted on behalf of the Debtor in connection with the transactions contemplated herein.

10.5    No Waiver.  The DIP Lender's failure, at any time or times, to require strict performance by the Debtor of any provision of this Agreement, the Interim Borrowing Order and/or the Final Borrowing Order shall not waive or diminish any right of the DIP Lender thereafter to demand strict compliance and performance with any or all of the foregoing, as applicable.

10.6    Remedies.  The rights and remedies of the DIP Lender under this Agreement, the Interim Borrowing Order and/or the Final Borrowing Order shall be cumulative and nonexclusive of any cumulative other rights and remedies which the DIP Lender may have under any other agreement or by operation of law or otherwise.

10.7    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.8    Conflict of Terms.  Except as otherwise provided in this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other document that may be executed in connection with this Agreement, the provision contained in this Agreement shall govern and control.

10.9    Notices.  Any notice that this Agreement requires to be given must be provided to the following parties, and is deemed to be completed three business days after the notice is mailed or transmitted, so long as such mail or transmission is confirmed as received:

VITALITY HEALTH PLAN OF CALIFORNIA
Mr. Brian Barry
CEO and President
Vitality Health Plan of California, Inc.
18000 Studebaker #960
Cerritos, CA 90703

COUNSEL FOR DEBTOR
Garrick Hollander, Esq.
Winthrop Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, CA 92660

15

EXHIBIT 2 - PAGE 15

ghollander@wghlawyers.com

ATRIO HEALTH PLANS
Charles J. Wilson, J.D., LL.M.
Chief Legal Officer
Atrio Health Plans
2965 Ryan Dr. SE
Salem, OR 97301
Charles.wilson@atriohp.com
COUNSEL FOR DIP LENDER
Ashley M. McDow, Esq.
Foley & Lardner, LLP
555 S. Flower St., Ste. 3300
Los Angeles, CA 90027
amcdow@foley.com

Michael Small, Esq.
Foley & Lardner, LLP
msmall@foley.com

10.10    <u>Section Titles</u>.  The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

10.11    <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively constitute one agreement.

10.12    <u>Advice of Counsel</u>.  Each of the parties represents to each other party hereto that it has discussed this Agreement with counsel of its choosing, or has been given the opportunity to do so and has elected not to do so.

10.13    <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.14    <u>Parties Including Trustees; Court Proceedings</u>.  This Agreement shall be binding upon, and inure to the benefit of, any and all successors, designees, transferees, endorsees and/or assignees of the DIP Lender.  The security interests and liens created in this Agreement shall be and remain valid and perfected, and the claims of the DIP Lender hereunder valid and enforceable in accordance with the terms hereof, notwithstanding any discharge that the Debtor may receive pursuant to section 1141 of the Bankruptcy Code, the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case or any subsequent chapter 7 case or the release or transfer of any Collateral from the Bankruptcy Estate.

16

EXHIBIT 2 - PAGE 16

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

VITALITY HEALTH PLAN OF CALIFORNIA, INC., a California corporation


By: _____
Name: Brian Barry
Its:  President


Atrio HP, Inc.


By: _____
Name: _____
Its: _____

17

EXHIBIT 2 - PAGE 17

## SCHEDULE 2.1
### Collateral

1.  All Accounts, Chattel Paper, Contracts, Documents, Equipment, Fixtures, General Intangibles, goods, Instruments, Inventory, Intellectual Property, Investment Property, Letters of Credit as these terms are defined in the California Commercial Code, either owned now by the Debtor or acquired subsequently.

2.  Commercial Tort Claims arising after the Petition Date.

3.  Any and all avoidance, recovery, subordination, or other claims, actions, or remedies which the Debtor, the debtor-in-possession, the Bankruptcy Estate, or other appropriate parties-in-interest have asserted or may assert under sections 502, 510, 542, 544, 545 or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statute or common law.

4.  All policies of insurance and any and all proceeds thereof.

5.  All money, cash or cash equivalents, except for any Capitation Payment, but only prior to receipt by the Debtor, after which it shall be Collateral, and without limitation of the provisions of paragraph 3.1

6.  Intellectual Property also includes, but is not limited to:
    all trademarks, patents, design patents, copyrights, trade secrets, and licenses to the same, and all physical embodiments of the same, including notebooks, and descriptions of such intellectual property.

7.  All intellectual property described in the Bankruptcy Schedules file by the Borrower.

8.  To the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing.

**SCHEDULE 3.1**

**Matters Affecting Relief from Stay**

1.      **Agreement with AllCare**.  The Borrower entered into an agreement that provided for, among other things, AllCare's ability to terminate its contract without seeking relief from stay in the event the Debtor defaults under the agreement.  See Docket no. ___

2.      **Stipulation with MedImpact**.    The Borrower has reached an agreement with MedImpact, the memorialization of which is being finalized by the parties.  This agreement provides for, among other things: (a) the Borrower's right to setoff rebates held by MedImpact for the benefit of Borrower against certain administrative claims held by MedImpact; and (b) MedImpact's right to setoff certain of the Borrower's rebates held by Medimpact for the benefit of Borrower against pre-petition debt held by MedImpact's under certain conditions.

3.      **Stipulation with Department of Managed Healthcare ("DMHC")**.  The Borrower has reached an agreement, the memorialization of which is being finalized by the parties.  This agreement provides for, among other things: (i) the Borrower agreeing to not add members to its plan while in bankruptcy, but allowing the reorganized debtor to add members as part of DHMC's consent to the change of control anticipated to be provided under a plan of reorganization; (b) the DMHC agreeing not to pursue an audit of the Debtor's financial statements; and (c) the DMHC agreeing not to pursue its pending action filed against Borrower for its alleged violation of the Tangible Net Equity requirement under the California Health Code based on the pending bankruptcy.

19

EXHIBIT 2 - PAGE 19

## SCHEDULE 4.3
## Proposed Amendment to Schedules

The Borrower has identified certain matters that need to be amended in its Bankruptcy Schedules (the "Schedules") and Statement of Financial Affairs ("SOFA").  In particular:

     1.    **Schedules**.  The Borrower needs to amend Schedule B to include rights to rebates in an unknown amount, which is believed to be not less than $1,000,000.  Consistent with this change, the Borrower needs to amend Schedule D to reflect a secured claim held by MedImpact, whose claim is secured by these rebates.

     2.    **SOFA**.  The Borrower needs to amend the SOFA to reflect that the Borrower's sole shareholder holding 100% of the Borrower's common stock is Vitality Health Plans of California, a Nevada corporation, and that the other parties are merely officers and directors of the Borrower.

EXHIBIT 3

**VITALITY HEALTH PLAN OF CALIFORNIA, INC.**
**13 WEEK CASH FLOW**
As of 03/12/2021

| | Week 1 3/21/2021 | Week 2 3/28/2021 | Week 3 4/4/2021 | Week 4 4/11/2021 | Week 5 4/18/2021 | Week 6 4/25/2021 | Week 7 5/2/2021 | Week 8 5/9/2021 | Week 9 5/16/2021 | Week 10 5/23/2021 | Week 11 5/30/2021 | Week 12 6/6/2021 | Week 13 6/13/2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Cash Balance | 203,868 | 394,302 | 41,432 | 110,534 | 564,995 | 208,172 | 159,054 | 334,297 | 186,810 | 176,500 | 19,928 | 58,747 | 245,108 | - |
| 1203-05 · Pharmacy/DME Rebate Receival | 97,544 | - | 109,254 | - | - | - | 107,420 | - | - | - | 101,525 | - | - | 415,743 |
| 2603-05 · SBA Loan Payable | - | - | - | 610,000 | - | - | - | - | - | - | - | - | - | 610,000 |
| 299-99 · DIP Loan | 450,000 | - | - | - | - | 250,000 | - | - | 250,000 | - | 300,000 | - | - | 1,250,000 |
| 41101-0 · Part C Risk Adjusted Premiums | - | - | 722,104 | - | - | - | 742,533 | - | - | - | - | 742,533 | - | 2,207,169 |
| TOTAL SOURCES OF CASH | 547,544 | - | 831,358 | 610,000 | - | 250,000 | 849,953 | - | 250,000 | - | 401,525 | 742,533 | - | 4,482,913 |
| 1803-05 · Security Deposit | - | - | 47,000 | - | - | - | 23,500 | - | - | - | 23,500 | - | - | 94,000 |
| 111140 · Capitation Expenses | - | - | (230,537) | - | - | (217,886) | - | - | - | - | - | (217,886) | - | (666,308) |
| 12010-0 · Dental Capitation | (5,112) | - | - | - | (5,027) | - | - | - | (4,751) | - | (4,751) | - | - | (19,641) |
| 12030-0 · Vision Services | - | - | - | - | (5,896) | - | - | - | (5,572) | - | (5,572) | - | - | (17,040) |
| 12040-0 · Hearing | (592) | - | - | - | (582) | - | - | - | (550) | - | - | - | - | (1,732) |
| 12050-0 · Chiropractic | - | - | - | - | (4,059) | - | - | - | (3,836) | - | - | - | (3,836) | (11,732) |
| 13010-0 · Pharmacy Expense FFSvc | (104,335) | (104,335) | (104,335) | (102,583) | (102,583) | (102,583) | (102,583) | (96,954) | (96,954) | (96,954) | (96,954) | (96,954) | (96,954) | (1,303,309) |
| 99999-9 · Hospital and Ancillary Provider C | - | - | - | - | - | - | - | - | - | - | - | - | - | (318,309) |
| 6001-05 · Salaries and Wages | (133,942) | - | (133,942) | - | (120,548) | - | (108,493) | - | (97,644) | - | (87,879) | - | (79,091) | (761,539) |
| 6008-05 · Medical Insurance-Employer | - | - | - | - | - | - | - | - | - | - | - | - | - | (65,655) |
| 6010-05 · Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | (94,285) |
| 6002-05 · Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | (9,897) |
| 6703-05 · Broker Commissions | - | - | - | - | - | - | - | - | - | - | - | - | - | (173,550) |
| 6704-05 · Reinsurance | - | - | - | - | - | - | - | - | - | - | - | - | - | (75,000) |
| 8202-0 · Reinsurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8401-0 · Utilities and Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8402-0 · Telecommunications | (2,833) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8403-0 · Software | (102) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8503-0 · Dues and Subscriptions | (600) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8504-0 · Bank Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | (7,466) |
| 88202-0 · Legal, Accounting, Actuarial | - | - | - | - | - | - | - | - | - | - | - | - | - | (61,750) |
| 6902-05 · BK Prof Fees | - | (100,000) | - | - | - | (100,000) | - | - | - | - | - | (100,000) | - | (300,000) |
| 6906-0 · Consulting Services | (107,125) | - | - | - | (107,125) | - | - | - | - | - | - | - | - | (414,643) |
| 6911-05 · Outside Service | (2,570) | - | - | - | - | - | - | - | - | - | - | - | - | (265,737) |
| 6915-05 · Mail Delivery Service | - | (20) | - | - | - | (20) | - | - | - | (20) | - | - | - | (60) |
| TOTAL USES OF CASH | (357,109) | (352,870) | (762,256) | (155,539) | (356,823) | (299,118) | (674,709) | (147,487) | (260,310) | (156,572) | (362,706) | (556,171) | (241,758) | (4,683,429) |
| Net Change in Cash | 190,435 | (352,870) | 69,102 | 454,461 | (356,823) | (49,118) | 175,243 | (147,487) | (10,310) | (156,572) | 38,819 | 186,361 | (241,758) | (200,517) |
| Closing Cash Balance | 394,302 | 41,432 | 110,534 | 564,995 | 208,172 | 159,054 | 334,297 | 186,810 | 176,500 | 19,928 | 58,747 | 245,108 | 3,351 | 3,351 |

EXHIBIT 3 - PAGE 1

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street Suite 500, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled: **DEBTOR'S <u>EMERGENCY MOTION FOR ORDER AUTHORIZING POST-PETITION SECURED LOAN PURSUANT TO 11 U.S.C. § 364(C)(1), (2) AND (3) ON ALL ASSETS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRIAN BARRY AND ERIC J. WEISSMAN IN SUPPORT HEREOF</u>** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **<u>March 16, 2021</u>**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  <u>SERVED BY UNITED STATES MAIL</u>**:  On **<u>March     , 2021</u>**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**3.  <u>SERVED BY COURIER, OVERNIGHT EXPRESS MAIL,</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **<u>March     , 2021</u>**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 16, 2021 | Jeannie Martinez | */s/ Jeannie Martinez* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

-20-

250165

1

2

<u>**NEF LIST**</u>

3

- **Ryan A Baggs**    rbaggs@wghlawyers.com,
  jmartinez@wghlawyers.com;mweinberg@wghlawyers.com

4

- **Ronald K Brown**    ron@rkbrownlaw.com

5

6

- **Sara Chenetz**    schenetz@perkinscoie.com,
  dlax@perkinscoie.com;cmallahi@perkinscoie.com

7

8

- **Mary L Fullington**    lexbankruptcy@wyattfirm.com,
  mfullington@wyattfirm.com

9

- **Paul L Gale**    paul@gale.law

10

11

- **Todd S Garan**    ch11ecf@aldridgepite.com,
  TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com

12

- **Evelina Gentry**    evelina.gentry@akerman.com, rob.diwa@akerman.com

13

- **Jonathan P Hersey**    jonathan.hersey@klgates.com

14

- **Matthew B Holbrook**    mholbrook@sheppardmullin.com,
  amartin@sheppardmullin.com

15

16

- **Garrick A Hollander**    ghollander@wghlawyers.com,
  jmartinez@wghlawyers.com;Meir@wghlawyers.com

17

- **Christopher D Hughes**    chughes@nossaman.com

18

- **Dare Law**    dare.law@usdoj.gov

19

- **Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com

20

21

- **Derrick Talerico**    dtalerico@ztlegal.com,
  maraki@ztlegal.com,sfritz@ztlegal.com

22

- **Susan J Turner**    Susan.Turner@DMHC.CA.GOV

23

- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

24

25

- **Peter N Villar**    peter.villar@troutmansanders.com,
  felisa.lybarger@troutmansanders.com

26

- **Arnold H. Wuhrman**    Arnold@WuhrmanLaw.com

27

28

250165